```
1                  UNITED STATES DISTRICT COURT
                       DISTRICT OF NEVADA
2            BEFORE THE HONORABLE HOWARD D. McKIBBEN,
                       SENIOR DISTRICT JUDGE
3
                            --o0o--
4


5   UNITED STATES OF AMERICA,: No. 3:16-cr-00016-HDM-WGC
                             :
6              Plaintiff,    : November 15, 2016
                             :
7      vs.                   : United States District Court
                             : 400 S. Virginia Street
8   STEVEN EUGENE FORD,      : Reno, Nevada 89501
                             :
9              Defendant.    : TRIAL DAY 1
    _____:
10


11


12           TRANSCRIPT OF JURY TRIAL PROCEEDINGS


13


14   A P P E A R A N C E S:


15   FOR THE PLAINTIFF:          BRIAN L. SULLIVAN
                                 Assistant U.S. Attorney
16                               100 W. Liberty Street
                                 Reno, Nevada 89501
17


18   FOR THE DEFENDANT:          DENNIS CAMERON
                                 Attorney at Law
19                               204 Marsh Avenue
                                 Reno, Nevada 89509
20


21


22   Proceedings recorded by mechanical stenography produced
     by computer-aided transcription
23


24   Reported by:                LORI URMSTON, RPR, RMR, FAPR
                                 NEVADA LICENSE NO. 51
25                               CALIFORNIA LICENSE NO. 3217
```

2

```
 1                          I N D E X

 2

 3   PLAINTIFF'S WITNESSES                               PAGE

 4    LILIA CLAUDE
       Direct Examination by Mr. Sullivan                  28
 5     Cross-Examination by Mr. Cameron                    35

 6    GEORGE CHERETIS
       Direct Examination by Mr. Sullivan                  53
 7     Cross-Examination by Mr. Cameron                    64
       Redirect Examination by Mr. Sullivan               89
 8     Recross-Examination by Mr. Cameron                  91

 9    RYAN ASHTON
       Direct Examination by Mr. Sullivan                  94
10     Cross-Examination by Mr. Cameron                   102

11   DEFENSE WITNESSES

12    STEVEN EUGENE FORD
       Direct Examination by Mr. Cameron                 122
13     Cross-Examination by Mr. Sullivan                 149
       Redirect Examination by Mr. Cameron               157
14

15   EXHIBITS                          MARKED    ADMITTED

16    1 - Evidence envelope with LG                        64
          cell phone
17
      2 - Threat form                    33         52
18

19

20

21

22

23

24

25
```

1    RENO, NEVADA; TUESDAY, NOVEMBER 15, 2016; 8:56 A.M.

2                        --o0o--

3    THE CLERK:  This is the date and time set for the

4    jury trial, Day 1, in Case No. 3:16-cr-16-HDM-WGC,

5    United States of America versus Steven Eugene Ford.

6    Defendant is present in custody with counsel, Dennis

7    Cameron.  Appearing on behalf of the government is

8    Brian Sullivan.

9        THE COURT:  Good morning, counsel.

10       MR. SULLIVAN:  Good morning.

11       MR. CAMERON:  Good morning, Your Honor.

12       THE COURT:  This is the time set for the jury

13   trial.  I've convened outside the presence of the jury.

14   We'll bring the jurors up in just a moment.

15       A couple of things.  We have -- in the indictment I

16   noticed that the indictment identifies the defendant as

17   Steven Eugene Ford.

18       Is that your true name?

19       THE DEFENDANT:  Yes, sir.

20       THE COURT:  I'm not sure what all these "also known

21   as" is all about.

22       MR. SULLIVAN:  One was an alias that the case agent

23   found for him.  The other, Elezar Melchizedek, is a

24   name that was used -- as you will hear from the

25   evidence, Your Honor, he identified himself to the

1   White House operator as such.  He also identified -- or

2   used that name at one point in time when the agents

3   were talking to him.

4        THE COURT:  So that has relevance.

5        MR. SULLIVAN:  That one does.

6        THE COURT:  What about the other one?

7        MR. SULLIVAN:  No.

8        THE COURT:  Okay.  I don't see any reason not to

9   just dismiss the other aka then.

10        MR. SULLIVAN:  That's fine with me, Your Honor.

11        THE COURT:  Is that all right with the defense?

12        MR. CAMERON:  No, that's fine, Your Honor.

13        THE COURT:  All right.  As long as it has

14   relevance, then I can see why it would be there.

15        How do you pronounce the -- Lilia Claude, George --

16   is it Cheretis?

17        MR. SULLIVAN:  Cheretis.  That's George right here.

18        THE COURT:  Mr. Cheretis.  And Ryan Ashton; right?

19        MR. SULLIVAN:  Yes.

20        THE COURT:  Let's see.  I think that's all I had.

21        Have you received the list of prospective jurors in

22   this case?

23        MR. SULLIVAN:  Yes.

24        THE COURT:  All right.  Is there any objection to

25   the random selection that was made by the Jury

1  Commissioner as to the first 32?  They'll be seated
2  when they come in here.  They've been randomly drawn
3  from the box.  Any objection by the government?
4      MR. SULLIVAN:  So what you're saying is she's not
5  going to do it right at --
6      THE COURT:  I won't say Juror No. 1.  They'll be
7  placed right in the box, 1 through 32.
8      MR. SULLIVAN:  Okay.  So she's already picked out
9  the names is what you're saying?
10     THE COURT:  They've been randomly pulled.  We can
11 randomly pull them too.  But is there any objection
12 from the defense?
13     MR. CAMERON:  No, Your Honor.
14     THE COURT:  All right.  So the last four will be
15 alternate jurors.  Each side will have one challenge as
16 to the alternate jurors.  So stipulated?
17     MR. SULLIVAN:  Yes.
18     THE COURT:  All right.
19     MR. CAMERON:  Agree, Your Honor.
20     THE COURT:  All right.  As to the others, the
21 government will have six peremptory challenges and the
22 defense will have ten.  Is that stipulated?
23     MR. CAMERON:  It is, Your Honor.  I'm just -- for
24 my own edification, the list we got, page 1 through 6,
25 those are the jurors that are going to come up and be

1 seated in that order?

2     THE CLERK:  No, Judge.  They have the alphabetical

3 list.  We have the drawn list.  They never receive the

4 drawn.

5     THE COURT:  Okay.  I don't see any reason that they

6 couldn't have a copy of the drawn list.

7     THE CLERK:  Do you want to start doing that?  We

8 haven't ever done that.

9     THE COURT:  Would that make it easier for you?

10     MR. CAMERON:  It would, Your Honor.

11     THE COURT:  I think it probably would.  So why

12 don't I just make a copy for each of them at this

13 point, because there's no surprises about that.

14     THE CLERK:  Do you want to start doing that, Judge?

15     THE COURT:  Well, give it to them right now.  Yeah,

16 we can do that.

17     In connection with Batson challenges, if there is

18 going to be a Batson challenge, you need to raise it at

19 the time that the other side makes the challenge.  All

20 right?  And if you don't, you waive it.

21     So stipulated by the government?

22     MR. SULLIVAN:  So stipulated.

23     THE COURT:  And by the defense?

24     MR. CAMERON:  Yes, Your Honor.

25     THE COURT:  All right.  If there's a request for a

1  sidebar -- I don't grant sidebars very often.  And if

2  we have one, will you stipulate that we may conduct the

3  sidebar without the presence of the defendant?  You

4  then explain to the defendant what was done at the

5  sidebar.  At that point, if there is a request that we

6  repeat what was done at the sidebar in the presence of

7  the defendant, I will take a recess with the jury and

8  we'll go over it again so that the defendant is present

9  for it.

10      Is that all right with the government?

11      MR. SULLIVAN:  Yes, Your Honor.

12      THE COURT:  With the defense?

13      MR. CAMERON:  Yes, Your Honor.

14      THE COURT:  Again, so it's clear, I want to make

15  sure that Mr. Ford knows what happens at the sidebar.

16  And we can either do it by continuous recesses or, if

17  it's a fairly routine type of matter, we can handle it

18  that way.

19      I think that's about all that I have.  Does either

20  the government or the defense have any specific

21  questions that you wish to have me ask the jurors?

22  I'll go over, you know, the questions that I think are

23  relevant to the case, but --

24      MR. SULLIVAN:  No, I don't.

25      THE COURT:  -- does the government have any

1   specific ones?  The defense, any additional?

2        MR. CAMERON:  No, Your Honor.

3        THE COURT:  All right.  I think we're ready as soon

4   as she brings the jurors up.

5                    (Pause in the proceedings.)

6        THE COURT:  All right.  If the jurors will come

7   forward, please.  You've been selected randomly, and

8   you will be seated in the order in which you have been

9   randomly selected.  The first juror will take the seat

10  in the back to my right, and then we'll fill the back

11  row and then the front row.  And then we fill the row

12  over here and then the seats going all the way over

13  here.

14       I thought -- I think we're going to do it -- the

15  front row and then the second row behind it, so we'll

16  keep those two rows open.

17       All right.  You may go ahead and seat the jurors.

18                    (The jury selection was reported
                         but not transcribed.)
19

20       THE COURT:  All right.  We're going to start the

21  trial in just a moment.  I'm going to take a brief

22  recess.  During all of the recesses you'll go through

23  this door and down the hallway, and there's a jury room

24  in there.  And that's where you will be during the

25  recesses.  I'll give you further instructions in just a

1   moment, but at this point I'm going to ask all of you

2   to please stand, raise your hand and be sworn to try

3   this case.

4        THE CLERK:  Raise your right hand.

5            (The oath was administered to the jury.)

6        THE COURT:  Thank you.  You may all be seated.

7        During the course of the trial I'll allow you to

8   take notes if you want to.  You don't have to.  And I

9   don't want you to be so consumed by note taking that

10  you don't listen to the witnesses as they're called and

11  testify.

12       I think you probably understood this as a result of

13  what I said earlier when we were selecting all of the

14  jurors, but the important function that you have is to

15  listen carefully to the facts of the case.  This case

16  will be decided on the facts and law.

17       I will give you a series of legal instructions at

18  the end of the case that describe each of the two

19  counts and tell you what elements or things have to be

20  proven beyond a reasonable doubt before you can find

21  the defendant guilty.  And if the government fails to

22  find any one of those beyond a reasonable doubt -- and

23  I'll define what reasonable doubt is for you -- then

24  the defendant is entitled to a not guilty verdict.

25       And so you will listen to the facts.  The facts

1  will come in either by testimony of witnesses here or

2  by a stipulation if evidence is received without a

3  witness being called and I say that evidence is

4  received for purposes of this trial in evidence.  And

5  then that can be taken to the jury room with you at the

6  time that you deliberate.

7      Keep an open mind.  Listen to all of the evidence

8  before you start forming any opinions about what you

9  believe and what you don't believe.  You decide the

10 facts.  You'll have no idea during the trial how I view

11 the facts, because I don't decide what facts to believe

12 or what facts not to believe.  That's entirely up to

13 you.

14     At the same time, I give you the instructions on

15 the law.  And even if you happen to disagree with the

16 law when you read and understand those instructions,

17 you're bound by it.  You recall each of you told me at

18 the outset of the trial that you would be bound by and

19 agree to follow any instructions that I give.  And even

20 though you might disagree with an instruction, that is

21 the law as stated by the court and you must follow it

22 in this case.

23     If you have any questions during the trial, you can

24 write them down on a sheet of paper and provide them to

25 the bailiff and then the bailiff can provide it to me.

1 │ And if it's a legally proper question, I'll give it to

2 │ counsel and they may or may not ask it.  Don't be upset

3 │ if they don't.  I don't allow you to verbalize the

4 │ question, but if you want to write it down, feel free

5 │ to do that.

6 │   During all of the recesses you'll be in the jury

7 │ room.  I would expect we'll take about a 10-minute

8 │ recess now; we'll come in and we'll have opening

9 │ statements.  An opening statement is a statement by the

10 │ government and by the defense, if the defendant chooses

11 │ to make an opening statement, of what they expect the

12 │ evidence to show.  It's not evidence.  What the lawyers

13 │ say during the course of the trial, whether it's

14 │ opening statements or closing arguments, is intended to

15 │ help you understand the evidence, but those statements

16 │ are not evidence.  The evidence is what you hear from

17 │ the witness stand and the exhibits received during the

18 │ course of the trial.

19 │   So we have the opening statements which is a

20 │ comment by the lawyers of what they expect the evidence

21 │ to show.  Then the witnesses are called and they'll

22 │ testify before you here at the witness stand.  After

23 │ that I will instruct you on the law.  And you'll get a

24 │ copy of the instructions to take to the jury room with

25 │ you.  And that is the law that you'll be bound by.  And

1    then the attorneys will make their closing arguments.
2    They'll summarize what they believe the evidence
3    showed.  And, of course, if your understanding of the
4    evidence is different than what's stated by the
5    attorneys, your understanding of the evidence will
6    control.
7        And then you'll retire for deliberations to reach a
8    verdict, if you can.  A verdict requires all 12 of you
9    to agree.  So unless all 12 of you agree, you would not
10   return a verdict in this case.  And if you're divided
11   and you cannot agree, then I would call it a deadlock
12   jury and you would be discharged and the case would be
13   heard by another jury later on.
14       So it does require a unanimous verdict, but each of
15   you has to make your own decision at the time that you
16   deliberate in deciding what is right in this case and
17   legally proper and factually proper based upon what you
18   heard during the course of the trial.
19       You can't communicate with each other about this
20   case and talk about the case at all in the jury room
21   until you have retired for deliberation.  So during the
22   recesses we take, you cannot go into the jury room and
23   say, "Well, what do you think of that witness?  What do
24   you think of that evidence?"  That would be
25   inappropriate.

1    At lunchtime, if you go someplace for lunch, you
2  can't discuss it with anybody.  And in the evening, if
3  you go home and this case isn't concluded today and
4  concludes tomorrow, you simply say, "I'm in federal
5  court.  The judge has instructed me I can't talk about
6  the case," and follow that instruction.
7    If I were to find out that you did, then I might
8  have to declare a mistrial.  And as you heard me say
9  earlier, I've never done that in a case, because jurors
10 are always very capable of and willing to follow my
11 instructions.  And I deeply appreciate it.
12    How many -- is there anyone here -- you know, I
13 used to ask the question how many of you have a cell
14 phone.  Now I ask the question how many of you do not
15 have a cell phone with you.  I don't take your cell
16 phones until you're deliberating, and then they'll be
17 kept in a box outside the jury room, but I also
18 admonish you not to use your cell phones in the jury
19 room.  It's probably not appropriate to disrupt others
20 by talking on your cell phone while you're in the jury
21 room.
22    If you want to step out in the hallway, which is
23 right where the jury room is, and if you have something
24 of an urgent nature to say on the cell phone, then you
25 can use your cell phone to do that.  But, again, you

1  can't talk about the case, you can't text about the
2  case.  You can simply say, "I'm in federal court and
3  I'm in a jury trial."
4      We'll go until about noon.  We'll take about an
5  hour recess or an hour and 15 minutes for a lunch break
6  and then we'll come back and we'll have testimony the
7  rest of the afternoon.  If we complete the testimony,
8  I'll probably instruct you this afternoon and give the
9  case to you late this afternoon.  If not, I'll do it
10  first thing tomorrow.
11      You might want to contact either your employer, if
12  it's a problem of any kind, or someone in your family
13  to advise them you are on jury duty and it is possible
14  you could be here this evening.  If you're deliberating
15  and you want to stay for part of the evening to begin
16  your deliberations, then I would allow you to do that.
17      I've never kept a jury here in the evening hours if
18  the jury doesn't want to be here in the evening hours.
19  I think it's inappropriate to force the jury to stay
20  here in the evening hours if the jury wants to go home,
21  but there is that possibility.  If you decide -- if you
22  get the case midafternoon or late afternoon and you
23  want to continue your deliberations, then I would allow
24  to you do that, but all of you would have to agree on
25  that.

1    In fact, I did that once and I got a note back

2   saying, "We're equally divided on whether we can stay

3   or not."  So we elected then to have you come back the

4   next day.

5    I think that's all I have.  Anna will be in the

6   jury room with you for a few minutes to show you where

7   the pads are and notepads, pencils, so you can take

8   notes.  If you have a question involving the trial at

9   all, you should write it down and give it to me and

10   I'll try to respond to it, but don't ask anybody on my

11   staff about anything involving the trial, because they

12   can't respond to it.

13    And so don't be upset if you were to say something

14   and they say, "Well, I'm sorry.  The judge tells me

15   that I can't respond to it."  They're not trying to

16   ignore you.  It's just that we can't and nor can any

17   members of my staff ever talk with you about the case.

18    This is a relatively small building, so it's

19   possible you would be in an elevator at noontime and

20   the attorneys would be there.  Please don't talk with

21   them.  They won't talk with you.  And it's not because

22   they're being disrespectful.  That's just the decorum

23   and the rules of the court, that there can't be any

24   discussion between the attorneys or with potential

25   witnesses and jurors.  And so don't hold it against

1    them if they happen to be in an elevator and you're in

2    there and they don't say anything to you, because you

3    can't say anything to them.

4        I think that's all I have to cover right now.

5        There may be objections during the course of the

6    trial.  Because I decide legal issues, I'll decide

7    whether to affirm, that is, I sustain the objection,

8    that I agree with the objection, and I won't permit the

9    witness to testify in that area, or I overrule the

10   objection.  That means I disagree with the objection

11   and I will allow the witness to go ahead and testify.

12   But those are legal matters and you don't have to be

13   concerned about them.

14       I think that's all we have.  I'm going to take

15   about a 15-minute recess so that you can get organized

16   and call if you need to call and tell everyone you're

17   going to be on jury duty here today, possibly tomorrow,

18   and then we'll reconvene.  And when we reconvene, we'll

19   have the opening statements and we'll move right into

20   the evidence.  And then we'll take a break around

21   noontime or a little after noon for probably about an

22   hour, hour and 15 minutes, and then we'll resume this

23   afternoon about 1:15 or so and continue the case until

24   we complete it.

25       Thank you very much.  I'm pleased that you're going

1  to be on this case.  I think the attorneys have

2  selected very wisely.  And I'll see you back in here

3  about 15 minutes.  You may go to the jury room.

4          (Outside the presence of the jury.)

5      THE COURT:  All right.  We'll be in recess for 15

6  minutes.

7      I did provide -- I did provide you last night or

8  sometime, I think, yesterday afternoon a copy of the

9  tentative jury instructions.  I don't know if you've

10 had a chance to go over them.  I would be happy at

11 noontime to spend a few minutes talking with you about

12 them.  If you could highlight for me right now if

13 either side has any major problems with any or if you

14 want to offer some that I haven't proposed here.  And I

15 don't know -- you know, I'll have to hear the evidence

16 to know exactly what I'm going to give.  But

17 tentatively does the government have any objection?

18     MR. SULLIVAN:  The only correction I was going to

19 ask you to make was on the interstate call, Count Two.

20 In the preface you do talk about an interstate call.  I

21 know you took it from the Ninth Circuit.  There's no

22 mention of the fact that it's an interstate call.

23     THE COURT:  You know, I already have that.  In

24 Count Two I have -- and I was going to give you a

25 revised copy.

1    MR. SULLIVAN:  Okay.

2    THE COURT:  I have first the defendant knowingly

3  sent a verbal threat in interstate commerce over the

4  telephone to injure a White House telephone operator.

5    MR. SULLIVAN:  That makes --

6    THE COURT:  So I had made that change.

7    MR. SULLIVAN:  And the other only thing, if you

8  decide to give an instruction on diminished capacity --

9  I know you put one in there anticipating that there may

10  be a possible one.  But we talked about it at the last

11  hearing.  I do have some additional language to add to

12  that I would propose to the Court.

13    THE COURT:  Why don't you go ahead and provide that

14  to us and we'll take a look at it.

15    MR. SULLIVAN:  It's from the case that I cited in

16  the motion that I filed, Your Honor.  It's -- to make

17  it real quick and easy, it would be document No. 33.  I

18  proposed -- if you decide to give an instruction and if

19  you decide that it's warranted, I would propose adding

20  to make things a little more fair and to give the jury

21  a little bit more idea -- the language that I cite on

22  lines 14 through 17 beginning with "The diminished

23  capacity defense is not cognizable simply because a

24  criminal," blah, blah, blah, ending with the quotation

25  marks, "defines the crime."

1       THE COURT:  Yeah, I don't know that I would use the

2   word "cognizable," but I'll take a look at that

3   language and see what we have here.

4       MR. SULLIVAN:  Thanks.

5       THE COURT:  Otherwise you don't have any problems?

6       MR. SULLIVAN:  No.

7       THE COURT:  What about the defense?

8       MR. CAMERON:  Your Honor, I'll look again at the

9   diminished capacity instruction the Court gave, and we

10  may have some arguments as to that.

11      THE COURT:  Okay.  We'll take a look at that one.

12  But otherwise you don't have any problems with the

13  other ones?

14      MR. CAMERON:  I do not, Your Honor.

15      THE COURT:  Okay.  Fine.  And we'll settle them on

16  the record later, but I just wanted -- if I needed to

17  be working on something right now, I could do it.

18      So we'll take 15 minutes.  Let's reconvene at a

19  quarter of 11:00.  Thank you.

20                  (A recess was taken.)

21              (In the presence of the jury.)

22      THE COURT:  You may all be seated.

23      Why don't you just go ahead and put those monitors

24  down for now.  They're kind of in the way.  And we're

25  not going to be using them, at least not right now, so

1    just kind of slowly put them in there.

2        Great.  Thank you very much.

3        All right.  The jurors are all present.

4        I want to express my appreciation to one of you.  I

5    know one of you had a conflict a little bit this

6    afternoon in terms -- I think you had to pick a spouse

7    up at a certain time.  And I know you were able to make

8    other arrangements, and I really appreciate it, because

9    I didn't want to adjourn that early if we didn't need

10   to.

11       I did talk to the jury commissioner about whether

12   we could make arrangements for taxi service or

13   something like that.  I hadn't gotten a final answer on

14   that.  I'm not sure which one of you it was, but thank

15   you very much.  It was very nice of you to make other

16   arrangements.  I appreciate it very much.

17       All right.  We've reached the stage where the

18   attorneys may make their opening statement.  The

19   government has the burden of proof, so the government

20   goes first on the opening statement.  The defense

21   doesn't have to prove anything in this case.  The

22   defense doesn't have to make an opening statement or

23   they could reserve on it until after the government

24   presents its case.

25       So, Mr. Sullivan, you may make your opening

1   statement on behalf of the government.

2       MR. SULLIVAN:  Thank you, Your Honor.

3       THE COURT:  And keep in mind, again, the opening

4   statement is intended to help you understand what the

5   evidence is going to be, but it's not evidence.

6   Evidence is what you hear from the witness stand and

7   the exhibits that are received during the course of

8   trial.

9       You may go ahead, Mr. Sullivan.

10      MR. SULLIVAN:  Thank you.

11      When Judge McKibben was talking to you just a

12  little bit ago about the old days, it got me thinking

13  about, you know, the old days and when I was younger

14  and when I was in high school and didn't care much for

15  certain things like history, but as you get older you

16  learn to like those things more.

17      Those of you that have studied U.S. history at

18  all -- I know I didn't realize this when I was in high

19  school but only later as I started reading about

20  American history and some of the presidents that I'm

21  sure you may have been as startled and as shocked as I

22  was to find out that from the beginning of our nation

23  when the White House was first opened until sometime

24  into the 20th century, you could just go up and knock

25  on the door and you might get a chance to be seen and

1  be heard by the President of the United States.

2      I think we all understand that we can't have that

3  anymore.  We need security based on 9/11.  You know, a

4  lot of different things that are happening in the world

5  today, that just can't be.  But the evidence in this

6  case will show you that the White House still endeavors

7  to be as open as possible to the citizenry of the

8  United States to allow people to approach the

9  President, maybe not in person, you're maybe not going

10  to get a direct response, you may not get any response,

11  but as you will hear from the evidence in this case,

12  you can still call the White House.  There's a main

13  line.

14      And one of the first witnesses the government will

15  call in this case will be one such person, an operator,

16  Lilia Claude, who works as a White House operator,

17  intakes calls from people who call up the main number.

18  Twenty-four seven it's open.  She usually works the

19  midnight shift.  And she'll tell you she gets a lot of

20  calls sometimes even during the graveyard shift that

21  she works.

22      The evidence will show that on March 1st -- I mean,

23  this system that I was basically trying to describe to

24  you I think is an effort by the President of the United

25  States to be open and take in comments and act on them

or not act on them or pay attention to them or not, but
the evidence is going to show you that on March 1st at
about 1:00 in the morning a caller, a male caller,
called the White House line and spoke with White House
operator Lilia Claude, and the caller almost
immediately made some threats.

The judge read those to you.  I'm going to repeat
them.  This particular caller said, "I'm going to kill
you, bitch.  I'm going to kill your children by cutting
their heads off.  I'm going to burn you alive.  I'm
going to kill that president.  I hate him.  I'm going
to bury you alive."

You'll hear from Ms. Claude that she keeps a pad
and notepaper and a pen handy and that she copied these
threats down when they came in.  She immediately
presses a button or does something to notify the Secret
Service that there's a malicious call coming in.

She will tell you that they don't record these
calls.  And she will tell you that -- I believe what
she's going to tell you is this started right around
the Nixon era that they wanted, as I mentioned, to be
open, an open government, have the people call in and
not be afraid that everything was going to be recorded.
So the call was not recorded.

During the call she wrote down the address for this

1   individual.  She also wrote his name.  He identified

2   himself as Eugene Ford.  And she did notice on the

3   caller ID that she has set up at her operator

4   station -- she did write down the number, the number

5   (775) 343-9041.

6      Now, about 20 minutes later this same person

7   called, called her back, and no real threats during

8   this call, but he identified himself this time as -- I

9   don't know if I'm pronouncing it right -- Eleazar

10   Melchizedek.

11      Later that morning the Secret Service back in

12   Washington, D.C., put together a little report and sent

13   it to the Reno office of the U.S. Secret Service, to

14   this agent right here -- I introduced him to you

15   earlier this morning -- George Cheretis.  He is the

16   resident -- he's a special agent with the United States

17   Secret Service.  He's the supervisor here in Reno,

18   resident agent in charge.

19      So first thing when he came in to work on

20   March 1st of this year, 2016, he had something that

21   needed action, a little report that he needed to do

22   something on.  He needed to go out and talk to this

23   individual.  He had conferred with his colleagues back

24   in Washington, D.C., and got the address, had the phone

25   number.  And he, along with other Secret Service agents

1   and Reno police officers, went to 320 Evans Street,

2   apartment 206, here in Reno, Nevada, and found the

3   defendant, Mr. Steven Eugene Ford, at his apartment.

4       Initially he was very confrontational, abusive,

5   using swear words, was not happy with their presence,

6   and would not let them in the apartment, but he agreed

7   to speak to them out in the hallway.  And he calmed

8   down.  He was not in custody, but they nonetheless

9   still advised him of his constitutional rights.  And he

10  understood them.  And they told him why they were

11  there, you know, "We're here because we believe you

12  made a threatening phone call earlier this morning to a

13  White House operator."  The defendant admitted that he

14  made that phone call and admitted that he made those

15  threats.

16      After they talked to him for a while, he at one

17  point in time did identify himself as Eleazar

18  Melchizedek.  He also stated when they were talking to

19  him -- he not only admitted making the call and

20  admitted making the threat but told the agents, "Yes, I

21  made the call.  Yes, I made the threats.  And if you

22  were good Catholics, you would help me carry out these

23  threats to erase evil from the world," something to

24  that effect, words to that effect.

25      Special Agent Cheretis talked to him a little bit

1  longer, gave him his business card, and said, "Look, if

2  you want to talk about these issues some more, here's

3  my number.  Give me a call," and they leave.  They

4  don't arrest.  They have more work to do.  They don't

5  arrest him at that time.

6      But later that day at his office he checks his

7  phone and he had several phone calls from that same

8  number, the number -- and that was part of his

9  reasoning for giving the business card was to see what

10 phone number would show up.  And it was, in fact, the

11 same number that Lilia Claude captured from her caller

12 ID in Washington, D.C.  It was (775) 343-9041.

13     Now, a few days later Special Agent -- after

14 Special Agent Cheretis finishes his investigation and

15 it came to an indictment and warrant, he and a group of

16 agents go back on March 10th, back to the same

17 apartment, and they arrested Mr. Ford on two counts.

18     You heard those counts.  The judge read them to

19 you.  Basically, Count One, making a threat against the

20 President of the United States and Count Two, making a

21 threat -- an interstate threat by telephone against the

22 White House operator.

23     Mr. Ford was agreeable verbally and later in

24 writing to give consent to search his apartment.  And

25 the agents seized one item, and that was only after

1  they took their own phone and punched in that number

2  that I just told you about, the 775 number, 343 number,

3  9041, and the cell phone that was in Mr. Ford's

4  apartment -- I think it was near his nightstand -- rang

5  indicating to them that this, in fact, was the phone

6  that was used to make the call during which threats

7  were made.

8      Once you've had a chance -- as the judge has

9  already indicated to you, this is going to be a pretty

10 quick trial.  But once you've had a chance to hear all

11 of the evidence, hear the witnesses, see the evidence

12 in this case, I will be given another opportunity to

13 come back and talk to you in a little more detail about

14 that evidence and at that time I'll ask you to find the

15 defendant guilty as he stands charged of both Count One

16 and Count Two.

17     Thank you.

18     THE COURT:  All right.  Thank you, Mr. Sullivan.

19     Mr. Cameron, do you wish to make an opening

20 statement at this time or reserve on that?

21     MR. CAMERON:  Your Honor, we will be reserving the

22 opening statement.

23     THE COURT:  Okay.  That's fine.

24     You may call your first witness.

25     MR. SULLIVAN:  Your Honor, we call Lilia Claude.

1    THE COURT:  If you'll come forward here and take a

2  seat up here, please.  Thank you.

3    Raise your hand and be sworn, please.

4      (The oath was administered to the witness.)

5    THE WITNESS:  I do.

6    THE COURT:  Thank you.  You may be seated.

7    THE CLERK:  Please state and spell your full name

8  for the record.

9    THE WITNESS:  Lilia Claude, L-i-l-i-a, Claude,

10  C-l-a-u-d-e.

11                     LILIA CLAUDE,
              having been first duly sworn, was
12            examined and testified as follows:

13                  DIRECT EXAMINATION

14  BY MR. SULLIVAN:

15    Q   And in what city and state -- where do you

16  reside without giving us your street address?

17    A   Washington, D.C., sir.

18    Q   You live right in the District of Columbia?

19    A   I do, sir.

20    Q   Okay.  And where do you work?

21    A   I work at the Executive Office of the

22  President.

23    Q   Okay.  And what is your position there?

24    A   I am a telephone operator.

25    Q   For the White House?

```
1      A    For the White House, yes, sir.
2      Q    Okay.  How long have you been a telephone
3  operator for the White House?
4      A    Twelve and a half years, sir.
5      Q    And what shift do you usually work?
6      A    I work from midnight to 8:30 in the morning.
7      Q    Do you get many calls between midnight and
8  8 a.m.?
9      A    Yes, we do, sir.
10     Q    I guess it depends on the day.
11     A    Yes.
12     Q    What -- tell us -- explain what your duties are
13  as a White House operator.
14     A    We screen and direct calls to the President,
15  the Vice President, the wives, the family, and the
16  staff.
17     Q    Does the White House have a separate -- I think
18  they call it the comment line.
19     A    Yes, sir.
20     Q    What is that?
21     A    It's separate from the switchboard where I
22  work.  The comment line, what we do is transfer calls
23  between 9 a.m. and 5 p.m., Monday through Friday, for
24  those callers who want to leave a message for the
25  President.
```

Q    Such as?

A    If they're happy with an executive order or not, if they're unhappy with a certain bill, or if a talk show host suggests that they should call the President to give them -- to give his opinion -- or their opinion, I should say.

Q    If I could have you -- if I could direct your attention back to March 1st of this year in the early morning hours around -- kind of right after you started your shift, maybe around 1:00 o'clock in the morning. Were you working that day as a White House operator?

A    Yes, sir, I was.

Q    Okay.  And you were working the midnight to 8:00 o'clock shift?

A    Yes, sir.

Q    Do you recall receiving a threatening telephone call early in your shift?

A    I do remember, sir.

Q    What time?

A    1:00 o'clock.

Q    And was the caller male or female?

A    It was a male.

Q    Okay.  Did this person ever identify himself to you during the call?

A    He gave his name.

```
 1        Q    As --
 2        A    Eugene Ford.
 3        Q    Eugene Ford?
 4        A    Yes, sir, Eugene Ford.
 5        Q    And please tell us about the threats.
 6        A    "I'm going to kill you, bitch.  I'm going to
 7   kill your children by cutting their heads off.  I'm
 8   going to burn you alive.  I'm going to kill that
 9   president.  I hate him.  I'm going to bury you alive."
10        Q    Now, did those calls come fairly early in the
11   call, or when?  Can you tell us about when those
12   threats came?
13        A    As soon as I answered, "The White House," he
14   started saying those very words that I have recited.
15        Q    Did you understand the threats?  Were they
16   clear?
17        A    They were very clear, sir.  I was writing them
18   down as he was saying them.
19        Q    Is that your normal practice, to keep a pad of
20   paper and pencil down?
21        A    All operators are always handy or prepared with
22   a piece of paper and a pen or a pencil.
23        Q    Okay.  Did the caller speak clearly?
24        A    Yes, sir, he did.  Yes, sir.
25        Q    And did he at some point in time give you his
```

1  address?

2      A    I remember, yes, sir, he did give his address.

3      Q    Do you remember what it was?  Do you remember

4  what city?

5      A    He said Reno.  And he said 720 -- 720 Seventh

6  Street.

7      Q    Was it a Reno address?

8      A    In Reno, Nevada.

9      Q    Okay.  And do all White House telephone

10  operators have a caller ID system?

11      A    Yes, sir.  We have a console that shows caller

12  ID unless the caller blocks his or her number when

13  calling the White House.

14      Q    What about this particular call?  Did your

15  caller ID show an incoming number?

16      A    As far as I remember, sir, it was on the

17  console.

18      Q    And what was that number?

19      A    I do not recall, sir.

20      Q    Do you have a -- when you -- after you received

21  this call did you refer it immediately to the United

22  States Secret Service there in the White House?

23      A    After I had written down all his statements, I

24  immediately pushed the button that says "MCT," which

25  means malicious call tracing, and connected him to a

1  Secret Service agent.

2      Q   And what happens then?

3      A   The agent who answered it -- am I allowed to

4  say the name of the agent?

5      Q   Well, there was a Secret Service agent.  Yes,

6  you're allowed to say it.  But basically the important

7  thing is a Secret Service agent answered?

8      A   Yes, sir.  And he repeated the same message to

9  me, the one that -- I'm sorry.  He repeated the same

10  things to the agent.

11      Q   And did you provide the information that you

12  had on your console to that agent?

13      A   We type the information on a form.  It's called

14  a threat form --

15      Q   Okay.

16      A   -- after which we either email it or fax it.

17  We don't fax anymore, because we don't have a fax

18  machine, so I believe I emailed it to the office where

19  it's supposed to go.

20      MR. SULLIVAN:  Your Honor, I'm going to show this

21  witness -- I'll see if the clerk can mark this as

22  Government's Exhibit No. 2.

23                  (Exhibit 2 was marked.)

24  BY MR. SULLIVAN:

25      Q   Ms. Claude, I'm showing you Government's

1    Exhibit No. 2.  Can you take a look at that and tell me
2    if you recognize it.
3         A    Yes, sir, I recognize it.
4         Q    What is it?
5         A    It's a threat form that I had filled out and
6    emailed to the MCT office.
7         Q    Okay.  And just take a minute to look it over
8    and tell me if you had written down the exact number
9    that it showed on your caller ID.
10        A    Yes, sir.  It's (775) 343-9041.
11        Q    And what line was used -- is there a general
12   number that -- when people call the White House is
13   there a general telephone number?
14        A    Yes.  It's a published number.  It's (202)
15   456-1414.
16        Q    And did you write that down on the form as
17   well?
18        A    Yes, I did.
19        Q    Okay.  When people make calls to the White
20   House are they recorded?
21        A    No, sir, they are not recorded.
22        Q    Why not?
23        A    Since the Watergate incident recorders have
24   been -- have not been allowed.  They're -- I'm sorry.
25   Recording equipment are not available to operators at

1   all.

2       Q   And what type of message does one hear if you

3   call that number, that White House number that you just

4   mentioned, the (202) 456-1414?  Is there a message

5   that's going to go out first?

6       A   There's an automatic recording, and it says,

7   "Thank you for calling the White House.  This call may

8   be monitored but not recorded."

9       Q   Okay.  Thank you.

10   MR. SULLIVAN:  No further questions, Your Honor.

11   THE COURT:  All right.  Thank you.

12   Are you offering that exhibit in?

13   MR. SULLIVAN:  No.

14   THE COURT:  Okay.  Mr. Cameron.

15   MR. CAMERON:  Thank you, Your Honor.

16                     CROSS-EXAMINATION

17   BY MR. CAMERON:

18       Q   Is it Mrs. or Ms. Claude?

19       A   Ms. Claude, sir.

20       Q   Okay.  Are you married?

21       A   I am divorced.

22       Q   Okay.  And you've worked 12 and a half years

23   for the White House telephone operation service;

24   correct?

25       A   Yes, sir.

1    Q    And please straighten it out for me.   There are

2    two lines that you can call in, the White House line

3    and a comment line as well?

4    A    Yes, sir.   For those callers who do not know

5    the comment line number, we either give it to them or

6    we connect them.

7    Q    Okay.   And in this particular case was it the

8    comment line that was called or the White House line?

9    A    It was -- I received the call, so it was the

10   1414 number.

11   Q    Okay.   And is that the White House line or is

12   that the comment --

13   A    That's our -- that's the switchboard operator's

14   line.

15   Q    Okay.   And the switchboard operator, is that --

16   I'm sorry if I'm maybe not catching it.   Is that the

17   comment line or the White House line?

18   A    That's the White House line, sir.

19   Q    Okay.   So when you're -- when you take this

20   call, do you ask them if they want to make a comment or

21   not?

22   A    This particular caller, all I had to say was

23   "The White House," which is our normal response when

24   the phone rings, and he immediately took over.

25   Q    Okay.   And by immediately take over, he started

1  speaking to you?

2      A    Everything that I had written on this report.

3      Q    Okay.  And in terms of the report, did you

4  review this report before testifying today?

5      A    Yes, sir, I did.

6      Q    Okay.  And have you testified before?

7      A    No, sir.

8      Q    This is your first time?

9      A    This is my first time, yes.

10      Q    And did you make any other reports other than

11  this threat form?

12      A    This is the only one that we fill out.

13      Q    I'm sorry.  Go ahead and finish.

14      A    This is the prescribed form.  What we have is

15  just scratch paper in order to write down numbers.  In

16  case a caller drops off, at least we know when the

17  caller calls back, and we have our paper and pencil

18  ready.

19      Q    And you had scratch pad and paper that evening?

20      A    All the time, sir.

21      Q    And if I followed your testimony correctly, you

22  did make some notes about the call.

23      A    Yes, sir.

24      Q    How many notes did you make about the call?

25      A    Exactly as I have written here, because I was

1  very attentive.  Whenever we receive a threat call, we

2  have to be very alert and attentive and be ready to

3  write.

4      Q   And you didn't know it was a threat call until

5  the threat is made, of course.

6      A   Yes, sir.

7      Q   Okay.  So they, to your recollection, came

8  fairly early during the telephone call?

9      A   Yes, sir.

10     Q   How early did they come?

11     A   If you're referring to this, sir --

12     Q   Yeah.  The telephone call was answered by you.

13 You say, "White House."

14     A   I would say, "The White House," and the caller

15 would say something, but in this case Mr. Ford

16 immediately said that "I'm going to kill you."

17     Q   Okay.  Immediately made these one, two, three,

18 four, five comments?

19     A   Yes, sir.

20     Q   And how long did that take?  Ten seconds?

21     A   According to the time, that ended in 14 minutes

22 which included the transfer to the Secret Service.

23     Q   Okay.  So the call lasted 14 minutes, but, if I

24 understand your testimony correctly, these threats came

25 in the first 10 or 15 seconds; correct?

1    A    Yes, sir.

2    Q    And you wrote them down?

3    A    The ones that he spoke to me, but the ones that

4  he did for the agent --

5    Q    Well, I'm only asking about what happened with

6  you.

7    A    Yeah, these are -- yes, sir.

8    Q    So you wrote them down on a piece of paper or

9  wrote down some notes on a piece of paper?

10    A    Yes, sir.

11    Q    And what did you do with those notes?

12    A    Well, after I had put them here, we normally

13  throw them away, because they have already been sent

14  out.

15    Q    Okay.  And it's your testimony that the only

16  thing you wrote down in those notes are verbatim what's

17  on this threat report?

18    A    Yes, sir.

19    Q    So there were other 13 minutes and 50 seconds

20  or so of conversation, but you don't have any record of

21  it because there's no recording; correct?

22    A    No, sir.  And if I -- we are advised to get the

23  gist of the message.  If it's not relevant or if it's

24  unnecessary, we do not include it on the report.  And

25  as far as I know, we have not been advised other than

1    to give the exact words as it appears here, exact

2    wording of the threat.  That's all we write.

3        Q    No.  And so you know, I'm not criticizing you.

4    I'm just trying to find out if there's any context to

5    the conversation, because it sounds like you wrote down

6    these things in the first 15 seconds.  And we don't

7    know what else was said or there's no record of what

8    else was said and what other comments may have been

9    made; is that correct?

10       A    As far as I remember, sir.

11       Q    Okay.  And you said several times, "We filled

12   out the threat form."  Did you fill it out or did you

13   fill it out with help?

14       A    Each operator, when he or she receives a threat

15   call, is responsible for preparing this form.

16       Q    Okay.  And this was -- this happened about

17   eight and a half months ago; correct?

18       A    In March, yes, sir.

19       Q    Do you have independent recollection now of the

20   context of that conversation, in other words, do you

21   remember it other than what you wrote on the threat

22   report?

23       A    Only this one, sir.

24       Q    Okay.  Only the context of --

25       A    Only the ones that I -- yes, that I have

1   written here.

2      Q   Okay.  Well, I'm going to ask you -- when you

3   answered the call, you indicated earlier in your

4   testimony that somebody began talking immediately;

5   correct?

6      A   Yes, sir.

7      Q   And were they rational when they were talking?

8   Were they irrational?  Were they excited?  What was the

9   tenor of the conversation?

10     A   He was rather clear, angry, and he spoke

11  rapidly.

12     Q   And do you have your -- do you still have your

13  report?

14     A   It's right here, sir, when I filled out the

15  report.  I don't have my original, because we don't

16  keep the scratch paper.

17     Q   Okay.  But in this report, the threat form,

18  there's a section that says, "Well-spoken.  Irrational.

19  Incoherent.  Foul," or, "A message read."  You marked

20  "Irrational."

21     A   Well, because it didn't seem that he -- in my

22  judgment at that time, sir, it appeared that he was

23  irrational because of the threat.

24     Q   Okay.  Was he irrational because he was

25  shouting?  Irrational because he was rambling?  Do you

1  remember any of that?

2      A   I do remember that he was angry, yes.

3      Q   And the anger was evidenced by loudness of his

4  voice or --

5      A   Yes, sir, and the rapidity of his accusations.

6      Q   And "accusations," are you talking about the

7  threats or accusations that he made against the

8  President as to his performance?

9      A   For both, sir, for me.

10     Q   Okay.  He was angry about the President's

11 performance as well?

12     A   I would imagine so and because -- well --

13     Q   Did he sound excited?

14     A   He would have been, sir, because he --

15     Q   So your answer is "Yes"?

16     A   I would imagine, because, yes, he wanted to

17 express himself so much in this manner.

18     Q   Now, how often does this happen that you take

19 threats against the President and fill out this

20 particular kind of form?  I'm talking about you

21 personally.

22     A   In the 12 and a half years, sir, or in this

23 particular administration?

24     Q   Well, let's just take from March 1st to the

25 present time.

```
 1      A    In my email -- less than ten.

 2      Q    Okay.  Less than ten times over the last eight

 3  and a half months?

 4      A    Yes, sir.

 5      Q    And this may sound like a silly question, but

 6  do you know Mr. Ford?

 7      A    No, sir.

 8      Q    Never heard of him before?

 9      A    Never heard, no, sir.

10      Q    And he doesn't know you?

11      A    No, sir.

12      Q    Okay.  Do you have any reason to believe he

13  holds any animosity towards you?

14      A    No, sir, not unless I look at this

15  transcription.

16      Q    We'll get to the transcription.  I'm just

17  asking if you have any knowledge of why he would have

18  any animosity towards you.

19      A    No, sir.

20      Q    And you were writing quickly; right?

21      A    Yes, sir.

22      Q    Okay.  And he was speaking quickly?

23      A    Yes, sir.

24      Q    And he was irrational while he was talking

25  according to your report?
```

1     A    Yes.

2     Q    Okay.  And in trying to write down the words --

3   and that's the only recollection we have of -- I'm

4   sorry.  Do you have independent recollection of this

5   telephone call?

6     A    Yes.

7     Q    Okay.  Then we'll go over it line by line, and

8   please excuse some of the verbiage.  But "I'm going to

9   kill you, bitch," that was the first words he spoke

10  after you said, "White House"?

11    A    Yes, sir.

12    Q    Okay.  You guys hadn't gotten into any argument

13  or anything over the phone?

14    A    Oh, no, sir.  No.

15    Q    And because of the common usage of the gender

16  of the word "bitch," did you assume he was talking to

17  you?

18    A    Yes, sir.

19    Q    Okay.  Have you ever heard that term used by a

20  male about another male in a derogatory manner?

21    A    No, sir.

22    Q    Okay.  So you've never heard in music or

23  anything like that one male referring to another male

24  as a bitch in a derogatory manner?

25    A    No, sir.

Q   Okay.  "I'm going to kill your children by cutting their heads off."  Okay.  Is that a threat that you thought was against you?

A   I thought so at the moment, yes.

Q   Do you have children?

A   No, sir.

Q   So you don't have any children?

A   No.

Q   And there would be no way for him to know whether or not you had children; is that correct?

A   That's correct.

Q   Do you know if the President has any children?

A   Yes.

Q   So that threat could have just as well have been against the President who actually does have children?

A   Yes.

Q   "I'm going to burn you alive."  Okay.  Again, that threat in context could have been just as much against the President as you?

Let me make it a simpler question.  Does he have any reason to want to burn you alive?

A   I am the representative of the President when I answer the phone.

Q   Okay.  So is it just as possible it was a

1   threat made against the President as against you?

2       MR. SULLIVAN:  Your Honor, I'm going to object to

3   this line of questioning.  He's asking for her to

4   speculate on what the words meant.  The words speak for

5   themselves.

6       MR. CAMERON:  Well, Your Honor --

7       THE COURT:  I'm going to allow it.  Go ahead.

8   BY MR. CAMERON:

9       Q    Could these words have been directed towards

10  the President within the context that you wrote them

11  down as well as against you?

12      A    Since I was the operator who received the call,

13  then I took it to mean that he's directing it to me.

14      Q    That's your interpretation.

15      "I'm going to kill that president."  That was

16  clearly not directed against you; right?

17      A    No, sir.

18      Q    And that's within the same 15 words as the

19  beginning of these threats; correct?

20      A    Yes.

21      Q    And you're certain you wrote it down verbatim,

22  "that President" instead of "the President"?

23      A    Yes, sir.

24      Q    Okay.  That's your recollection --

25      A    Yes.

1    Q    -- from eight and a half months ago?

2    "I hate him."  That was directed against the

3 President?

4    A    Yes.

5    Q    "I'm going to bury you alive."  Again, within

6 the context of what you wrote down, was that possibly a

7 threat against the President or you?

8    A    Perhaps both of us.

9    Q    Okay.  So you really don't know who these were

10 directed at?

11    A    Like I said, sir, I -- when I answer the phone,

12 I represent the President and --

13    Q    Well -- and I'm sorry.  I want to let you

14 finish.  I understand that.  But the issue I'm asking

15 you about is these innocuous threats -- and by

16 "innocuous" I don't mean they're not serious -- but

17 they're not gender specific either; is that correct?

18    A    Except the first one.

19    Q    Okay.  And, again, that's within the context as

20 you understand it?

21    A    Yes.

22    Q    Okay.  And he certainly wasn't calling you that

23 evening; correct?

24    A    He was calling the White House.

25    Q    He was calling the -- he was calling to leave

1  comments to the President, if I understood your

2  testimony correctly.

3      A   He did not specifically say he was leaving a

4  comment.  He just directed his statement to me.

5      Q   Now, again, I'm going to ask you to reach back.

6  You do remember the conversation; correct?

7      A   I try to remember, sir.  I try very hard.

8      Q   Was there rambling during the conversation?

9      A   No, just repetitions of everything that he --

10  that is written here.

11     Q   So he would go over and over again the same

12  thing?

13     A   Yes.

14     Q   Did he ever make comments about the President's

15  performance?

16     A   No.

17     Q   Okay.  Did anybody in the government when they

18  investigated this case ask you if you had children?

19     A   No, sir.

20     Q   So they never checked to find out whether or

21  not the threat about children was directed at you;

22  correct?

23     A   Correct.

24     Q   Now, there were two calls, as I recall.

25  Correct?

1        A    Yes.

2        Q    Did you take both calls?

3        A    Yes.

4        Q    Okay.  And the second call was a different

5   name; correct?

6        A    Correct.

7        Q    And do you know what that name is?

8        A    Yes.  It's Eleazar Melchizedek which is a

9   biblical name.

10       Q    And you recognized that yourself or you were

11  told that later?

12       A    No, I recognized the name.

13       Q    Did it sound -- seem strange to you that the

14  same person would call back using a biblical name this

15  time?

16       A    No, sir.

17       Q    And he called back about six minutes later?

18       A    Yes.

19       Q    And what was the gist of that conversation?

20  Because that conversation doesn't appear to be reported

21  on the threat form.

22       I'm sorry.  Do you need a better question or are

23  you just considering it?

24       A    I'm trying to remember if he hung up right

25  away.

```
 1        Q    So that was a short call?
 2        A    I believe he just said his name is Eleazar
 3   Melchizedek.
 4        Q    And if you don't remember --
 5        A    And there was no end time, sir.  So it was just
 6   a call and then he hung up.
 7        Q    And it's all right if you don't remember.
 8   There's not -- it's not a quiz.  I just wondered if you
 9   could remember the gist of that conversation.
10        So you think it was just you answered the phone,
11   and you knew it was same number; correct?
12        A    Yes.
13        Q    And he gave the name Eleazar Melchizedek;
14   correct?
15        A    Yes.
16        Q    And that was it?
17        A    Yes.
18        Q    Okay.  Did you transfer that call to the Secret
19   Service as well?
20        A    I could not.  Whenever the caller hangs up, I
21   do not have the chance to transfer.
22        Q    Okay.  Well, let's take the first call then.
23   It's a 13-minute call; correct?
24        A    Yes.
25        Q    And do you recall how far into the call you
```

1  transferred it to the Secret Service agent?

2     A    That would be after I had taken notes.  Some

3  time, sir, because -- this instant I really cannot

4  recall, but as soon as the threat begins we connect the

5  caller to the MCT.  And while I'm taking notes, the

6  Secret Service on the other end is also listening in.

7  So it could have been before he finished or it could

8  have been after.  I cannot be sure at this time.

9     Q    Okay.  And so I'm clear, you're still involved

10 in the conversation after you switch the call, or are

11 you not?

12    A    I do not speak anymore when the Secret Service

13 agent begins.  I just take note.

14    Q    Can you still hear the conversation?

15    A    I can.  When I -- let's see.  There was a time

16 when we could listen in, but I cannot recall when our

17 system was changed and after being connected to the MCT

18 line if we could still listen in.  So I cannot this

19 time -- that's why -- because our phone system has been

20 upgraded.  The previous system, we could listen in, but

21 we will not join the conversation, we'll just listen in

22 until the interview with the agent has ended.

23    Q    So if I follow your testimony correctly, the

24 only input you ever had into this conversation is you

25 said, "White House"?

1      A    Yes, sir.  I -- well, let's see.  If I may, let
2  me rewind.  I did ask him for the phone number to make
3  sure, because we have to confirm that what is on the
4  console is what -- the phone number belongs to the
5  caller.  And we also ask for the name to make sure that
6  what I report is accurate as far as we can report it.
7      Q    So that would be some limited conversation as
8  to the telephone number, which you had, and the address
9  which you got?
10     A    Yes.
11     Q    Okay.  So for the other 12 minutes or so, it
12 was just Mr. Ford ranting?
13     A    As far as I can recall at this time.
14     MR. CAMERON:  Thank you, Your Honor.  That's all I
15 have.
16     THE COURT:  Are you offering that Exhibit 2 in
17 evidence?
18     MR. CAMERON:  Your Honor, I believe that I will
19 since it's the best evidence we have of part of the
20 call.
21     THE COURT:  Is there any objection?
22     MR. SULLIVAN:  No objection.
23     THE COURT:  It will be received in evidence.
24               (Exhibit 2 was admitted.)
25     THE COURT:  All right.  Any redirect?

1      MR. SULLIVAN:  No, Your Honor.

2      THE COURT:  Thank you very much.  You're excused.

3      THE WITNESS:  Thank you.

4      THE COURT:  You may call your next witness.

5      MR. SULLIVAN:  The government calls George

6  Cheretis, Your Honor.

7          (The oath was administered to the witness.)

8      THE WITNESS:  I do.

9      THE CLERK:  Would you state and spell your full

10  name for the record.

11      THE WITNESS:  George Cheretis, G-e-o-r-g-e.

12  C-h-e-r-e-t-i-s.

13                      GEORGE CHERETIS,
                 having been first duly sworn, was
14               examined and testified as follows:

15                   DIRECT EXAMINATION

16  BY MR. SULLIVAN:

17      Q   And what city and state do you currently reside

18  in?

19      A   Reno, Nevada.

20      Q   And where are you employed?

21      A   United States Secret Service.

22      Q   Your position with the Secret Service?

23      A   I'm the resident agent in charge of the office.

24      Q   How long have you worked as a Secret Service

25  agent?

1      A    Going on 25 years now.

2      Q    Can you tell the jury what the duties are of a

3  Secret Service agent?

4      A    The Secret Service has two missions, to ensure

5  the financial integrity of the United States and to

6  protect the President, the Vice President, and a few

7  folks -- a few other folks that are directed by

8  Congress or presidential executive order.

9      Q    When you say to help ensure the financial

10  integrity of the United States, what do you mean by

11  that?

12      A    Well, we are the law enforcement branch of the

13  Treasury, so we investigate financial fraud, things of

14  that nature, counterfeit.

15      Q    Credit card fraud?

16      A    Credit card fraud.

17      Q    Did you conduct an investigation of Steven

18  Eugene Ford?

19      A    Yes.

20      Q    Can you tell us how that investigation began?

21      A    On March 1st we -- I received messaging from

22  our Protective Intelligence Division that a call had

23  been received into the White House switchboard of a

24  threatening nature, and I was directed to go out and

25  investigate.

```
 1      Q    What was the date of that call?  When did you
 2   get so advised?
 3      A    March 1st.
 4      Q    Of this year?
 5      A    Correct.
 6      Q    And was that right when you came in to work
 7   that morning?
 8      A    Yes.
 9      Q    And did you speak with anybody from the Secret
10   Service in Washington, D.C., or you just had a little
11   report?
12      A    No, I called the Protective Intelligence
13   Division, and they had provided me some background
14   information on who the caller was and an address they
15   had determined.
16      Q    And what address did they give you?
17      A    320 Evans Road, apartment 206.
18      Q    In Reno?
19      A    Correct.
20      Q    Okay.  And did you take some action that day?
21      A    I did.  We went out to 320 Evans Road,
22   apartment 206, and interviewed Mr. Ford.
23      Q    Was he home then?
24      A    Yes.
25      Q    And about when was that?  Was that on the same
```

1    day, March 1st, 2006?

2        A    Same day.

3        Q    I'm sorry.   2016.

4        A    We're mandated to respond within 24 hours.

5        Q    And about what time was it?  I'm sorry.  I

6    missed it.

7        A    2 p.m.

8        Q    Okay.  Was he home?

9        A    Yes.

10       Q    What happened after you knocked on his door?

11       A    We knocked on his door.  Mr. Ford came out and

12   closed the door behind him and was not very happy to

13   see us.

14       Q    Who all was present?

15       A    Myself, Secret Service Agent Steve Martinez,

16   Reno Police Detective Ryan Ashton, and two other

17   uniformed police officers.

18       Q    Was he -- you say he was not very happy to see

19   you?  How did he react to your presence?

20       A    He was very agitated, anxious, excited,

21   confrontational, verbally abusive.

22       Q    Did you tell him why you were there?

23       A    I did.

24       Q    Was he willing to talk to you eventually?

25       A    Eventually he calmed down and we did have a

1   conversation.

2       Q    And this took place out in the hallway still?

3       A    In the hallway in front of his apartment.

4       Q    Okay.  Did you advise him of his constitutional

5   rights?

6       A    I did.

7       Q    Was he in custody?

8       A    No.

9       Q    Why did you advise him of his rights?

10      A    It's our procedure to advise of constitutional

11  rights, because the situation could change.

12      Q    Okay.  Did he seem to understand what you told

13  him about his rights?

14      A    He seemed to.

15      Q    Was he willing to be interviewed?

16      A    He was.

17      Q    Did he during this conversation identify

18  himself to you?

19      A    He did.

20      Q    As?

21      A    Steven Eugene Ford.

22      Q    Did he use any other names during the

23  conversation?

24      A    Not initially.

25      Q    But later?

1      A    Later he identified himself as Eleazar

2  Melchizedek.

3      Q    Melchizedek?

4      A    Melchizedek.

5      Q    Did you talk to him about a certain telephone

6  call to the White House that he made earlier that day?

7      A    I did.

8      Q    That was your main purpose in going there;

9  correct?

10      A    Correct.

11      Q    And did he answer your questions with respect

12  to that issue?

13      A    He did.

14      Q    What did he tell you?

15      A    When I asked him about if he had made the call

16  to the White House and the subject threats, he

17  acknowledged that he had made the call and he had made

18  the threats.

19      Q    Did he tell you why he made the threats?

20      A    I asked him why, and he said that he was duty

21  bound to carry out the threats because a good

22  Catholic -- a good Catholic's responsibility is to

23  eradicate evil from the world.

24      Q    And did he make any further statements along

25  those lines?

1    A    He did.  He challenged me and the agents and

2    the officers there to help him carry out the threats

3    and said that if we were good Catholics that we were

4    duty bound also to eradicate evil from the world.

5    Q    Did you arrest him after this interview?

6    A    No, sir.

7    Q    Why not?

8    A    It was pretty serious, so I wanted to consult

9    with the U.S. Attorney's Office and develop a course of

10   action on how to move forward.

11   Q    Before you left the interview did you -- well,

12   let me back up.  How did you leave it with him before

13   you left?

14   A    I left him my business card.

15   Q    Why?

16   A    Well, if he called me, I would get the number.

17   I was thinking maybe if he used his cell phone, I would

18   get the cell phone number that he called me from.

19   Q    And did you go back to your office?

20   A    Yes.

21   Q    Did you get any calls on your cell phone?

22   A    Multiple calls.

23   Q    From what number?

24   A    (775) 343-9041, nine, zero, four, one.

25   Q    And was that -- did that draw your -- were you

1  concerned about that number?

2     A   Yes, because that's the number that was

3  recorded on the White House line threat form as the one

4  that was captured as the originating call.

5     Q   Did there come a point in time when you did go

6  back to that same apartment and arrest Mr. Ford?

7     A   We did.

8     Q   And did you have a properly issued arrest

9  warrant at that time?

10    A   We did.

11    Q   And when did you execute the warrant?

12    A   9:30 that morning on March 10th.

13    Q   2016?

14    A   2016, yes.

15    Q   Who was present during the arrest?

16    A   Myself, Agent Jeff DeLuca from our office,

17  Detective Ryan Ashton, Reno Police Department, and two

18  other uniformed Reno police officers.

19    Q   Okay.  Did you have any problems during the

20  arrest?

21    A   No, sir.

22    Q   Was Mr. Ford again advised of his

23  constitutional rights?

24    A   Yes.

25    Q   And did he seem to understand them?

1     A    Yes.

2     Q    Did you obtain his consent to search his

3   apartment?

4     A    Yes.  I asked if we could search his apartment,

5   and he acknowledged that we could.

6     Q    Was it given freely?

7     A    Yes, I believe so.

8     Q    Did he later give you or sign a written

9   consent --

10    A    Yes.

11    Q    -- to search?

12    A    Yes.

13    Q    Did you seize any evidence from the apartment

14  before you left?

15    A    We did.  We searched the apartment and seized

16  one item.

17    Q    And can you describe the item that you seized?

18    A    It was an LG cell phone.

19    Q    And where did you find that?

20    A    It was on the nightstand next to his bed.

21    Q    And why did you seize that cell phone that you

22  found on the nightstand?

23    A    Because we believed it was the cell phone used

24  to call the White House and issue the threat.

25    Q    Why do you believe that?  Why did you believe

1  that?

2      A    Detective Ashton punched in the number that we

3  thought was that cell phone's number and the phone

4  rang.

5      Q    Okay.  Let me back up.  So Detective Ashton was

6  with you --

7      A    Yes.

8      Q    When you say "punched in the number" --

9      A    I'm sorry.  He dialed the number on his cell

10  phone.

11      Q    Which number are you talking about?

12      A    The (775) 343-9041.

13      Q    That's the number that showed up on

14  Ms. Claude's caller ID?

15      A    Correct.

16      Q    And what happened after -- on his own personal

17  cell phone what happened after he made that call?

18      A    When he sent the call, the phone rang that was

19  on the nightstand.

20      Q    Okay.  Now, I'm going to show you -- I'm going

21  to show you an envelope that's marked Government's

22  Exhibit No. 1.  Would you just take a minute and look

23  it over.

24      A    Yes.

25      Q    Do you recognize it?

```
 1        A    I do.

 2        Q    How?

 3        A    Because I prepared it.

 4        Q    Okay.  Can you tell us generally what it is?

 5        A    It is the evidence envelope followed with an

 6   evidence receipt containing the LG cell phone that we

 7   seized from Mr. Ford's apartment inside here.

 8        Q    So inside the envelope is that cell phone that

 9   you talked about?

10        A    Yes.

11        Q    And did you -- what did you do with that phone

12   when you got back to your office?

13        A    I immediately put it in this envelope and

14   sealed it and put it in our vault.  We have an evidence

15   vault.

16        Q    Did it stay in that vault or in your office

17   until you brought it over to court today for this

18   trial?

19        A    Yes.

20        Q    Okay.  And is it in substantially the same

21   condition now as when you seized it?

22        A    Yes.

23        MR. SULLIVAN:  Your Honor, at this time I'm going

24   to move for admission into evidence Government's

25   Exhibit No. 1.
```

1    THE COURT:  Is there any objection?

2    MR. CAMERON:  There is not, Your Honor.

3    THE COURT:  It will be received in evidence.

4              (Exhibit 1 was admitted.)

5  BY MR. SULLIVAN:

6    Q   Now, I don't think -- did you make any -- did

7  you check the phone yourself personally to see if any

8  calls were made from that call [sic] to Washington,

9  D.C.?

10    A   I did not.

11    Q   Did anyone in your office?

12    A   Yes.

13    Q   Who was that?

14    A   Reno Police Detective Ryan Ashton.

15    Q   Does he work in your office?

16    A   He is.  He's a member of the task force we run

17  out of the Reno office, so he's a deputized federal

18  agent.

19    Q   Okay.  Thank you.

20    MR. SULLIVAN:  No further questions, Your Honor.

21    THE COURT:  Thank you.

22    Mr. Cameron.

23              CROSS-EXAMINATION

24  BY MR. CAMERON:

25    Q   Good morning, Agent Cheretis.

1    A    Good morning.

2    Q    I understand from your direct testimony you've

3 been with the Secret Service for 25 years?

4    A    Yes, sir.

5    Q    And, in fact, you are the resident agent in

6 charge of the office here?

7    A    Yes.

8    Q    So you make the decisions for the Reno office

9 on investigations; correct?

10   A    Yes.

11   Q    And how long have you been the resident agent

12 in charge?

13   A    I reported to Reno October 2015, so a little

14 over a year now.

15   Q    Okay.  And this was in March of 2016 that this

16 case took place?

17   A    Correct.

18   Q    And if I understood your testimony correctly,

19 after receiving the information from Washington, D.C.,

20 you went directly -- or not directly, but you went that

21 same day to Mr. Ford's residence?

22   A    Yes.

23   Q    And the information that you got from the agent

24 in Washington was basically the same words that were

25 written down by the earlier witness today?

 1      A    Yes.

 2      Q    And you didn't have any idea what the context

 3  of that threat was, did you?

 4      A    Just other than what the words --

 5      Q    The words themselves, but you didn't have the

 6  rest of the conversation?

 7      A    No, sir.

 8      Q    Nobody talked to you about that?

 9      A    No.

10      Q    Okay.  So you did arrive at Mr. Ford's

11  apartment.  And I think you indicated that he was

12  aggressive and not cooperative.

13      A    Yes.

14      Q    Can you kind of run through what happened?  I

15  mean, you knocked on the door.

16      A    We knocked on the door, he came outside and

17  began -- he was obviously angry and anxious that we

18  were there.  And he began to verbally taunt all the

19  officers and agents that were there.

20      Q    Well, let's stop right there and see if we

21  can't break it down a little bit.

22      A    Sure.

23      Q    When you knocked on the door did you see a cell

24  phone or part of a cell phone Scotch-taped to the door?

25      A    No, sir.

1      Q    That wasn't there?

2      A    No.

3      Q    Okay.  And did he first acknowledge your

4  presence through the door and you told him who you

5  were?

6      A    He opened the door.  I told him -- I asked him

7  if he was Steven Eugene Ford.  He said he was.  And

8  then I identified myself as "George Cheretis, Secret

9  Service.  Can we talk to you for a moment?"

10      Q    And you indicated he was angry and agitated?

11      A    He came outside, closed the door behind him,

12  and then started with profanity and what I had said

13  earlier.

14      Q    Okay.  In addition to that, was he irrational

15  and rambling?

16      A    He was.

17      Q    And could you make sense of everything he was

18  saying?

19      A    I could understand what he was saying.  I don't

20  understand the content of what he was saying.

21      Q    So when you say he calmed down, how long did it

22  take him -- I'm sorry.  Bad question.

23      How long did it take you before you could start

24  making sense of what he was saying?

25      A    Well, he kept talking, rambling, and he

1  wouldn't let us talk, so I made a deal with him

2  actually.  I told him, "Just hold on.  I'll let you say

3  whatever you want to say, but then you got to just let

4  me talk."  And then he agreed to that.

5      Q   Okay.  And when you say he was rambling, what

6  was he rambling about?  What was he trying to say that

7  he was talking over you?

8      A   He was quoting biblical scripture.  Then he

9  would insult us.  Then he would go back to scripture,

10 insult us some more.  He said that he had a poison

11 pipette in his ribs and he was taunting us to break it.

12     Q   In other words, he indicated to you that he had

13 some device between his ribs that if you broke it he

14 would die and he wanted you to do that?

15     A   Yes.

16     Q   Okay.  During this initial contact with him

17 when he's rambling and asking you to kill him and

18 quoting scriptures, did you have any concern about his

19 mental state?

20     A   That's -- no, I didn't.  That's not for me to

21 determine.

22     Q   Well, I'm not asking you for a diagnosis.  I

23 asked from the context of his conversation and your

24 observations, did you have any concern about his mental

25 state?

1    A    What do you mean by "concern?"  For my personal

2 safety?

3    Q    Not for personal safety.  Did you think you

4 were talking to a rational thinking human being during

5 the beginning of this interview?

6    A    Not initially.

7    Q    Okay.  So you did have some concerns about

8 that?

9    A    In that context, yes.

10   Q    To the extent that you tried to calm him down?

11   A    Correct.

12   Q    And how did you do that?

13   A    By making -- by striking this deal with him, he

14 calmed down, he said his peace, and then he let us --

15 he let me talk.

16   Q    And what did you say to him?

17   A    I explained to him why we were there, and then

18 I went right into the phone call that we believed he

19 made.  I had asked him if he had, in fact, called the

20 White House and issued these threats.  And he had -- he

21 said that he had.

22   Q    Did you tell him what the threats were?  Did

23 you read verbatim the information you had on what the

24 threats had been?

25   A    I didn't read it off the paper, but I had read

1  it before.

2      Q   To him?

3      A   To him.  So I went off my memory and I said,

4  "Did you really say this?"  And he acknowledged that he

5  did.

6      Q   Did you try to make any determination as to who

7  he was allegedly threatening?

8      A   No.  I let the words speak for themselves.

9      Q   Well, you read the words?

10     A   Right.

11     Q   Correct?

12     A   Yes.

13     Q   And if I follow correctly, basically they were

14  the identical words that was testified to by the prior

15  witness.

16     A   Yes.

17     MR. CAMERON:  Can I have the Court's indulgence for

18  one moment?

19  BY MR. CAMERON:

20     Q   Did you have a copy of the threat form?  Was

21  that one of the things that was sent to you?

22     A   It was.

23     Q   Okay.  So on the threat form when you reviewed

24  it, did you understand that he was irrational when the

25  threats were made?

1    A    Yes.

2    Q    And the threats themselves, "I'm going to kill

3  you, bitch," okay, those were the words that you

4  understood were uttered?

5    A    Yes.

6    Q    In that context have you ever heard another

7  male refer to a male in a derogatory term by calling

8  him bitch?

9    A    Yes.

10    Q    So that's something that you're familiar with?

11    A    Yes.

12    Q    "I'm going to kill your children by cutting

13  their heads off."  Okay.  Was that one of the threats

14  that you understood was made?

15    A    Yes.

16    Q    And during your investigation did anybody ever

17  bother to ask the White House operator if she even had

18  any children?

19    A    I did not.

20    Q    Okay.  And you heard her testimony this morning

21  that she doesn't; is that correct?

22    A    Yes.

23    Q    "I'm going to burn you alive.  I'm going to

24  kill the President.  I hate him.  I'm going to bury you

25  alive."  Now, the context of that you determined was a

1  threat against the President of the United States;
2  correct?
3      A   Correct.
4      Q   And this was a threat that my client,
5  irrational as he was in the beginning, admitted making;
6  is that correct?
7      A   Yes.
8      Q   In other words, you talked to him and he said,
9  "Yes, I said that, and it's my duty as a good Catholic
10 to help stamp out evil."  Did that ring any bells for
11 you?  Did you -- let me make a better question.
12     Did you think there may be some problem with him
13 mentally to be undertaking this mission from God?
14     A   Yes.
15     Q   And within the context, these words, if you
16 take them for their plain meaning, could have been
17 directed towards the President, who he clearly was
18 upset with, or towards an operator he had never met and
19 knew anything about or had no grudge against; correct?
20     A   Correct.
21     Q   So as you sit here today, do you know who he
22 was really threatening?  Was it the President or was it
23 the operator?
24     A   Well, I asked him if he had said that to the
25 operator, if he had threatened, and he said he had.

1    Q   Did you use the term "operator"?  Because
2  that's not in your report.  In your report you said you
3  read the words.
4    A   Right.  I just assumed that he meant the
5  operator.
6    Q   So everybody kind of assumes that he meant the
7  operator; correct?
8    A   Correct.
9    Q   Okay.  Even though the call was to the
10 President; correct?
11   A   I don't know who he was trying to call.  I know
12 he was calling the White House, the White House
13 switchboard.
14   Q   Now, you took his telephone.  And you indicated
15 on your direct testimony that the White House was
16 called; is that correct?
17   A   The White House switchboard.
18   Q   Yeah.  And that would be the number -- if I can
19 make my fingers work, I'll give it to you.
20   A   The switchboard number?  456-1414?
21   Q   Yes.  (202) -- I have it here.  (202) 456-1414;
22 correct?
23   A   Yes.
24   Q   Okay.  And you heard the operator testify about
25 two telephone calls; is that correct?

1     A    Yes.

2     Q    How many telephone calls did you find that were

3  made that evening by the phone?

4     A    There were multiple phone calls.

5     Q    At least four, maybe more?

6     A    I think there was a few more.

7     Q    Okay.  And you conducted an investigation on

8  this.  Well, let me go back.

9     Even after my client admitting to you that he had

10  made those calls and saying that, you know, it was his

11  duty to stamp out evil and encouraging you and the

12  other officers to join him as good Catholics to try to

13  stamp out the evil, you made a determination not to

14  arrest him; correct?

15     A    Correct.

16     Q    And he had confessed?

17     A    Correct.

18     Q    And you were there with four or five other

19  officers, but you wanted to investigate further; would

20  that be a fair statement, sir?

21     A    I wanted to consult with the U.S. Attorney's

22  Office.

23     Q    So it wasn't part of your determination that he

24  appeared mentally unstable to you and you wanted to

25  follow through on that as well?

1    A    Well, consult with the U.S. Attorney's Office

2  but also begin doing some background checks and to find

3  out what other things he may have done or history and

4  mental issues.

5    Q    And you did that?  That was part of your

6  follow-up investigation for the next eight or nine

7  days?

8    A    Correct.

9    Q    Okay.  And that's something that you do as a

10  matter of course as a Secret Service agent, because you

11  get threats -- well, I'm not going to put words in your

12  mouth.

13    Do you get threats from people who are not mentally

14  stable?

15    A    We do.

16    Q    And you investigate that to kind of find out

17  what the validity of the threat is?

18    A    We do.

19    Q    And that's been done almost on every case if

20  it's an issue; correct?

21    A    Correct.

22    Q    Okay.  In fact, it was done in this case?

23    A    Correct.

24    Q    Now, in determining what calls were made --

25  there were a number of telephone calls -- well, more

1  than the two that we heard about this morning.  There

2  were at least four, maybe more, calls made to the White

3  House that evening; correct?

4      A   Yes.

5      Q   Is it unusual in your experience to have

6  somebody identify themselves and give their home

7  address when they're making a threat?

8      A   It's not unusual.

9      Q   It does happen?

10     A   It happens more often than you think.

11     Q   Okay.  And is that sometimes an indicator that

12  the person is not mentally right when they make a

13  threat like that, which is against the law, and then

14  say, "Oh, by the way, I'm right here"?

15     A   I don't think I can determine that.

16     Q   Okay.  That's fair.

17     A   We act on the threats, the state of mind.  You

18  can't just ignore the threats.

19     Q   And I understand that.  But state of mind is

20  something that you do take into consideration when

21  you're investigating it so you can give that

22  information to the prosecutors?

23     A   Correct.

24     Q   Now, in investigating the phone calls that were

25  made, did you find phone calls made to the Russian

1  Embassy?

2      A    Yes.

3      Q    Did you find phone calls made to the Israeli

4  Embassy?

5      A    I don't remember one to the Israeli Embassy,

6  but I know the Russian Embassy.

7      Q    You know the Russian Embassy, and you just

8  don't recall whether there was one to the Israeli

9  Embassy?

10     A    I don't recall if there was one to the Israeli

11 Embassy.

12     Q    And you don't know what the nature of those

13 calls were, or did you discuss that with Mr. Ford?

14     A    No, I did not.

15     Q    That came up afterwards?

16     A    No, I didn't discuss anything that I found

17 during our investigations with Mr. Ford.

18     Q    Okay.  And one of the things that you were

19 investigating, as we discussed already, was kind of

20 where he was mentally; correct?

21     A    Where he was mentally when he made the threats?

22     Q    When he made the threats, when you interviewed

23 him, where he was --

24     A    One of the factors we considered, yes, is where

25 was his state of mind, his mental health, of course.

1    Q    And, in fact, in your investigation were you
2  able to determine where he was on March the 2nd through
3  March the 8th?
4    A    No, I could not.
5    Q    Okay.  You don't recall subpoenaing his records
6  from the Veterans mental health hospital?
7    A    We did, we subpoenaed his records, and -- we
8  did.
9    Q    In fact, you subpoenaed his records for that
10 date, from the 2nd to the 8th?
11   A    Correct.
12   Q    And they sent you those records?
13   A    Yes.
14   Q    Did you review them?
15   A    Yes.
16   Q    Were you able to determine as part of your
17 investigation --
18     MR. SULLIVAN:  Your Honor, I'm going to object to
19 further questioning here.  He's talking about records
20 from the Veterans Administration, and no one is here
21 from the Veterans Administration to talk about those
22 records.
23     MR. CAMERON:  Actually, Your Honor, if I could be
24 heard.
25     THE COURT:  Well, I'm going to allow it for -- I'm

1   going to allow it for the purposes of the investigation

2   that he undertook and whether or not he formed any

3   opinions in connection with this investigation, not

4   necessarily for the truth of what's in there.  So go

5   ahead.

6       MR. CAMERON:  Thank you, Your Honor.

7   BY MR. CAMERON:

8       Q    And were you able to obtain those records?

9       A    Yes.

10      Q    And you reviewed them?

11      A    Yes.

12      Q    And were you able to determine as part of your

13  investigation that he was taken there the next day by

14  Reno Police Department on a legal 2000?

15      A    Yes.

16      Q    And that the reason was he had held a knife to

17  his throat and tried to kill himself?

18      A    Yes.

19      Q    And he also threatened people at the mental

20  hospital; correct?

21      A    Correct.

22      Q    And they kept him for eight days because he was

23  psychotic?

24      A    That's what the reports say, yes.

25      Q    Okay.  Now, you obtained an indictment in this

1    case by testifying at the grand jury.  You were the

2    agent who testified there?

3        A    Yes.

4        Q    And you answered the questions that you were

5    asked; correct?

6        A    Yes.

7        Q    And you were never asked about his mental state

8    and whether he had been in the mental hospital for

9    eight days for being psychotic, were you?

10       A    No, I don't recall.

11       Q    You basically were asked did you get follow-up

12   from Washington, did you go there, did the guy admit

13   making threats?  That was the gist of the grand jury

14   testimony?

15       A    Yes.

16       Q    Okay.  Nothing about him being irrational when

17   you spoke to him, him rambling, him being admitted to

18   the mental hospital for a psychotic breakdown, none of

19   that went to the grand jury?

20       A    Just the -- Mr. Ford's demeanor when we

21   originally talked to him the first -- the first time on

22   March 1st, I believe that was in -- that was in the

23   grand jury testimony, but the other stuff, no.

24       Q    Okay.  Now, when you talked to him on the 1st

25   did he appear to have been drinking?

```
1       A    No.
2       Q    Okay.  When you went to his house and got the
3   consent search didn't you see inside the house empty
4   bottles of booze, gallon bottles of booze, laying on
5   the floor?
6       A    We did see alcohol, the alcoholic containers,
7   yes.
8       Q    Quite a bit of alcoholic containers that were
9   emptied?
10      A    Yes.
11      Q    What was the -- what did the house look like
12  when you went in?
13      A    It was unkempt.
14      Q    It was in a shambles, wasn't it?
15      A    Yes.  Well, not a shambles, but it was messy
16  and unkempt.
17      Q    Okay.  Empty booze bottles laying on the floor;
18  correct?
19      A    Well, piled off, I think, off to the corner.
20      Q    In fact, everything was in a pile, the entire
21  apartment --
22      A    Yes.
23      Q    -- was a giant pile of junk?  Is that correct?
24      A    We don't call it junk.  His things.
25      Q    Okay.  Well, that's probably a better
```

1   description.  Thank you.

2       Now --

3       THE COURT:  How much longer do you think you'll be?

4   I'm going to take the noon recess.

5       MR. CAMERON:  We can take it, Your Honor.  I'll be

6   a while.

7       THE COURT:  You'll be a little bit longer.  All

8   right.

9       I'm going to go ahead and take the noon recess.

10  Please do not discuss this case among yourselves during

11  the recess.  Let's try to reconvene at about 1:15.

12  That's a little more than an hour.  You're free to go

13  as you wish.

14      Please do not discuss this case with anyone during

15  the recess and don't discuss it among yourselves.

16  We'll reconvene at 1:15 back here and then we'll

17  proceed this afternoon.  I think it's likely we're

18  going to complete the evidence this afternoon and it's

19  also likely that I'll instruct you and you'll start

20  your deliberations this afternoon.  It may not be until

21  tomorrow.  I don't know.  But you may plan to be here

22  at least all the way through the afternoon.  So I'll

23  see you at 1:15.  Thank you very much.

24      You may just leave your notepads on your seat

25  there, if you want to, or take them back in the jury

1    room, whatever you prefer.

2           (Outside the presence of the jury.)

3        THE COURT:  All right.  Thank you.  You're excused.

4    Thank you.

5        THE WITNESS:  Should I just leave this here?

6        THE COURT:  That's fine.  Sure.

7        All right.  We'll reconvene at 1:15 this afternoon.

8        Mr. Cameron, just for my own schedule here, you

9    think you'll be another 30 minutes or so?

10       MR. CAMERON:  I wouldn't think that long, maybe 15

11   more minutes.

12       THE COURT:  And you've got -- what? -- one more

13   witness?

14       MR. SULLIVAN:  One more witness.  It shouldn't take

15   too long.

16       THE COURT:  Who is the other witness that you have?

17       MR. SULLIVAN:  Ryan Ashton.  He's been mentioned

18   already.

19       THE COURT:  That will be fairly short.

20       MR. SULLIVAN:  Yeah, he's not going to be that

21   long.

22       THE COURT:  Do you know whether or not -- will you

23   be calling any witnesses?

24       MR. CAMERON:  Your Honor, I'm anticipating we'll be

25   calling one witness.  That will, again, be up to my

1  client, but that's my understanding as --

2      THE COURT:  I didn't hear all that.  I'm sorry.

3      MR. CAMERON:  I'll get close to the mic.  I'm

4  anticipating one witness, Your Honor.  That will be up

5  to my client at the time, but that's my understanding

6  as we stand here today, he will be testifying.

7      THE COURT:  You think it's likely that the

8  defendant will testify?

9      MR. CAMERON:  I believe it is likely that he will

10 testify.

11     THE COURT:  Okay.  We'll take a recess when we get

12 to that point and I'll give him the admonitions at that

13 point then, if that's all right.

14     MR. CAMERON:  That's fine.

15     THE COURT:  Let me know -- if that's the only

16 witness, then just signal to me that it's a good time

17 to take a recess and I'll take one.  Thank you.

18     MR. CAMERON:  I can tell the Court right now that

19 will be the only witness we call if we call a witness.

20     THE COURT:  Okay.  All right.  Well, I think we'll

21 definitely finish this this afternoon then and

22 definitely give the instructions to the jury this

23 afternoon.  So what I'll plan to do is take a recess

24 when the government rests.  Then we'll deal with

25 whatever issues we have at that point.  And then if

1  there is testimony, fine.  If there is no testimony,

2  then I'll go ahead and instruct at that point.  And

3  then we'll have the final arguments.  I do instruct

4  first.

5      All right.  I'll see you at 1:15.  Thank you very

6  much.

7          (The lunch recess was taken at 12:10 p.m.)

8                      --o0o--

1    RENO, NEVADA; TUESDAY, NOVEMBER 15, 2016; 1:22 P.M.

2                          --o0o--

3    THE COURT:  We're still waiting for one juror.  I

4 would say I'll wait until about --

5    What's that?

6    MS. HUBBARD:  She rode up in the elevator with me.

7    THE COURT:  Okay.  So she should be here very soon

8 then.  Okay.  I thought I would wait until 1:30 and

9 then make a decision on what to do, but if she's on her

10 way up, we're ready to go.  Thank you.

11                 (Pause in the proceedings.)

12                 (In the presence of the jury.)

13    THE COURT:  The jurors are all present.  You may

14 all be seated.

15    Mr. Cameron, you may continue.

16    MR. CAMERON:  Thank you, Your Honor.

17 BY MR. CAMERON:

18    Q   Special Agent, going back to the date of your

19 interview with Mr. Ford, do you recall advising him

20 that if he was upset or wanted to call somebody, he

21 should call you rather than the White House?

22    A   Yes.

23    Q   Okay.  And you made that offer because in the

24 state he was in you didn't want him calling back to the

25 White House, you would rather have him call you?

1    A    No, I made that number so I could capture his

2    cell phone number.  I made that offer so I could

3    capture his cell phone number should he choose to call.

4    Q    It wasn't any concern about him being upset or

5    anything, you wanted to try to capture the cell phone

6    number?

7    A    Yes.

8    Q    Okay.  And he did call you, didn't he?

9    A    Yes.

10    Q    How many times did he call you?

11    A    I have it written down exactly how many, but

12    off the top of my head, between seven and ten.

13    Q    Okay.  He called you seven and ten times over

14    what period of time?

15    A    Two days.

16    Q    Two days or one day?

17    A    Two days, I think.  I think the first day was

18    seven-ish and then the second day was three and then

19    the calls stopped.

20    Q    Okay.  But he was committed at the Veterans

21    Hospital from the 2nd to the 9th.

22    A    It must have been early in the 2nd, because

23    I --

24    Q    Okay.  It could have been two days?

25    A    I can check the records.  It might have been

1    early in the morning before he was committed, but
2    I believe that there were a couple of calls on the 2nd.
3    I can check the records.  I actually have them.
4        Q    Now, did you speak with him or did you record
5    the messages?
6        A    I did not speak with him.  He left messages.  I
7    listened to the messages and then deleted them.
8        Q    Okay.  So all those messages have been deleted.
9    You no longer have them?
10       A    No.
11       Q    Do you recall what the message or the tenor of
12   the messages were?  In your report you view them as
13   rambling and nonsensical.
14       A    Correct.  I was listening -- so I just deleted
15   them.  It was the same stuff that we were -- that I
16   heard when I had talked to him on the 1st.
17       Q    So he was again delusional to the effect that
18   he thought he was a biblical person and quoting
19   scripture?
20       A    I don't know what his state of mind was.  I can
21   just say what he was saying.
22       Q    What was he saying then if you can recall?  I
23   know that you don't have the recordings.
24       A    I don't have the recordings, but, again,
25   referring to biblical scripture, world events, just

1  ramblings that I couldn't put together.

2      Q    So he wasn't making any sense at all?

3      A    No.

4      Q    On the 1st or the 2nd?

5      A    Correct.

6      MR. CAMERON:  Can I have the Court's indulgence one

7  moment?  I may have asked this series of questions that

8  I'm looking at now, so I don't want to go through it

9  again.

10      I think that's all I'm going to ask, Your Honor.

11      THE COURT:  Thank you.

12      Do you have redirect?

13      MR. SULLIVAN:  Yes, I do, Your Honor.

14                    REDIRECT EXAMINATION

15  BY MR. SULLIVAN:

16      Q    Special Agent Cheretis, when did you receive

17  the VA records that Mr. Cameron asked you about?  Was

18  it before or after the grand jury presentation?

19      A    After.

20      Q    Okay.  And the conversation that you had with

21  Mr. Ford on the 1st, you characterized it as him

22  talking about biblical stuff and other things; is that

23  correct?

24      A    No.  Initially we couldn't have a conversation

25  because of the rantings, but then after Mr. Ford calmed

1    down, we actually did have a conversation.

2        Q    And was it a logical conversation that you had

3    with him?  I mean logical in the sense were you able --

4    was he able to understand you?

5        A    Yes.

6        Q    And were you able to understand him then?

7        A    Yes.

8        Q    And how long did that conversation last?

9        A    It couldn't have been more than four to five

10   minutes.

11       Q    The person that -- the person that identified

12   himself to you as Steven Eugene Ford, and also I think

13   you stated one time he also said his name was Elezar

14   Melchizedek, that person -- do you see that person here

15   in the courtroom, the person you arrested?

16       A    Yes.

17       Q    Could you point him out for the record and

18   identify him?

19       MR. CAMERON:  Your Honor, we'll stipulate to

20   identification.  Mr. Ford is sitting right next to me.

21       THE COURT:  The record will so reflect.  Thank you.

22       MR. SULLIVAN:  No further.

23       THE COURT:  Thank you, Mr. Sullivan.

24       Mr. Cameron, do you have anything else?

25       MR. CAMERON:  I do, Your Honor.  And I think I can

1  sum it up in just a few questions to the officer.

2                    RECROSS EXAMINATION

3  BY MR. CAMERON:

4      Q   So he was going in and out of coherency during

5  the time that you were interviewing him?  Sometimes you

6  could understand, sometimes you couldn't?

7      A   No.  I think he could understand what I was

8  asking, but his answer didn't make sense to me, if that

9  makes sense to you.

10     Q   I think it does.  I mean, the answers you got

11  were nonsensical and rambling?

12     A   Correct.  I believe he understood what I was

13  asking, but the reasoning for why he did it didn't make

14  sense to me for the answer he provided as to why he

15  made the call, why he made the threats.  It didn't make

16  sense to me why he -- his reasoning.

17     Q   Okay.  I think that's a fair answer.  I will

18  ask you, though, sir, he was not in a good state when

19  you first started your conversation with him; correct?

20     A   Correct.

21     Q   And you certainly don't have any idea what

22  state or mental state he was in when he made these

23  calls; correct?

24     A   I have no idea.

25     Q   Okay.

1    A    Correct.

2    Q    Mr. Sullivan asked you about when you received

3  the Department of Veteran Affairs records for his

4  hospital stay from the 2nd to the 9th.  Do you recall

5  what date that was?

6    A    I don't recall what date it was, but it was way

7  after.

8    Q    Do you recall when you ordered them?

9    A    I do recall -- I recall ordering the Veteran

10  Affairs records.  I wasn't targeting his stay there

11  from the 2nd, I believe it was, until the 8th.  I

12  didn't even know that had happened until after I

13  received the records.

14    Q    You had actually ordered twice, didn't you,

15  because they came in two packets?

16    A    I think we issued one subpoena.

17    Q    But they came in two different packets?

18    A    I believe so.

19    MR. CAMERON:  And if I could approach the witness,

20  Your Honor, I would like to have him -- just ask him if

21  he recognizes this packet.

22    THE COURT:  That's fine.

23  BY MR. CAMERON:

24    Q    You can take your time.

25    A    Yes, this is -- I don't want to go through and

1  read the whole thing, but the format is the same, and I

2  do recognize the packet.

3      Q   And that's the VA medical records from the

4  2nd to the 9th that you received on Mr. Ford's stay

5  there?

6      A   Yes.

7      MR. CAMERON:  Your Honor, at this time I would ask

8  to have that admitted as an exhibit as records that he

9  had received in the course of his investigation that he

10  reviewed.

11     MR. SULLIVAN:  We object, Your Honor.  There's no

12  foundation from the VA personnel.  It's hearsay.  He's

13  not a competent witness to authenticate these records.

14     THE COURT:  The objection is sustained.

15     MR. CAMERON:  Okay.  I'll get it back, Your Honor.

16     THE COURT:  Okay.

17  BY MR. CAMERON:

18     Q   And, sir, is there any reason that you deleted

19  the messages that you got from him other than they were

20  nonsensical and you couldn't understand them?

21     A   That's the reason.

22     MR. CAMERON:  That's all I have, Your Honor.

23     THE COURT:  Thank you.

24     Anything else, Mr. Sullivan?

25     MR. SULLIVAN:  No, Your Honor.

1       THE COURT:  All right.  Thank you.  You're excused.

2    You may call your next witness.

3       THE WITNESS:  Do I just leave this up here?

4       THE COURT:  That would be fine.  Thank you.

5       MR. SULLIVAN:  The government calls Ryan Ashton.

6          (The oath was administered to the witness.)

7       THE WITNESS:  I do.

8       THE CLERK:  Will you please state and spell your

9    full name for the record.

10      THE WITNESS:  My name is Ryan Ashton, R-y-a-n,

11   A-s-h-t-o-n.

12                          RYAN ASHTON,
                   having been first duly sworn, was
13                 examined and testified as follows:

14                      DIRECT EXAMINATION

15   BY MR. SULLIVAN:

16      Q   And what city and state do you reside in?

17      A   Sparks, Nevada.

18      Q   And are you currently employed?

19      A   I am.

20      Q   How so?

21      A   I work for the Reno Police Department.

22      Q   In what capacity?

23      A   I'm assigned to the Financial Crimes Unit.

24      Q   As a detective?

25      A   Yes.

1    Q    And how long have you worked for the Reno
2  Police Department?
3    A    I've worked there for just over 12 years.
4    Q    What is your current assignment with Reno PD?
5    A    So I'm assigned to the Financial Crimes Unit as
6  a detective, but I work full-time for the U.S. Secret
7  Service.  It's called the Electronic and Financial
8  Crimes Task Force.
9    Q    How long have you been doing that?
10    A    Since January of this year.
11    Q    And did you -- while you were working with the
12  United States Secret Service task force did you have
13  occasion to participate in any part of the
14  investigation of Steven Eugene Ford?
15    A    I did.
16    Q    And do you know -- when were you involved in
17  that investigation?
18    A    March of this year.
19    Q    What day?
20    A    March 1st.
21    Q    Okay.  And what exactly was your involvement?
22    A    I was there just to assist with an
23  investigation that originated from that location.
24    Q    And did there come a point in time -- what type
25  of allegation were you investigating?

1    A    It was some threats that were made against the

2   President of the U.S. made to the White House.

3    Q    All right.  And did you try to find the

4   individual that had allegedly made the threats?

5    A    We did.

6    Q    And when was that?

7    A    The same day, March 1st, 2016.

8    Q    At about what time?

9    A    Approximately 1400.  Sorry.  2:00 o'clock p.m.

10   Q    Okay.  And where did you go exactly?

11   A    It was on Evans Street here in Reno downtown.

12   Q    Okay.  And did you find an individual at that

13  address?

14   A    We did in room No. 206.

15   Q    And did that person identify himself?

16   A    He did.

17   Q    And can you give us the name?

18   A    Steven Ford.

19   Q    And do you know if this person was read his

20  constitutional rights?

21   A    He was.

22   Q    Did he seem to understand them?

23   A    He did.

24   Q    Can you tell us about the initial encounter

25  with this person?  Did he let you in the apartment?

1     A     He did not.  When we initially contacted him --

2  the door was knocked on -- Mr. Ford opened the door

3  pretty abruptly, stepped outside, and then closed the

4  door behind him.

5     Q     Did you identify yourselves?

6     A     We did.

7     Q     And did you tell him why you were there?

8     A     So Special Agent Cheretis was the one that had

9  contact with him and explained to him why we were

10 there.

11    Q     Was he doing most of the talking with Mr. Ford?

12    A     Yes, he was trying to.

13    Q     Okay.  Did there come a point in time when

14 Special Agent Cheretis talked to him about some alleged

15 threats that were made against the White House?

16    A     Yes.

17    Q     And did he acknowledge the threats?

18    A     He did.

19    Q     Did he acknowledge making the threats?

20    A     He did.

21    Q     Do you recall if he identified himself in any

22 other fashion while you were talking to him?  This was

23 outside the door in the hallway?

24    A     Correct, it was in the hallway.  He identified

25 himself.  I don't remember the exact first name, but

1    the last name he used was Melchizedek.

2       Q   Okay.  And do you recall what he said about the

3    threats?

4       A   He was asked about the threats and he said that

5    he had made them and that it was his duty as a good

6    Catholic to rid the world of evil.

7       Q   Did he say anything else or add anything else?

8       A   Just a lot of just kind of nonsensical

9    rambling, just a lot of talking.

10      Q   About what?

11      A   He said that he wanted us to kill people and

12   then kill ourselves.  He said that he wanted us to kill

13   him, that he was going to kill himself with a pipette

14   that he had installed in his chest.

15      Q   Okay.  Was he arrested then?

16      A   He was not.

17      Q   Did there come a point in time when he was

18   arrested?

19      A   Yes, on March 10th of this year.

20      Q   And did you participate in that arrest?

21      A   I did.

22      Q   Who else was present?

23      A   It was Special Agent Cheretis, Special Agent

24   DeLuca from Secret Service.  And then from Reno Police

25   Department was Officer Espinoza and Officer Welch along

with myself.

    Q   Did you have any trouble arresting Mr. Ford?

    A   No.

    Q   Was this done pursuant to an arrest warrant?

    A   It was.

    Q   Did he give you consent to search his apartment?

    A   Yes, he did.

    Q   Did you seize any evidence in his apartment?

    A   We did.

    Q   What did you seize?

    A   It was a LG flip phone, cell phone.

    Q   Okay.  And why did you seize that particular piece of evidence?

    A   Because the number that had called the White House that was used to make the threats, that phone number was documented.  And while we were inside the apartment, I called that phone number from my cell phone after blocking my phone number and that LG cell phone rang, so we presumed that it was the same phone that was used to call the White House and make the threats.

    Q   Okay.  And do you see the person here in the courtroom today that was arrested on March 10th, 2016?

    A   I do.

Q   Could you identify him for the record?

MR. CAMERON:  Again, Your Honor, we'll stipulate to identification.

THE COURT:  The record will so reflect.

MR. SULLIVAN:  Thank you.

BY MR. SULLIVAN:

Q   Now, have you had occasion to look at that cell phone and look at its call log?

A   I did.

Q   And were you able to determine whether or not from the call log any calls were made from that phone to the Washington, D.C., area, the 202 area code area?

A   I did.  So looking at the phone's call log, I looked at the outgoing phone calls and specifically I found five phone calls that were made to -- the phone number was (202) 456-1414 which was the, I guess, recipient phone number that the threats were called against.  Of those five phone numbers, the dates were -- February 29th there was four of them, and then there was another phone call made on -- it was March 1st.

Q   Let's start with the first phone call that was made on -- February 29th of 2016?

A   That's correct.

Q   At about what time?

1    A    It was at 10:06 p.m.

2    Q    10:06 p.m.?

3    MR. CAMERON:  Will you specify whether it's Eastern

4 Time or Pacific Time?

5    THE COURT:  That's fine.

6 BY MR. SULLIVAN:

7    Q    Do you know what time it was -- did it indicate

8 on the phone itself what time it was, whether it was

9 Pacific Time or Eastern Time?

10    A    It didn't specify which time zone it was in,

11 just that it was 10:06 p.m.

12    Q    Okay.  And then was there another call after

13 that, shortly after?

14    A    There was.  There was another call at

15 10:21 p.m. the same day.

16    Q    And was that call to the same number?

17    A    It was.

18    Q    To which number again?

19    A    (202) 456-1414.

20    Q    Okay.  And then you mentioned that there were

21 some more to that same number or other numbers?

22    A    There were -- in addition to those two,

23 specifically to that phone number there were three more

24 calls that were very short duration, less than a minute

25 each.  And then there were also other area code 202

1  phone numbers that were called.  I didn't specifically

2  look into those ones just because I wasn't sure of

3  their relation to the case.

4       Q   Okay.  Thank you.

5       MR. SULLIVAN:  No further questions.

6       THE COURT:  All right.  Thank you.

7       Mr. Cameron, do you have any questions?

8                      CROSS-EXAMINATION

9  BY MR. CAMERON:

10      Q   Detective Ashton, you went out on the 1st when

11 Mr. Ford was first contacted by agents of the Secret

12 Service?

13      A   That's correct.

14      Q   And during your direct testimony you said that

15 the agent was trying to talk to him.  What did you mean

16 by that?

17      A   Mr. Ford was extremely agitated and from the

18 initial onset of him opening the door he started

19 talking constantly.

20      Q   And he was rambling nonsensically, if that's

21 the correct terminology that you would use?

22      A   Yeah, there were times where he was rambling

23 nonsensically, but he was also able to engage in

24 conversation with Special Agent Cheretis.

25      Q   But at the beginning it was nonsensical

1  rambling, if I follow what the testimony was?

2      A    Yes, that's correct.

3      Q    And that was nonsensical to the extent that he

4  was telling you that he had a pipette in between his

5  ribs that contained poison and urging you to smash it

6  to kill him?

7      A    Correct, or he also threatened to do it

8  himself.

9      Q    And additionally he was claiming biblical

10  references to being this person of biblical

11  significance from 2,000 years ago?

12      A    That's also correct.

13      Q    And that he was encouraging people to stamp out

14  evil, including you agents; correct?

15      A    That's correct.

16      Q    Did that make any sense to you from an

17  observer's standpoint as to what this guy was doing?

18      A    Just in the sense that he was really angry or

19  upset.

20      Q    Angry and upset to the point of being mental?

21  Did you have a question as to his mental state?

22      A    No, I didn't question it.

23      Q    Because that wasn't your job or because you

24  didn't think he was having mental problems with the way

25  he was rambling?

1      A    It's hard for me to say.  I was -- I worked on

2  the street as a patrol and police officer for 10 years,

3  so I encountered people of all walks of life, so it's

4  hard for me to say.

5      Q    There are a slot of ramblers on the streets of

6  Reno?

7      A    That's correct.

8      Q    Okay.  Now, at some point in time there were

9  some admissions made; correct?

10      A    That's correct.

11      Q    To your recollection did he admit making phone

12  calls?

13      A    I don't remember that specifically, just that

14  he admitted to making the threats.

15      Q    Okay.  And if I follow your testimony

16  correctly, there were five telephone calls starting out

17  at about 10:00 -- I had it here a moment ago --

18  10:30 -- 10:02, is that -- well, I'll let you testify.

19  When did the phone calls start?

20      A    So according to the phone, the phone that was

21  taken from the apartment, that phone's call log, the

22  first phone call was made at 10:06 p.m. on

23  February 29th.

24      Q    10:06 p.m. would be around 1:06 p.m. Eastern

25  Time when you figure in the time differences?

1    A    Correct.

2    Q    Okay.  And that there were five calls starting

3  then and then ending up sometime later in that evening?

4    A    The last phone call was made -- so the first

5  four phone calls were made between 10 p.m. and 11 p.m.

6  and then the fifth and final phone call was made at

7  approximately 8:30 a.m. on March 1st.

8    Q    Okay.  So that would have been well after these

9  alleged threats were made?

10    A    Correct.

11    Q    Because my calculation is they were all made at

12  1:00 o'clock in the morning Eastern Time which would

13  still have been 10:00 o'clock in the evening Western

14  Time, so that's why they're listed as the 29th rather

15  than the 1st?

16    A    That's correct.

17    Q    Okay.  Now, do you have any knowledge as to why

18  only two phone calls were reported on back there if

19  five were made?

20    A    Sorry.  I don't follow.

21    Q    Okay.  Well, there's a report of two telephone

22  calls being made that contain these alleged threats,

23  but according to your investigation there were five

24  telephone calls made.

25    A    Correct.

1    Q   Do you have any information from your
2  investigation as to what happened to the other three
3  calls?
4    A   I don't, but, like I said, the three additional
5  phone calls, I believe one was about 10 seconds long,
6  another one was 40 seconds long, and I don't remember
7  the third one.  So, like I said, they were all less
8  than a minute.
9    Q   But they were all to the same number?
10   A   Correct.
11   Q   Okay.  Now, when you went back to effect the
12  arrest of Mr. Ford, you got permission to go into his
13  room?
14   A   Yes, we did.
15   Q   Did you ever see a cell phone taped to his
16  door?
17   A   I believe there was one.
18   Q   Did you recover that cell phone as well?
19   A   No, because that wasn't the one that rang when
20  I called the phone number.
21   Q   When you went into the room how did it look?
22   A   It was in, I would say, a stage of disarray,
23  messy.
24   Q   Do you recall seeing empty alcohol bottles on
25  the floor of the room?

1    A    Yes, there were.

2    Q    Were there a lot of them?

3    A    Yes, there were.

4    Q    Were they gallon bottles?   Half gallon bottles?

5    A    I can't specifically recall.

6    Q    Do you recall what kind of alcohol they were?

7    A    I don't remember that either.

8    Q    You don't remember seeing vodka bottles?

9    A    There may have been.   I didn't --

10   Q    You just don't remember.   Okay.

11   But you did call the number and the phone rang;

12   correct?

13   A    Yes, sir.

14   Q    Okay.   And you seized that telephone?

15   A    I did.

16   Q    Did you do any other follow-up investigation

17   related to this particular case other than seize the

18   telephone and look at the phone logs?

19   A    I did.   So I submitted what's called -- well,

20   first I found out that the phone number was registered

21   to AT&T.   And from there I sent an administrative

22   subpoena which is just a request for information

23   belonging to that specific phone number.   AT&T sent a

24   response to my work email.   I printed it out and gave

25   it to Special Agent Cheretis.

1    Q    And those are the documents from which you were
2    able to determine that there were five phone calls made
3    to that number?
4    A    I didn't look specifically at that to count the
5    number of calls made to that phone number.  Where I
6    come up with the five is from the phone's actual call
7    log.
8    Q    From the phone's call log?
9    A    Yes, sir.
10   Q    Now, having completed your investigation and
11   taken him into custody, were you aware of him being
12   subsequently picked up by the Reno Police Department?
13   A    After we arrested him on the 10th?
14   Q    No, after you interviewed him on the 1st.
15   A    I don't know that he was arrested, no.
16   Q    Okay.  Was there some interaction between him
17   and the Reno Police Department?
18   A    I believe there was.
19   Q    And what type of interaction was that?
20   A    So when we went there on the 10th, so this
21   would be about a week and a half after we interviewed
22   him, the two patrol officers from RPD that went to help
23   us said that they were -- well, they questioned whether
24   or not it was the same person that was placed on what
25   we call a legal hold.  It's a -- technically it's not

1    an arrest, it's more of a detention that's done for

2    people who threaten to hurt themselves or other people,

3    among other things.

4        Q    It's basically a civil commitment for somebody

5    who has a mental impairment that needs to be seen by a

6    psychiatrist; correct?

7        A    Yeah, I would say so.

8        Q    Okay.  And these officers had picked him up the

9    following morning?

10       A    I don't know if it was those specific officers.

11   They just mentioned hearing a call about an individual

12   with a knife that was threatening other people and was

13   placed on a hold.

14       MR. CAMERON:  Okay.  That's all the questions I

15   have.  Well, I do have one other, Your Honor.  I'm

16   sorry.

17   BY MR. CAMERON:

18       Q    As nonsensical and rambling as he was when you

19   first arrived, you don't have any idea what his mental

20   state was when he allegedly made these calls, do you?

21       A    No.  I'm not qualified to make those kind of

22   judgments.  I know I wasn't --

23       Q    And you weren't there?

24       A    On the 1st or when he was taken --

25       Q    When the calls were made.

```
 1      A    No, of course not.

 2      Q    Okay.  That's all I wanted to establish.  Thank

 3 you.

 4      MR. SULLIVAN:  No further questions, Your Honor.

 5      THE COURT:  Thank you.  You're excused.

 6      The government may call their next witness.

 7      MR. SULLIVAN:  The government rests its case, Your

 8 Honor.

 9      THE COURT:  Okay.  The government has rested its

10 case, so I'm going to take a brief recess at this

11 point.  I'll call you back shortly.  It should only

12 take us a few minutes and then I'll call you back.

13 Please do not discuss the case during the recess.

14 Thank you.

15           (Outside the presence of the jury.)

16      THE COURT:  All right.  We've convened outside the

17 presence of the jury.

18      Do you have any witnesses that you intend to call?

19      MR. CAMERON:  Your Honor, prior to that I would

20 make a motion to the Court regarding Count Two, the

21 alleged threat against the White House operator.  And I

22 move to have that count dismissed since there hasn't

23 been evidence adduced that the jury could find beyond a

24 reasonable doubt that he's guilty of that crime.

25      THE COURT:  All right.
```

1      MR. CAMERON:  In this particular case, if the Court

2   wants to just make a ruling, that's fine.  Otherwise

3   I'll explain my reasoning.

4      THE COURT:  Well, you know, I think there is

5   evidence that would support the separate threat against

6   the operator factually based upon the testimony that's

7   been given and the language used, and so it is a jury

8   issue in my opinion.  So that motion is denied.

9      MR. CAMERON:  That's fine, Your Honor.

10     In regards to the Court's other inquiry, I have

11   discussed with Mr. Ford his right to testify or not

12   testify and explained to him that's his choice.  And

13   I've explained to him what merit that would be to his

14   case and what amount of risk it may also entail.  And I

15   believe at this point in time he's made a decision that

16   he wants to testify.

17     THE COURT:  That he does want to testify?

18     MR. CAMERON:  That's correct.

19     THE COURT:  Mr. Ford, do you understand that you

20   have -- you may remain seated.  Do you understand you

21   have the right to remain silent?

22     THE DEFENDANT:  Yes, sir.

23     THE COURT:  And the presumption of innocence

24   applies throughout the proceedings here.  You

25   understand that?  You have to say audibly "Yes" or

```
 1  "No."
 2       THE DEFENDANT:  Yes, sir.
 3       THE COURT:  And that means that you're not required
 4  to call any witnesses and you don't have to give any
 5  testimony and that can't be held against you.  And I
 6  would so instruct the jury.  Do you understand that?
 7       THE DEFENDANT:  Yes, sir.
 8       THE COURT:  You have the right to waive that
 9  privilege and give testimony on your own behalf.  Do
10  you understand that?
11       THE DEFENDANT:  Yes, sir.
12       THE COURT:  Now, your attorney doesn't make the
13  final decision on that; you do.  Do you understand
14  that?
15       THE DEFENDANT:  Yes, sir.
16       THE COURT:  He can decide trial strategy and he
17  examines the witnesses and what have you, but the
18  ultimate decision on whether you testify is up to you
19  to make.  Do you understand that?
20       THE DEFENDANT:  Yes, sir.
21       THE COURT:  If you make the decision to testify,
22  then you are open to full cross-examination by the
23  government.  Do you understand that?
24       THE DEFENDANT:  Yes, sir.
25       THE COURT:  And you can be impeached by virtue of
```

1   evidence presented by the government if you testify.

2   Do you understand that?

3       THE DEFENDANT:  Yes, sir.

4       THE COURT:  Okay.  Are you freely and voluntarily

5   making the decision to give testimony?

6       THE DEFENDANT:  Yes, sir.

7       THE COURT:  Have you been forced in any way by

8   Mr. Cameron to make that decision?

9       THE DEFENDANT:  No, sir.

10      THE COURT:  Have you been promised anything in

11  exchange for making that decision?

12      THE DEFENDANT:  No, sir.

13      THE COURT:  All right.  That's something you are

14  doing of your own volition and freely and voluntarily;

15  is that correct?

16      THE DEFENDANT:  Yes, sir.

17      THE COURT:  And you understand the consequences of

18  it, if you are cross-examined and the jury doesn't

19  believe your testimony, that that could impact your

20  case?  You fully understand that?

21      THE DEFENDANT:  Yes, I sure do.

22      THE COURT:  It may help your case, it may hurt your

23  case, but in any event, you're going to make yourself

24  vulnerable by virtue of testifying because you can be

25  examined.  Do you understand that?

1     THE DEFENDANT:  Yes, sir.

2     THE COURT:  And it's still your choice to do that;

3  is that right?

4     THE DEFENDANT:  Yes, sir.

5     THE COURT:  And you understand what you're doing;

6  is that correct?

7     THE DEFENDANT:  Yes, sir.

8     THE COURT:  Your responses are very appropriate to

9  the Court.  I'm watching you.  I believe that you fully

10  understand what we're talking about.  So when I call

11  the jury back in, then you will be called to testify.

12  You still don't have to if you decide not to between

13  now and then, but you'll be asked questions by your

14  counsel, and then Mr. Sullivan on behalf of the

15  government will have the right to cross-examine you.

16  Do you understand that?

17     THE DEFENDANT:  Yes, sir.

18     THE COURT:  And understanding all of that, you're

19  still freely and voluntarily making the decision to

20  testify; is that correct?

21     THE DEFENDANT:  Yes, sir.

22     THE COURT:  Okay.  Thank you.

23     I expressly find that the defendant, one, is

24  competent to make that determination just based upon

25  the reports that I've had earlier in connection with

1  his ability to assist in his defense.  At all times he

2  has appeared to the Court to be competent to make those

3  determinations and certainly competent to decide

4  whether he'll testify and that he has assisted in his

5  defense here.  He's been communicating with his counsel

6  and he's been very appropriate in his conduct in

7  connection with the Court here, so I believe that he is

8  competent to make the decision to go ahead and testify

9  in his defense.  And, therefore, we'll call the jury

10 back and the defendant may go ahead with his testimony.

11     As long as I have the jury out, I'm just going to

12 discuss -- well, I'll discuss the instruction we were

13 talking about earlier on diminished capacity after we

14 hear from the defendant, so --

15     THE CLERK:  Judge, would you like the defendant to

16 take the stand?

17     THE COURT:  We can call the jury back in just a

18 second.  Let's go ahead and have the defendant come up

19 here.

20     I think it's probably not necessary to have both of

21 you come up here.  Okay.  Maybe just sit in the back in

22 the corner.  That's fine.  And we'll have Mr. Ford come

23 up.

24     Do you anticipate that you're going to have any

25 rebuttal testimony?

1          MR. SULLIVAN:  No, Your Honor.

2          THE COURT:  So when Mr. Ford is finished

3     testifying, we'll take another recess.

4          MR. CAMERON:  And, Your Honor, before -- I'm

5     sorry -- before the jury comes in, I had a brief

6     opening statement to make.  I had reserved --

7          THE COURT:  Oh, I had forgotten about that.  Yeah.

8     That was my fault.  I should have remembered that.  I

9     guess I ought to take two recesses then.

10         MR. CAMERON:  Judge, this trial has been so short,

11    I'm just going to waive the opening.

12         THE COURT:  No, I want you -- it's not a problem.

13    It's not a problem at all.

14         So let's go ahead and have you be seated over here

15    and we'll just take another quick recess.

16                   (In the presence of the jury.)

17         THE COURT:  I'm sorry.  You may all be seated.

18         You may make your opening statement on behalf of

19    the defense, Mr. Cameron.

20         MR. CAMERON:  Thank you.

21         Ladies and gentlemen, in making my opening

22    statement, I always like to reiterate what the judge

23    has already advised you.  What we say in these opening

24    statements is not evidence.  Evidence is what you hear

25    testified to from the witness stand and the reasonable

1   inferences that you can draw from that testimony.

2       My job is a little easier than Mr. Sullivan's job,

3   because a lot of the testimony is already in, so you

4   can see what an opening statement is about.  It's

5   supposed to be a roadmap as to what each side believes

6   the evidence will show to you.  The final determination

7   of what that evidence says or what it means to you is

8   the determination that you get to make as triers of the

9   fact.

10      In this case you were promised things in the

11  government's opening statement, that there were phone

12  calls made to the Washington, D.C., White House comment

13  line.  I think there's been testimony to show that that

14  took place.

15      You've also been told that there were threats that

16  were made.  And I think the testimony of the first

17  witness indicates that she believes there were threats

18  made and it was her job to write down what those

19  threats were.  What you didn't hear was a tape

20  recording of them because none exists.  For some reason

21  since the Nixon era they don't like recordings at the

22  White House.  And that's something I think some of you

23  that are as old as me can understand and appreciate.

24  But there are no recordings.

25      There's also evidence adduced that there's a

1   13-minute long call but only 20 to 30 seconds of it
2   were reduced to writing.  And in all honesty, the
3   evidence adduced was that all that she remembered other
4   than the fact that the caller was irrational.  That was
5   introduced in the exhibit which is the call log.  It
6   was an irrational call at 1:00 o'clock in the morning.
7   Other than that, we don't know much about that
8   telephone call.

9       What we do know from the testimony of the special
10  agent is that there was an immediate response, because
11  these are matters that are important and they require
12  an immediate response.  And the resident agent in
13  charge here did that.  He went and interviewed
14  Mr. Ford.

15      The roadmap is pretty clear from there.  He was
16  nonsensical.  He was erratic.  He was babbling about
17  biblical scriptural things.  He was telling the agents
18  to kill him, that he had pipettes in his ribcage, that
19  they should smash them, if they didn't, he would.  And
20  it took the agent quite a while to get him calmed down.

21      When he did, he asked him if he had made threats.
22  And he said, "Yes.  And, in fact, you should join me,
23  because I'm a good Catholic and you're good Catholics
24  and it's our duty to stamp out evil."  Even during what
25  was said to be the rational part of the conversation,

1   he was still irrational in his responses.

2       The agent invited him to call him -- and that was

3   testified to -- if there were any other instances where

4   he was unhappy, not to call the White House, to call

5   him specifically.  The resident agent in charge

6   indicated that was so he could capture the phone

7   number.  I leave that to you as to what that evidence

8   tells you, whether it was to capture the phone number

9   or for a number of purposes, to keep him from making

10  more irrational calls to the White House.

11      Having said that, Mr. Ford availed himself or at

12  least the telephone number that they had rang at his

13  office ten times.  And each of the ten times each of

14  the calls were ranting and irrational and biblical

15  scripture.  Again, a man who is not in a right mental

16  state.

17      That's the evidence that was adduced by the

18  government.  But the government goes on, because part

19  of this agent's job is to investigate the validity of

20  the threat, what the mental state may have been of the

21  person making it.  He continued the investigation.

22      He found out there were calls to the Russia Embassy

23  as well, found out that Mr. Ford had been picked up the

24  very next day on a legal 2000, as testified to by both

25  of the law enforcement officers, because he was a

1  threat to himself and others and needed to be examined

2  by a psychiatrist before he could be released.

3     The agent testified that his investigation had

4  shown that he was there for eight or nine days before

5  he was reduced from the psychotic state he was in to

6  one where he could be released back into the public.

7  This is the government's case, not our case.

8     What you will hear next is from Mr. Ford himself as

9  to what was going on in his mind, what happened, his

10  vision of what went on that night, what the

11  conversations between the agents were, what he was

12  doing, where he called, how many times he called, what

13  his recollection, if any, of the conversations were.

14     After that the judge will instruct you and you'll

15  follow those instructions and return what I believe

16  will be a not guilty verdict in this case based on the

17  instruction of diminished capacity.

18     Thank you very much.

19     THE COURT:  Thank you.  Mr. Cameron, you're getting

20  your exercise today.

21     I'm going to take about another five-minute

22  recess -- do not discuss this case -- and then we'll

23  call the witness.  We'll call you back in just a

24  moment.  Please do not talk about the case.

25          (Outside the presence of the jury.)

1    THE COURT:  I'm going to have an instruction

2  revised somewhat and then I'll give a copy of it to

3  you.  It will take about three or four minutes and then

4  we'll call the jury back.  So I'll be right back.

5    MR. SULLIVAN:  Can we take a quick bathroom break,

6  Your Honor?

7    THE COURT:  That's fine.

8              (A recess was taken.)

9    THE COURT:  You can take a look at that.  We'll

10  talk about it later when we finish up.  What I'm doing

11  is just tracking the language from the -- as best I can

12  from the Christian decision.  I'll explain everything

13  about that at the time.  In fact, most of the language

14  is precisely the language of that decision, but we will

15  talk about it later.

16    Okay.  Let's go ahead and have Mr. Ford come up

17  here.

18    And I understand the government's position on it.

19  I think that's a legal issue for the Court to decide,

20  whether or not there's a threshold basis for giving the

21  instruction in the first place.  And that was the

22  concern the Court had on Judge Mahan's case.  And I

23  believe at least at this point -- I have to hear all

24  the rest of the testimony -- that that threshold has

25  probably been met.

1      All right.  Let's go ahead and bring the jury in.

2  We'll talk about it later.

3               (In the presence of the jury.)

4      THE COURT:  You may all be seated.

5      All right.  If you'll raise your right hand and be

6  sworn, please.

7    (The clerk administered the oath to the witness.)

8      THE WITNESS:  Yes, sir.  Yes, ma'am.

9      THE CLERK:  Please state and spell your full name

10  for the record.

11      THE WITNESS:  Steven Eugene Ford, S-t-e-v-e-n,

12  E-u-g-e-n-e, F-o-r-d.

13      THE COURT:  All right.  Thank you.

14      Mr. Cameron, you may go ahead.

15      MR. CAMERON:  Thank you, Your Honor.

16                   STEVEN EUGENE FORD,
                having been first duly sworn, was
17              examined and testified as follows:

18                   DIRECT EXAMINATION

19  BY MR. CAMERON:

20      Q    And, Mr. Ford, what town do you live in?

21      A    Reno, Nevada.

22      Q    And how long have you been here?

23      A    Eleven years.

24      Q    Okay.  And, sir, were you ever in the Armed

25  Services?

1    A    Yeah.  I was an aerospace med tech.  I went in

2   as EOD and then I transferred over to aerospace

3   medicine and I did -- I went to Brooke medical school

4   to become a medic.  And then I went to Pope Air Force

5   Base on Fort Bragg, North Carolina, to do medical

6   coverage for Delta Force with JSOC.

7    Q    And were you -- when did you leave the Air

8   Force?

9    A    I think it was back in 1990, somewhere around

10  there.

11   Q    At some point in time were you declared to be a

12  disabled veteran?

13   A    Yes.

14   Q    And when was that?

15   A    I think that was in -- a couple years after I

16  left the service.

17   Q    And the basis for your disability -- in

18  addition to your knees, did you have a panic disorder

19  and posttraumatic stress disorder?

20   A    I've been diagnosed with posttraumatic stress

21  disorder.  I also had a head injury too.  I had a --

22  under my right eye I got sutures right there when I was

23  in Fort Bragg.  And also when I was out doing some drop

24  zone coverage for the 82nd and also for -- I hit a

25  tree.

1     Q   Did they also diagnose you with agoraphobia?

2     A   Yeah, they did.  I don't like being around a

3 lot of people.

4     Q   Okay.  Do you like leaving your house at all?

5     A   Not too much.

6     Q   Okay.  You were also diagnosed with a schizoid

7 personality disorder?

8     A   Yeah, that's what they tell me.

9     Q   Okay.  Now, during the time that you were

10 disabled did you work part-time as an inventor?

11     A   Yeah, I have invented some stuff, yeah.

12     Q   Okay.  What are some of the things that you've

13 invented?

14     A   One is to knock out drones.  It's -- I have a

15 frequency generator.  I had one that I could put up to

16 an invisible fence where you can jam all the

17 frequencies of drones coming over -- like over your

18 house or whatever.  That's one of the things.

19     Q   And did you patent that particular idea?

20     A   No, I never -- I haven't had a chance to.

21 There hasn't been a drone -- you know, there has never

22 been drones like there are now.  Before this day there

23 was no use to have an invisible fence that just knocks

24 down drones.

25     Q   But you invented this some time ago is what I

1   understand.

2        A    Yeah, probably about 12 to 14 years ago.

3        Q    Okay.  What about the invention you had to fix

4   the oil spill in the Gulf of Mexico?

5        A    I also had to where you could use pipes like

6   lead pipes attached to a water -- a water jet pretty

7   much with high explosives to bring them down inside the

8   actual well itself to cause an explosion.  Actually you

9   can also use hydrogen gas to also pump through your

10  line and it would just -- it would collapse the whole

11  oil drilling pipe from below the surface.  It would be

12  almost like a small earthquake.  It would collapse

13  anything.

14       Q    And it was your belief that that would stop the

15  oil leak into the Gulf of Mexico?

16       A    It would have stopped it for sure.  It would

17  have definitely ended it.

18       Q    And did you try to get support for these

19  inventions to try to have them commercially used?

20       A    Some of the inventions that I have are really

21  not -- you can't really go out and get support for

22  them.  I mean, kind of -- you know what a hovercraft

23  is.  So you can use that almost like -- to put an IED

24  on it for a long range to help personnel in the Middle

25  East or also have like what is known as a foam bomb.

1    I think most people have seen what you can do with

2  canned foam when you spray it on your house.  You can

3  actually drop that from like 30,000 feet, like five

4  gallon buckets, in an area so you don't cause injuries

5  and get some people's radiators.  It also clogs up

6  people's guns so they can't use them.  And then when

7  they try to clean them, they have to use gasoline to

8  clean that stuff.  So it would make a great -- you

9  know, you would have like almost like a vapor line when

10  you cleaned your weapons.

11    And in the Middle East that would save lives,

12  because they can't use their weapons when you have foam

13  like a .50 caliber or an AK-47.  It jams the --

14    Q   And, in fact, sir during and around the

15  timeframe of March 1st of this year, did you call the

16  Israeli Embassy and try to help them in their situation

17  with your invention?

18    A   Yeah, I sure did.  I gave them the foam

19  disbursement which just basically allows them to drop

20  it in an urban setting to take out the vehicles,

21  because you can't drive a vehicle in the Middle East

22  without a radiator.  If you block that radiator up --

23  you know, I imagine you all have seen what happens to a

24  carburetor from the radiator when it's really cold.  It

25  gets hot.  You put foam in the radiator, it knocks the

1  vehicle out completely.

2      It also would knock out any kind of anti-aircraft

3  guns, because the foam gets in your mechanism and it

4  doesn't allow the fire.  If you do try to fire it, it's

5  going to explode on you.  So I gave them that design.

6      Q   And then in this same timeframe, around March

7  of 2016, did you also call the Russia Embassy to try to

8  help them out?

9      A   Yeah.  They said they had a jet that went down

10  with no reason why.

11      Q   And that was something you read in the

12  newspaper?

13      A   I read it in the newspaper.  I also saw it on

14  TV.  But nowadays you can actually make a liquid

15  hydrogen bomb and use a pipette as a detonator.  So

16  basically it's a glass pipette with liquid hydrogen.

17  There would be a cursory explosion.  There would be

18  something you could throw in a briefcase or in a

19  suitcase.  As the liquid hydrogen starts to expand,

20  because you can't keep it at those temperatures, it

21  would cause a hydrogen bubble in the suitcase which

22  once that pipette ignite the hydrogen gas around the

23  cylinder, that compression along with the hydrogen

24  bottle itself would also explode.

25      Q   And that was your theory as to how the

1  aircraft --

2      A    The Russia aircraft that went down on the Sinai

3  peninsula.

4      Q    And were the Russians receptive to your theory?

5      A    We talked for a little bit, and they kind of

6  got upset with me when I said, "You need to stop

7  bombing, you know, certain places in Syria and go after

8  the place in Turkey."  There's some places in Turkey

9  right now that are hot spots for ISIS.  Actually they

10  use Starbucks of all places.  There's three Starbucks

11  right above Aleppo.  And those three Starbucks is where

12  they access the direct web.  It also is where they put

13  all their propaganda video.

14      I said, "That's the places where you need to start

15  getting ISIS and not -- you know, don't be bombing

16  innocent civilians in Syria.  Make a few innocent

17  strikes in Turkey."

18      Q    And when you were rebuffed by the Russian

19  Embassy, did you --

20      A    I wasn't rebuffed.  They just -- they didn't

21  know what to do with me.

22      Q    Well, did you then call the CIA?

23      A    I called them to let know that I talked to

24  the Russians.  That was about it.

25      Q    Okay.  Now, do you believe that you were being

1   investigated by the government prior to the March

2   incident?

3       A   Yes.

4       Q   And was that as a result of a conversation you

5   had on a bus ride to Washington State?

6       A   No, Sak'N Save.  No.  Sometimes I -- people

7   will sometimes ask me, you know, "What do you think of

8   this idea?" or "Do you have an idea about this?"  They

9   ask me, you know, "How would you solve this problem?"

10      So I might take a bus ride up to Moses Lake in

11  Washington and on the way up there I might read a

12  manual or listen to something.  And on the way back,

13  you know, I can drop a manual off or whatever, so --

14      Q   And, in fact, sir, is it your belief that you

15  were contacted on a bus ride to the lake in Washington

16  by someone who was giving you the schedule for ICBMs

17  that were being transported about the country?

18      A   No.  Somebody said, "How would -- what would be

19  the easiest way to do a quick response time for an

20  ICBM?"

21      The most quickest way you could do that is by

22  having a tube launcher, which your ICBM goes into like

23  a submarine.  You've seen nuclear submarines with a

24  tube.  You put that tube in like a storage container

25  and have it -- like an ROV to where you could actually

1  drop it off the coastline.

2      And what would be the response time from the time

3  it takes off -- let's say if you wanted to hit New York

4  City and/or Washington, D.C., and make it look like a

5  terrorist got in there, instead it was an ICBM or even

6  a cruise missile, you would want to drop the storage

7  container off the coast of Washington, D.C., or New

8  York.  And your response time, you would have like five

9  minutes from the time that storage container went

10  vertical to launch to hit a major city.

11      Q   And did you, sir, remember calling Edwards Air

12  Force Base to advise them of this?

13      A   There was things that the Russias were talking

14  about, but, yeah, I did call Edwards Air Force Base and

15  I did say, you know, "Why don't you show the Russians

16  what we have?" because we have cruise missiles that are

17  stealth and we could just as easy put them in storage

18  containers with ROV -- remote-operated vehicle storage

19  containers that would be almost like a small submarine,

20  but they would be unmanned.  They would just float an

21  antenna every 30 days to get an update signal.  They

22  would stay stationary until they needed to be moved.

23  The batteries would be hydrogen cell batteries so they

24  wouldn't have an internal resistance so you would just

25  keep on going and going and going.  So yeah.  But that

1   was back in November.  So yeah.

2       Q   As a result did you get visited by the Reno

3   Police Department and tell you not to call them

4   anymore?

5       A   They didn't like me calling Edwards Air Force

6   Base and talking to a private, so yeah.

7       Q   Okay.  Now, sir, getting back to on or about

8   March 1st of this year, what were your feelings towards

9   the government of the United States?

10      A   Well, I love my country.  I mean, that's why I

11  joined the military.  And I was -- I'm a military brat

12  actually.  I was conceived at Edwards Air Force Base.

13  I was born in Hawaii.  I was born shortly after the

14  Viet Nam War started.  And I was in the Philippines as

15  a kid when the Viet Nam War ended living off base.

16      And that's actually where people -- my first

17  episode of posttraumatic stress disorder came from,

18  because at that time in the Philippines it was really

19  rough and we had people actually try to come to my

20  base -- off base in the Philippines, off Clark, and

21  actually try to kill me as a kid.  So I was under the

22  age of 10 when somebody first tried to kill me.  So --

23      Q   And what, sir, during this time was your

24  biblical connection with --

25      A   Yeah.

1    Q   -- Mr. Melchizedek?

2    A   Melchizedek, Eleazar Melchizedek.  When you're

3  talking to Iranians -- Melchizedek is actually in --

4  it's in the Old Testament, the New Testament.  It's

5  even in the Koran.  So if you want to use a name that

6  someone would recognize when you're talking to the

7  Middles East or somebody, that's a good name to use,

8  because everybody knows that name.  You could go to any

9  holy book and find that name in it.

10   Q   And did you, sir, adopt that name as your own?

11   A   I use it if I go on line, if I go like at a

12  Starbucks.  Actually you can actually access some

13  things on the web and use that name from the Koran and

14  go a lot farther than if you use Steven Ford.

15   Q   And you were investigating activities in the

16  Middle East with the pseudonym?

17   A   Yeah.

18   Q   Okay.  And do you often feel a religious

19  calling to where you have to stamp out evil?

20   A   No.  I'm a Baptist.  I've never been a Catholic

21  in my life.  Actually I don't know where they got that

22  from.  I'm a Baptist.  I actually went to the ministry

23  at a Baptist school.  It's called Bible Institute.  It

24  was a Baptist school.  So I don't know where they got

25  the Catholic stuff at.  I'm a bible-breathing Baptist.

Q   But you're a religious person?

A   Yeah, I am a Christian.

Q   Okay.  And in regards to telephone calls made
on the 1st, aside from the Russia Embassy and the
Israeli Embassy and perhaps the CIA in that timeframe,
do you have a recollection of calling the White House?

A   No, I do not.  I have no knowledge of any
threatening phone calls at all.

Q   Okay.  And do you have a recollection of
speaking to a White House operator at any time?

A   No.

Q   Okay.  And you're aware, sir, that there are
five telephone calls from your phone to that number
during that timeframe?

A   From the call logs, yeah, I am aware of that.

Q   And do you have any explanation for that?

A   I -- the VA had me on medication where all
during those times I was unconscious.  I actually --
waking up with my door open and me on the floor.  So,
yeah, I have very low blood pressure as it is.  And
they also had me on Trazodone, Prolixin,
diphenhydramine, and a few other things.

Q   And, sir, not to be embarrassing to you, were
you having a problem with alcohol at this point in
time?

1  A  I do drink, yeah, so I do have a problem with

2  alcohol.  And I also had back surgery.  Also I'm a

3  disabled vet.  Also my knees too.  So I'm in a lot of

4  pain.  So I do drink and I do --

5  Q  The alcohol that you were drinking, what were

6  you drinking?

7  A  Vodka, vodka or rum.  It's depends on how cheap

8  it is, so --

9  Q  Okay.  Because you're on a fixed income?

10  A  I'm on a fixed income.

11  Q  And how much were you drinking during the

12  timeframe of, say, February 27th to the time you were

13  admitted to the hospital on the 2nd of March?

14  A  Well, I'm like my dad.  He's a drinker too.  I

15  can probably down a gallon of vodka like, you know,

16  White Wolf or McCormick probably in about a day and a

17  half, not even a day, sometimes two or three days.

18  Q  And this would be during the same time you were

19  taking your Trazodone and other prescription

20  medication?

21  A  Yeah, the same thing.

22  Q  Okay.  And do you recall having a conversation

23  with this gentleman here?

24  A  Yeah.  He's the one who threatened me with the

25  SWAT team.  Yeah, he said he was going to come back and

1   threaten me with the SWAT team.  I remember him quite

2   well.

3       Q   Let's just go back to when you think the

4   conversation took place.

5       A   It was -- it was around the 1st, I imagine.  So

6   it was around the 1st.  I remember that.

7       Q   And do you recall from that conversation ever

8   telling this gentleman that you had some sort of poison

9   implanted in your ribs?

10      A   That's -- it's -- if you don't want to be

11  captured -- I mean, you know, I personally would never

12  want to be captured by anybody that would want to

13  torture me or whatever.  So they call it a kill switch

14  where you take a pipette and you fill it up with a list

15  of poisons and you seal it up over a torch and then you

16  insert it into your ribs.  So that way if you ever do

17  get captured, you can actually do, you know, a rib

18  break and you don't have to worry about being tortured.

19      Q   That's the theory.  Have you ever to your

20  knowledge inserted a pipette between your ribs so you

21  wouldn't be captured?

22      A   No.

23      Q   So --

24      A   Some of this stuff was -- you know, at Fort

25  Bragg is where they have like Jay Sofford (phonetic) of

1   Delta Force and also like Camp Mackall where the CIA

2   flies him in and out of.  So that's where some of this

3   stuff you just pick up.

4       Q   Okay.  So on the night of the 1st, or I guess

5   it would be the early morning hours of the 29th for us

6   in this timeframe, were you drunk, or do you remember?

7       A   I don't remember.

8       Q   Okay.  Had you been drinking up to that point?

9       A   Yeah, because it was the end of the month.  I'm

10  always -- I always see how much money I have left over

11  and then I usually buy all my vices.

12      Q   That's when your checks come in?

13      A   No, that's before my checks come in, because I

14  always pay all my bills, my food, and then I buy my

15  vices.

16      Q   Okay.  So in terms of a meeting with special

17  agents from the Secret Service, do you recall them

18  asking you if you had made threats against the

19  President?

20      A   No, I don't.  And I know I didn't volunteer it

21  either, because I don't do that.  That's -- I don't

22  know where they got -- that's them; that's not me.

23      Q   But you're saying that knowing that you don't

24  have a good recollection of that evening?

25      A   Right, but I know -- I'm a Christian, right, so

1  I know that there's no use of killing those people that

2  they say I threatened, because even like the current

3  President, he has to go off and become like the head of

4  the United Nations.  You know, if you look at the

5  bible, you know, you really can't kill him.  You have

6  to go off and become a globalist.

7      Q    So you believe President Obama will become the

8  head of the United Nations?

9      A    Right, I think that's going to be his next job.

10     Q    Now, you heard the testimony today, especially

11  the young lady from the White House answering service?

12     A    Right.

13     Q    Do you know that lady?

14     A    No.

15     Q    Do you know whether she has children?

16     A    No.

17     Q    Would you have any reason at all that you can

18  imagine as to why you would ever threaten that person?

19     A    None.

20     Q    Okay.

21     A    I still don't believe I done it.

22     Q    Well, let me ask you this, sir.  Have you ever

23  used the terminology "bitch"?

24     A    No.  I mean, I've used it before, but, no, not

25  in threats or whatever.

1    Q    When you've used it before, is that gender
2 neutral to you?
3    A    Yes.  But usually it's for a female dog.  I
4 mean, I don't use profanity like that.
5    Q    So if the agents testified that you were using
6 profanity --
7    A    Yeah, that's wrong.
8    Q    That's not your usual makeup?
9    A    Right.  I just don't use it.
10    Q    But you don't remember what you did that night?
11    A    Right.
12    Q    Okay.  Now, the following morning did you have
13 occasion to go to the mini mart or the 7-Eleven?
14    A    Yeah, I went to the 7-Eleven to buy -- their
15 hot dogs are cheap.  You can get a hot dog and a Big
16 Gulp for two bucks.
17    Q    And on the way to the 7-Eleven -- this would be
18 on the morning of the 2nd --
19    A    In front of the police station.
20    Q    -- did anything unusual happen?
21    A    They arrested me and took me to the VA
22 Hospital.
23    Q    Who arrested you?
24    A    The Reno Police Department.
25    Q    Okay.  And were there allegations that they

1  were making that you're aware of?

2      A    They said I was threatening, so that's when

3  they took me to the VA Hospital.

4      Q    And, in fact, sir, didn't they say you

5  threatened to kill yourself with a 10-inch knife?

6      A    I had it around, so just, you know, just

7  like -- it was a hanging knife, but it was just that.

8  I mean, they could probably read into that if you just

9  see somebody doing that.  And I think three or four

10  days after that the deputy did arrest somebody for

11  having the same knife situation, but he was actually

12  robbing the place.

13      Q    Okay.  But they took you to the Veterans

14  Hospital on what's generally termed a legal 2000, in

15  other words, you had to have a mental evaluation before

16  you would be allowed to leave?

17      A    Right, I did.

18      Q    And how long were you at the VA Hospital?

19      A    I think I was there for seven or eight days.

20      Q    You were there from the 2nd to the 9th?

21      A    Yeah.

22      Q    During that time were you diagnosed as

23  psychotic?

24      A    Yeah, they were saying I was psychotic, I

25  was --

```
 1      Q    Schizo personality?

 2      A    Yeah, schizo personality, suffering from

 3 posttraumatic stress disorder.

 4      Q    Did they say you were delusional?

 5      A    Yeah, somewhat.

 6      Q    Did they say you threatened hospital staff as

 7 well?

 8      A    That's what they said.  That's what they

 9 stated.

10      Q    And what's your recollection?

11      A    I remember I always quote one verse over and

12 over again whenever I get upset, and it's -- you know,

13 it's from the Book of Revelations, that thou art worthy

14 O Lord to receive glory and honor and power for thou

15 hast created all things and for thy pleasure they are

16 and were created.  That's what I say over and over

17 again when I get nervous, but I don't threaten, no.

18      Q    Do you recall being nonsensical and rambling --

19      A    That's what they said I was.

20      Q    -- at the VA Hospital?

21      A    That's what they stated I was.

22      Q    And did they put you on medication?

23      A    Yeah, Risperdal.

24      Q    And how long did they keep you on Risperdal?

25      A    While I was there.  They put me on Risperdal
```

1    and they took me off all my other medications.

2        Q    And were you counseled and visited several

3    times while you were there before they could make a

4    determination to release you back into --

5        A    It was every day they -- actually twice a day I

6    was counseled and also I had to go with the group

7    therapy too.

8        Q    Okay.  And, sir, despite all the testimony, the

9    fact that you were irrational on the phone, the fact

10   that you were rambling incoherently, the fact that you

11   were nonsensical, the fact that you weren't making any

12   sense at all, do you believe you have mental problems?

13       A    That's a tough one.

14       Q    Well, I'm here to get your answer, sir.

15       A    I think anybody who is a Christian would get

16   that diagnosis, so yeah.

17       Q    So you think it's your Christian beliefs

18   they're diagnosing rather than your mental state?

19       A    Right.  Yeah, I mean I -- yeah, because I -- I

20   think the medical community don't like Christians and

21   not to mention they also don't like -- I mean, I have

22   posttraumatic stress disorder, like I know that.  And I

23   do drink and all that kind of stuff.  So I know I

24   probably do have mental issues, because you can't go

25   through a gallon of liquor --

1    Q   But even at times you're not drinking and

2  mixing your medication, you hold some beliefs and ideas

3  that are not held by the general public as to your

4  ability to divine how to plug the leak in the Gulf of

5  Mexico, why the airliners came down, how to drop foam

6  bombs in the Middle East so there can't be any gunfire,

7  those are things that you believe in and have worked

8  on?

9    A   Yeah.

10   Q   And that's not odd to you?

11   A   Yeah, it is a little odd, I think, when you

12  look at it from a perspective of further away.  When

13  you're in it, it's not, but when you're looking at --

14  because, I mean, I don't want to see people get killed

15  no matter anywhere, especially in the Middle East right

16  now.  So that's --

17   Q   And your testimony is you bear no malice

18  towards the President of the United States?

19   A   No.  He has to go on and do other things, so

20  no.

21   Q   And certainly the young lady that testified

22  today, you don't know her from Adam, had no reason to

23  threaten her?

24   A   No.  That's right.  I have no reason to know

25  her, no reason to threaten her or do her harm

1   whatsoever.

2       Q    And your testimony today is you have no

3   recollection of the verbiage that was testified to by

4   the young lady from the White House?

5       A    I still have no knowledge and I still think it

6   was done.  I can figure out ten ways how to do that.

7       Q    What ways would those be, sir?

8       A    One, you could clone my phone.  That's the

9   simplest way.  And I have a broken phone on my door

10  that all someone has to do is clone your phone and make

11  those same phone calls.  They can also clone your phone

12  and listen to your conversations.  They can clone your

13  phone and listen to your conversations and then re-edit

14  it.  They can clone your phone, tape your

15  conversations, edit it, and then make phone calls to

16  whoever they want.

17      Q    So your theory is it could have been a cloned

18  phone, it could have been reconstructed conversation?

19      A    Right.

20      Q    And as for the interviews with the agents, you

21  simply remember parts and don't remember parts?

22      A    I remember them coming to my door.  I remember

23  George threatening me with the SWAT team.  That's --

24  I'll never forget that.  I remember seeing the Catholic

25  rings on them and them being Catholic.  I also remember

1   the same -- not him but having a run-in with Secret

2   Service agents at a Hillary Clinton campaign rally too.

3   And that's when all my mail stopped coming to me and

4   that's when I started getting notes under my door too.

5       Q   So you feel as though you were being persecuted

6   because of going to the Clinton rally?

7       A   Yeah, because Clinton had a chance to

8   kill Osama bin Laden when he was President and he

9   didn't take that chance.  He didn't do it because there

10  was a Saudi prince with him.  If he would have killed

11  Osama bin Laden then in that cave where he was hiding

12  at, then we wouldn't have had 9/11.  That was the

13  biggie right there.

14      Q   And how is it you know things like this that

15  are at the highest levels of government?

16      A   I was at Pope Air Force Base, North Carolina,

17  when -- JSOC was right there.  I remember going right

18  there with JSOC.  I remember Camp Mackall.  I remember

19  when Clinton came to Pope.  That was a big deal too and

20  that's what everybody was talking about.  Everybody was

21  saying why didn't he kill that no good SOB when he had

22  a chance.

23      Q   So this is just rumors you've overheard at the

24  Air Force base?

25      A   Well, usually when you have some stars on your

1  shoulder and he's complaining or even anybody in the

2  special forces like Delta Force -- when Delta Force is

3  complaining that the President didn't kill Osama bin

4  Laden when he had a chance because some Saudi prince

5  was with him -- and after that you also -- right after

6  that is when they started getting the expensive

7  speaking engagements from all the universities that all

8  these Saudis went to.  And, yeah, there was -- that

9  was -- that upsets me, because 9/11 shouldn't have

10  happened.

11     Q   Okay.  When you were released from the mental

12  hold on you at the Veterans Hospital, where did you go?

13     A   I went home.

14     Q   Okay.

15     A   I was going to go home and start donating

16  plasma.  I actually went to the -- to see if I could

17  donate plasma again.  So yeah.

18     Q   And at some point during that day were you

19  again recontacted by the Secret Service?

20     A   Yeah, they came and arrested me.  And then,

21  again, you know, when they arrested me, they said,

22  "Don't worry.  You'll be out before dinner."  And now

23  I've been locked up 250 days.

24     Q   Okay.  You recall that comment by the agent?

25     A   Yeah.

1    Q   Okay.  And did you, in fact, give them
2  permission to search your house?
3    A   Yeah, because I didn't think there was nothing
4  to it.
5    Q   Okay.  And did you give them permission to
6  search a storage shed you had?
7    A   Yeah, again, because I didn't think there was
8  nothing to that either.
9    Q   Because at this point in time you hadn't read
10  any reports as to what the allegations were?
11    A   Exactly.
12    Q   Okay.  Is there anything, sir, that would have
13  caused you on the evening of the 1st to be angry enough
14  to call the White House line and threaten the
15  President?
16    A   No.  No.  As I said, I don't -- no.  No, there
17  was not.
18    Q   Okay.  And that's with the knowledge you had
19  been drinking that night; correct?
20    A   That's with the knowledge I had been drinking
21  and I had been taking my VA medication like I was
22  supposed to and everything else.
23    Q   Do you recall being angry and irritated when
24  the agents knocked on your door?
25    A   Yeah, I might have been, because that morning,

1  you know, it's a hangover or whatever, so, yeah, I
2  might have had a hangover.
3      Q    Okay.  But you don't recall the exact
4  conversations you had with them?
5      A    I remember him knocking on the door.  And then
6  I remember opening the door, going out, because I
7  didn't know what was going on, because I never like to
8  see local police around me, because that's something
9  that I just don't like seeing.  And I even told him, I
10 said, "Please come and knock on my door without these
11 guys and that would be just fine.  I'm not going to
12 hurt anybody."
13     And then we made a deal that he could talk for
14 seven minutes and I could talk for seven minutes or
15 whatever.  And in that seven minutes, that's when they
16 started -- that's when he started going on his bit
17 about coming back with the SWAT team and threatening
18 me.
19     Q    Okay.  And, sir, do you recall making 17 calls
20 to the Secret Service office --
21     A    No.
22     Q    -- on the 1st and 2nd?
23     A    No.
24     Q    You don't recall making any of those calls?
25     A    No, not too much.  No, I mean, my phone has

1  those things where you can -- it auto dials, so like
2  the last number or first number or whatever.
3      Q    So you don't have any recollection of making
4  those calls and rambling on nonsensically about
5  biblical issues?
6      A    No, but I'm always talking about biblical
7  issues even on the bus.  On the RTC bus I ramble, so --
8      Q    And who talks to you on the bus?
9      A    If somebody -- you know, if you want to talk --
10 if somebody wants to talk about Christianity or how to
11 get to heaven, I tell them, you know, trust the Lord
12 Jesus Christ as your personal savior and Jesus Christ
13 as God and you're going to be saved.  So I give them
14 the gospel.  And from there we go to you believe we're
15 living in the end times.  And that's the other thing.
16 People don't like me talking about the end times.
17     Q    Have you ever heard voices on the bus?
18     A    No.
19     Q    Okay.  So these are just conversations with
20 people you have on bus No. 2?
21     A    Right.
22     MR. CAMERON:  Your Honor, that's all the questions
23 I have.
24     THE COURT:  All right.  Thank you, Mr. Cameron.
25     Mr. Sullivan.

```
 1                    CROSS-EXAMINATION
 2   BY MR. SULLIVAN:
 3       Q   Mr. Ford, you testified that you were admitted
 4   to the local Reno VA Hospital for about seven days,
 5   from March 2nd to about March 9th of this year?
 6       A   Yeah.  Can I get the medical reports and
 7   refresh my memory?
 8       Q   I can't hear you.  Can you speak up?
 9       A   Can I get the VA medical reports and refresh my
10   memory?
11       Q   But you just testified --
12       A   Yeah.
13       Q   -- that you were admitted for about a week.
14       A   Yeah, about a week.
15       Q   And do you recall on the day when you were
16   discharged by the VA Hospital, you said you went home
17   right after that?
18       A   I walked home.
19       Q   You walked home from the VA Hospital?
20       A   Yes.
21       Q   And when you were being discharged, isn't it
22   true that you told two of the doctors there that you
23   were going to continue harassing the government but
24   would take it down two notches?
25       A   Not harassing.  I said I would take it down --
```

1    I would take my lifestyle down a few notches.

2        Q    But you told those doctors that you were going

3    to continue harassing the U.S. Government, didn't you?

4        A    I said I would take it down a few notches.

5        Q    Okay.  Now, if I could show you this exhibit.

6        MR. SULLIVAN:  Do you have a letter opener or a

7    pair of scissors?

8        Your Honor, could the record reflect that I'm

9    taking Government's Exhibit No. 1 -- it's a sealed

10   envelope -- and I'm going to open it and take out the

11   contents.

12       THE COURT:  The record will so reflect.

13   BY MR. SULLIVAN:

14       Q    Mr. Ford, I'm showing you -- this has been

15   admitted into evidence.  It's Government's Exhibit

16   No. 1.  And take a look at that.

17       A    Yes, sir.

18       Q    Does that appear to be the phone that they

19   seized on the date of your arrest?

20       A    Not all of it.

21       Q    What do you mean "not all of it"?

22       A    When I left the VA Hospital, my cell phone

23   didn't have a back.

24       Q    Okay.

25       A    And this one does.

1    Q    But you had a cell phone like that?

2    A    Yeah, I had a cell phone like that, but when I

3  left the VA Hospital with my phone or this phone, it

4  didn't have a back to it.  I made them go back to the

5  back storage room and look all over for the back.

6    Q    Okay.  But you're not disputing that you had

7  this cell phone?

8    A    I had a cell phone like that, but mine

9  didn't -- it did not have a back on it.

10    Q    And you're not disputing that you gave them

11  permission to search your apartment, are you?

12    A    That's right.  Again, my cell phone didn't have

13  a back.  I have a cell phone just like that, but when I

14  left the VA Hospital, it didn't have a back on it.  I

15  said, "Could you please go in the backroom and look for

16  the back."

17    Q    Mr. Ford, my question is you're not disputing

18  that you gave them permission to search your apartment;

19  correct?

20    A    That's correct.

21    Q    And you also stated -- Mr. Cameron asked you

22  did you -- you gave them permission to seize your

23  storage shed; correct?

24    A    No.  They had a warrant, so -- they said they

25  had a warrant.  "Can we search your apartment?"

1      I said, "Yeah, if you have a warrant."

2      Q   Do you recall signing a permission form

3  allowing them permission to search your apartment and

4  your storage shed?

5      A   Back here at the courthouse.

6      Q   Okay.  But you agree that you did that

7  voluntarily; correct?

8      A   Back here at the courthouse?

9      Q   Yes.

10      A   Yeah.

11      Q   Okay.  How long have you been using that cell

12  phone, the one that I just showed you, Government's

13  Exhibit 1?

14      A   I think maybe nine months, something like that.

15      Q   Nine months.  And the number is (775) 343-9041;

16  correct?

17      A   There's like three or four cell phones going

18  around, so I have no idea.

19      Q   Does that sound like a familiar number?

20      A   Yeah, but I don't know what the phone number is

21  on the one on the door.  I mean, that might be it too.

22      Q   Okay.  Let me repeat the number again.  You had

23  it for several months; correct?  (775) 343-9041.

24      A   Yeah, that might be right.  One is 41 and one

25  is 91.  There's a picture of the door phone too.  That

1  also had a phone number.

2     Q   Okay.  I just want to -- you basically agree

3  that that is a phone number that's associated with you;

4  correct?

5     A   Well, yeah, one of them.

6     Q   One of them.  Now, you basically -- you heard

7  Ms. Lilia Claude testify this morning, didn't you?

8     A   Yes, I did.

9     Q   And you heard the threats that she reported;

10 correct?

11    A   Yes.

12    Q   And are you denying that you made those

13 threats?

14    A   I'm denying that -- I have no knowledge of

15 those threats at all.  I did not make those threats.

16    Q   Okay.  And you also heard the testimony of this

17 agent here, George Cheretis, didn't you?

18    A   Yeah, I heard all his testimony.

19    Q   And you also heard the testimony of Ryan

20 Ashton?  You were present here in trial during that

21 testimony, weren't you?

22    A   Yes.

23    Q   And both of them testified that you admitted on

24 March 1st later in the day -- threats came in during

25 that morning.  Later in the day they're out there about

1  2:00 o'clock.  You admitted -- there's two witnesses

2  there that are testifying -- you're under oath -- that

3  you admitted to them that you made those threats to the

4  White House operator.

5      A    The most I would ever have said is I made

6  calls.  No, I did not say I made White House phone

7  calls.

8      Q    So you deny that you made those threats?

9      A    Yeah.  Yeah, sure am.  Now, I called Russia.

10     Q    I'm sorry.  Let me ask a question first.

11     Now, your attorney asked you if you made other

12 phone calls to the Secret Service on the evening of

13 February 29th, 2016, and March 1st, 2016.

14     A    Right.

15     Q    And you testified you did; correct?

16     A    Right, because I was upset about the SWAT team.

17     Q    And you testified that you made a phone call to

18 the Russian Embassy?

19     A    Yes.

20     Q    Isn't it true you also called the FBI?

21     A    I might have.

22     Q    Well, isn't it true that you called the FBI

23 numerous times, over 20 times, in that same time

24 period?

25     A    I might have.  From the -- from what I saw in

1  the logs in the evidence, it says that I did.

2      Q   And didn't you threaten to fill up balloons

3  with anomia and bleach and throw them into

4  kindergarten, first, second and third grade classes?

5      MR. CAMERON:  Your Honor, I'm going to object at

6  this point in time.  I object based on relevance as to

7  why conduct of prior bad acts is being entered without

8  entering --

9      MR. SULLIVAN:  He opened the door to this.

10     THE COURT:  I'm going to sustain the objection now

11 without a further hearing at some point, so --

12     MR. SULLIVAN:  I'm sorry.  What's your ruling?

13     THE COURT:  I'm sustaining the objection at this

14 point.

15     MR. SULLIVAN:  Okay.

16 BY MR. SULLIVAN:

17     Q   But you do admit that you did call the FBI;

18 correct?  You may have?

19     A   I may have.  The evidence is what it shows,

20 those phone logs.  I can read the phone logs and --

21 that Ashton --

22     Q   Now, when the Secret Service came out to visit

23 you on March 1st, 2016, you recall that; right?

24     A   Right.

25     Q   When George Cheretis came out with the other

1 agent --

2  A Right.

3  Q -- you do remember that; correct?

4  A Yeah.

5  Q That wasn't the first time the Secret Service

6 had been to your apartment, is it?

7  A March 1st?

8  Q No.  I mean, they've been out before.  Five

9 years before in 2010, weren't they out there then?

10  A Not at Evans Avenue.

11  Q No, at a different apartment.

12  A A different apartment, yeah.

13  Q In Reno?

14  A Right.

15  Q And do you recall why they came to see you

16 then?

17  A Because somebody threatened the President.  I

18 said, "You can't do that."  So I was trying to save the

19 President's life.

20  Q Wasn't the allegation that you had threatened

21 the President?

22  A No.  Why would I call the Secret Service and

23 tell them that somebody else has threatened the

24 President?

25  Q Well, I didn't say you called them, but they

1  came to talk to you.

2      A    I called them.  No, I called them.  I'm the one

3  who called them.

4      Q    Okay.  But you do recall them coming out and

5  talking to you?

6      A    Right, because somebody in the complex was

7  threatening.

8      Q    Somebody said, "Who wants to kill the

9  President?"  Correct?

10     A    I'm not sure about the exact words.  They said

11 they wanted to kill Obama as they was walking by my

12 window.  And then I called the Secret Service, because

13 I didn't want -- I said, "You can impeach him, but

14 don't kill him."

15     And then I went on to say, "Go ahead and try to

16 impeach a constitutional attorney who's trained in the

17 Constitution."  I'm the one who called the Secret

18 Service on somebody else.

19     MR. SULLIVAN:  No further questions, Your Honor.

20     THE COURT:  All right.  Thank you.  Mr. Sullivan.

21     Mr. Cameron, do you have any redirect?

22     MR. CAMERON:  I do, Your Honor.

23                    REDIRECT EXAMINATION

24 BY MR. CAMERON:

25     Q    And on the incident, the earlier incident with

1  the Secret Service that Mr. Sullivan questioned you

2  about, you weren't arrested on that, were you?

3      A    No.  They came out and they talked to me and I

4  told them -- I was living in another apartment complex,

5  and I was having disagreements with the manager.  And

6  it was also right around the time of the oil spill.  I

7  submitted my plans.  And people were really upset with

8  that whole oil spill.  I think somebody committed

9  suicide over losing their ability to shrimp.

10      And that's when they walked by my window and they

11  said, "Well, we'll just kill the President."

12      And I said, "Well, you can't do that."  I said,

13  "You can impeach him, but you can't kill him."

14      Q    And not to cut you short, sir, but clearly

15  after interviewing you, you were not arrested?

16      A    I was not arrested.  I was not arrested.  And

17  they said, "If you know who it is that was yelling

18  that, let us know and we'll come back and we will get

19  them out of here."

20      MR. CAMERON:  That's all I have, Your Honor.  Thank

21  you.

22      THE COURT:  Thank you.  Anything else?

23      MR. SULLIVAN:  Nothing further, Your Honor.

24      THE COURT:  All right.  Thank you.

25      Do you have any additional witnesses that you're

1  going to call, Mr. Cameron?  Do you have any additional

2  witnesses?

3      MR. CAMERON:  I do not, Your Honor.

4      THE COURT:  Does the defense rest?

5      MR. CAMERON:  We do.

6      THE COURT:  Does the government have any rebuttal?

7      MR. SULLIVAN:  No, Your Honor.

8      THE COURT:  All right.  All of the evidence that

9  you're going to hear has now been presented to you.

10  What remains to be done is for me to instruct you on

11  the law and for the attorneys to make their final

12  concluding arguments.  It will take me about 15 or 20

13  minutes to settle the instructions with the attorneys.

14  I provided them with copies of what I intend to give,

15  but I need to talk with them about it, so we'll take

16  the afternoon recess.  We'll come back in about 15 or

17  20 minutes, and then I will instruct you on the law and

18  we'll have the final arguments.

19      Please do not discuss this case among yourselves

20  during the recess.  The jury may retire.

21          (Outside the presence of the jury.)

22      THE COURT:  All right.  You're excused.  Thank you.

23      All right.  We've convened outside the presence of

24  the jury.  I've given you a packet of instructions.

25  You've had a chance to take a look at them.  They are

1 the same as what I discussed with you this morning

2 except for -- and I haven't marked these yet and

3 numbered them, because I'm not sure, you know, what

4 additional ones I may have to give.

5     First, there has been some testimony that just

6 occurred that if I understood it correctly may

7 relate -- I sustained the objection as to another

8 alleged bad act, but there was also testimony that was

9 elicited just now that relates to another potential bad

10 act.  And I believe under those circumstances that I

11 may be required to give some type of an instruction on

12 the extent to which prior bad acts might be considered

13 by the jury in deciding the case beyond the issue of

14 intent and for no other purpose.

15     Is there any objection by either party if I type up

16 an instruction on that?

17     MR. SULLIVAN:  No, Your Honor.  I don't see the

18 number on it, but I remember submitting it, and I see

19 it here, the one that says you're only here to

20 determine whether the defendant is guilty or not guilty

21 of the crime charged, he's not on trial for any conduct

22 or offense not charged in the indictment.  I think that

23 covers it.

24     THE COURT:  Well, I'm -- that's in the

25 instructions.

1        MR. SULLIVAN:  That's one of the instructions

2    that's in your packet.

3        THE COURT:  That's a pattern instruction, but I'm

4    talking about one that even goes "You've heard

5    testimony of other bad acts," and that's a separate

6    instruction.  I mean, I'm perfectly willing to go with

7    that one if the defense is willing to go with that one,

8    but I would be prepared also to give one on prior bad

9    acts with the admonition that its limited purpose of it

10   being admitted is on the issue of intent and for no

11   other purpose, but that's up to both of you to tell me

12   what you want to do on that.

13       MR. CAMERON:  And, Your Honor, I'm kind of on the

14   horns of a dilemma because I don't think it was prior

15   bad act evidence, because he was not charged.  And his

16   answer to the question was "I didn't make a threat and

17   I wasn't the one.  I was the one that called it in."

18   So I'm satisfied, I believe at this point, with the

19   instruction that Mr. Sullivan alluded to saying that

20   you decide it only --

21       MR. SULLIVAN:  I agree.

22       THE COURT:  If both of you will stipulate to that,

23   I'm prepared to give that one.  I have it in the packet

24   here.

25       MR. CAMERON:  I would be willing to do that.

1    THE COURT:  I would agree that that's a gray area,

2  but I specifically wanted you to know that the Court

3  would be prepared to consider such an instruction if

4  you thought it wasn't so gray and that I ought to go

5  ahead and give that one.  I do have the pattern

6  instruction on prior bad acts for the limited purpose

7  for which they may be considered.  So based upon that

8  stipulation, I'll give the instructions here.

9    And you're not offering any additional ones, is

10  that correct, Mr. Cameron?

11    MR. CAMERON:  I am not, Your Honor, but I was

12  looking for the one instruction --

13    THE COURT:  Wait a minute until I just get to that.

14  I'll go on to the rest of them.  I want to solve this

15  problem first.

16    And the government has no objection; is that

17  correct?

18    MR. SULLIVAN:  No objection.  You're talking about

19  the --

20    THE COURT:  I'm talking about the other bad act

21  issue and whether I give that or not.  You're satisfied

22  with what's in the instructions?

23    MR. CAMERON:  We'd stipulate to the one that's in

24  the packet would suffice, Your Honor.

25    THE COURT:  Okay.  Thank you.

1       So now let's go to the packet and put aside

2   diminished capacity for a moment.  And we'll discuss

3   that in a moment, but first I would like to settle all

4   the rest of them, if I can.

5       Does the government have any objection to any of

6   the instructions I'm giving except possibly the one on

7   bad acts and the language in that?  I mean except the

8   one on diminished capacity.  Does the government have

9   any other objections?  And I'm not sure if you have

10  objections to it, but assuming there are some, we'll

11  handle that in a minute.

12      MR. SULLIVAN:  I'm just going through.  I read them

13  the other day when I got the packet.  I'm just looking

14  through them.  Most of them I just wrote "Okay, Okay,

15  Okay."

16      THE COURT:  I'll come back to you.

17      Does the defense have any objections?

18      MR. CAMERON:  Your Honor, I'm looking for the

19  one -- it's the instruction we crafted to replace the

20  withdrawn Ninth Circuit instruction.  For some reason

21  I'm not coming up with it in the packet.

22      THE COURT:  Well, the withdrawn Ninth Circuit

23  instruction dealt with the -- where it could be -- and

24  that was the case we were just talking about.

25      MR. CAMERON:  I think it's the instruction right

1  after the indictment.

2      THE COURT:  It is.  It's the one on the elements.

3      MR. CAMERON:  And the problem that I have, Your

4  Honor -- Mr. Sullivan and I went over this ad nauseam.

5      THE COURT:  Well, let's -- is it the one relating

6  to charged in Count Two or Count One?

7      MR. CAMERON:  I think it is.

8      THE COURT:  I want the specific instruction.

9      MR. CAMERON:  I'm looking at both of them, Your

10 Honor.

11     No, I'm fine with the White House telephone

12 operator.

13     THE COURT:  All right.

14     MR. CAMERON:  The problem that I had was the one --

15 and I think I've got it correct -- on the threats to

16 the President.  The intent part of that was withdrawn

17 because they didn't like the reasonable man standard

18 that the Ninth Circuit had.

19     THE COURT:  Correct.  And that's not in here.

20     MR. CAMERON:  Yeah.  And I know it's not in here.

21 But the problem I have with the instruction is that it

22 was clear from the reading of the case that they didn't

23 like the reasonable man standard because that standard

24 had to be higher than a reasonable man.  And there's no

25 standard elicited in this one other than new

1  communications would be viewed as a threat against the
2  President of the United States.  And to me that's
3  fairly nebulous when the standard has to be higher.
4      THE COURT:  That they intended the threat to be.
5  It couldn't be just negligence, and it can't be the way
6  it's perceived by somebody else.  A reasonable person
7  standard.  So it's a higher standard.  It has to be a
8  threat and he has to know the communication would be
9  viewed as a threat against the President of the United
10  States, not that a reasonable person would have
11  understood it to be, or that he did it negligently or
12  that he did it recklessly.
13      MR. CAMERON:  But that language isn't in there.  I
14  mean, it's just inferred that it has to be a threat.
15  So the Court is okay with me arguing that?
16      THE COURT:  Absolutely.
17      MR. CAMERON:  Okay.  Then I'm fine with it.
18      THE COURT:  Absolutely, because negligence is not
19  sufficient.
20      Does the government have any problem with that?
21      MR. SULLIVAN:  With this particular instruction for
22  the 871 charge?
23      THE COURT:  Right.
24      MR. SULLIVAN:  No.  I submitted it.
25      THE COURT:  Okay.  Well, you didn't submit it in

1    that precise language.  I modified it.

2        MR. SULLIVAN:  You did?  It looks good to me.

3        THE COURT:  Okay.  Then let's -- so there are no

4    objections that anyone has to any of the instructions

5    except we'll talk about now the diminished capacity

6    instruction.  And the diminished capacity

7    instruction --

8        I guess we won't be needing that one after all.

9    They stipulated that we don't need that.

10       On the diminished capacity instruction, what I have

11   done on that one is take the Ninth Circuit pattern

12   instruction and I've modified it slightly to track the

13   language of the Ninth Circuit in the case of United

14   States versus Christian.

15       Now, I agree with the government and Mr. Sullivan's

16   comments about the fact that a jury instruction is

17   required only if there is some evidence supporting a

18   link between the mental illness of the defendant and

19   his ability to form a specific intent to threaten,

20   though the evidence may be weak, insufficient,

21   inconsistent, or of doubtful credibility.

22       In my opinion that language clearly indicates that

23   that's a threshold legal issue that the Court has to

24   decide on whether or not I'm going to give the

25   instruction.

1    MR. SULLIVAN:  I agree.

2    THE COURT:  In this case I believe that there is

3    more evidence than in that case on that issue, and the

4    jury will have to make that determination.  So I think

5    that that's the legal analysis that I have to go

6    through.  And I've gone through that in deciding to

7    give the instruction.

8    So now let's look at the instruction.  Does either

9    the defense or the government have any objection to the

10   language I've used in the instruction which I think

11   parrots pretty closely what is specifically stated in

12   the United States versus Christian case where they talk

13   about whether or not the defendant had the ability to

14   form the intent to threaten?  And it says, "If any

15   evidence -- his ability to form the intent, that is, to

16   show whether or not he could form the intent to

17   threaten."  And those are the exact words that I've

18   used here, "form the intent to threaten the President

19   of the United States and/or the White House telephone

20   operator and acted with the intent required to commit

21   the crimes charged in Counts One and Two of the

22   indictment."

23   So maybe I don't have to talk about it.  Maybe no

24   one has an objection.

25   MR. SULLIVAN:  Here's my point, Your Honor.  This

1    is why I wanted you to look at that language.  I do

2    agree with what you've just said, that it's your

3    decision as the judge to decide if the threshold has

4    been met.  And I can't dispute, you know, what the case

5    says.  It can be weak or, you know, not a whole lot of

6    evidence to be able to get this instruction, but my

7    point is that this case makes it very clear, the

8    language that I was proposing, part of which you did

9    adopt, that the diminished capacity defense, you don't

10   get it simply because you may be mentally ill.  I think

11   what they're trying to say is you can still be mentally

12   ill and commit a crime.

13       What I'm worried about here is the jury, especially

14   after seeing Mr. Ford's testimony and all of the other

15   evidence, they're going to go, "Well, he's got some

16   problems here, so I guess he wins."

17       And I realize that you've tried to craft it so that

18   it's just basically you're telling them acted with the

19   intent required, whether it's --

20       THE COURT:  Yes.  And I'm going to allow you to

21   argue in closing argument.  I don't think it's

22   inappropriate closing argument to say that the fact

23   that the defendant may suffer from a mental illness

24   does not defeat the government's position that the

25   intent was formed here --

1    MR. SULLIVAN:  Okay.

2    THE COURT:  -- as set forth in the instructions.

3  And I think that's a fair argument --

4    MR. SULLIVAN:  Okay.

5    THE COURT:  -- because I think that's what the law

6  is.

7    MR. SULLIVAN:  Okay.

8    THE COURT:  Okay.  Well, if there's no objection,

9  let's just go ahead and mark these instructions then.

10   Does the defense have any that they wish to offer

11  or the government wish to offer that I've rejected?

12   MR. SULLIVAN:  No.

13   MR. CAMERON:  No.

14   THE COURT:  Let's go ahead, and I hope we come up

15  with the same numbers.

16   The first one is -- well, I don't have an

17  instruction number at the bottom of it.  Let's see.  So

18  I'll put an instruction number at the bottom of the

19  second page.  So that would be No. 1.

20   And then No. 2 is "The indictment is not evidence."

21   3, "A defendant in a criminal case."

22   4, "Proof beyond a reasonable doubt."

23   MR. CAMERON:  Your Honor --

24   THE COURT:  I'm sorry.

25   MR. CAMERON:  He did testify.

1       THE COURT:  What?

2       MR. CAMERON:  He did testify.

3       THE COURT:  Oh, I'm sorry.  That comes out.  Yeah,

4   No. 3 is "Proof beyond a reasonable doubt."

5       MR. SULLIVAN:  And what should come in would be the

6   corollary, the instruction that --

7       THE COURT:  Yeah.  I don't have -- let's take a

8   look at --

9       MR. SULLIVAN:  I submitted it.

10      THE COURT:  Do you have a number?

11      MR. SULLIVAN:  Yeah, I can get it real quick.

12      THE COURT:  It would be nice if they had a better

13   index here.  Let's see.  I know the one we're talking

14   about, and I've given it before, but I don't --

15      MR. SULLIVAN:  It's basically you give one or the

16   other.

17      THE COURT:  Right, but I just need to find it.  The

18   problem is this is an old book and everything is on the

19   computer now.  See if you can find that one

20   instruction.

21      MR. SULLIVAN:  It's 3.4.

22      THE COURT:  What is it?

23      MR. SULLIVAN:  It's the Ninth Circuit 3.4,

24   defendant's decision to testify.

25      THE COURT:  3.4, let's see if we can pull that up.

1    Thank you.  And then we'll make three copies of it.

2        Okay.  So that will be the number -- let's see.

3    That would be number --

4        MR. CAMERON:  Your Honor, I did have a problem with

5    the reasonable doubt instruction.

6        THE COURT:  With what?

7        MR. CAMERON:  I did have a problem with the

8    reasonable doubt instruction.

9        THE COURT:  You know, you're speaking down.  I

10   can't hear the last part of what you're saying.

11       MR. CAMERON:  Well, I have a problem with the

12   reasonable doubt instruction because it goes through

13   and says if you're convinced beyond a reasonable

14   doubt -- I'm sorry.  I read it backwards.  If you're

15   not -- no, I'm fine.  I was looking at the last part

16   and it looked to me like you're saying, well, if

17   there's not enough evidence, you still have to find him

18   guilty, but the first part clears that up.

19       THE COURT:  No, this is stock language.

20       MR. CAMERON:  I see that now.  I was simply reading

21   it wrong.

22       THE COURT:  And this one will be -- let's go ahead

23   and mark the rest of them.

24       So No. 3 will be the one that Mr. Sullivan is

25   referring to which I will give as soon as I find it.

1      Number 4, "Proof beyond a reasonable doubt."

2      5, "The evidence you are to consider."

3      MR. SULLIVAN:  Can you hang on one second?  Let me

4   catch up with you.  3, 4.  Okay.  You're up to 5 now?

5      THE COURT:  Right.

6      And then 6 --

7      MR. SULLIVAN:  Wait.  Which one was 5, "The

8   evidence you are to consider"?

9      THE COURT:  "The evidence you are to consider in

10   deciding what the facts are," that would be No. 5.

11      Number 6, "In reaching your verdict."

12      7, "Evidence may be direct or circumstantial."

13      8, "In deciding the facts."

14      9, "You are here only."

15      10 is the indictment.

16      11, "The defendant is charged in Count One."

17      12, "The defendant is charged in Count Two."

18      13, "A threat is knowingly made."

19      14, "The government does not have to prove."

20      So No. 15 then is the one we've just discussed

21   about diminished capacity.  That's the new one.

22      MR. SULLIVAN:  The one that we're inserting.

23      THE COURT:  The one we're inserting.  That's 15.

24      MR. CAMERON:  15 is the diminished capacity

25   instruction?

1    THE COURT:  Yes.

2    16, "The punishment provided by law."

3    17, not to discuss the case.

4    And 18 is the last one, "When you begin your

5  deliberations," two pages.

6    Okay.  So I will pull up that one on the defendant

7  testifying.  So go ahead and take about ten minutes,

8  whatever you need, and then we'll come back and we'll

9  have the final arguments.

10    MR. SULLIVAN:  Okay.

11    THE COURT:  And then I -- will counsel stipulate on

12  the record that we have settled the instructions?  On

13  the record so stipulated on behalf of the government?

14    MR. SULLIVAN:  Yes, Your Honor.

15    MR. CAMERON:  Yes, Your Honor.

16    THE COURT:  Does the government have any objections

17  to any of the instructions to be given by the Court?

18    MR. SULLIVAN:  No, Your Honor.

19    THE COURT:  Does the defense?

20    MR. CAMERON:  I do not, Your Honor.

21    THE COURT:  Does the government wish to offer any

22  that I have rejected?

23    MR. SULLIVAN:  No, Your Honor.

24    THE COURT:  And does the defense wish to offer any

25  I have rejected?

1      MR. CAMERON:  No, Your Honor.

2      THE COURT:  All right.  So they've been settled in

3  open court.

4      I will get that one and get it to you right now.

5  Take about ten minutes or so and then we'll come back

6  and I will instruct the jury and then we'll have final

7  arguments.  Thank you very much.

8                    (A recess was taken.)

9      THE COURT:  Mr. Sullivan, are you ready to proceed?

10     MR. SULLIVAN:  This is the new No. 3?

11     THE COURT:  Yes.

12     MR. SULLIVAN:  Okay.

13     THE COURT:  Just insert that new one as No. 3.

14     All right.  We can go ahead and bring the jury

15  back.

16                    (In the presence of the jury.)

17     THE COURT:  You may all be seated.

18     The jurors are all present.

19     All right.  Now, two things remain to be done.  One

20  is for me to instruct you on the law that applies to

21  this case.  And then the attorneys will make their

22  concluding arguments and then you'll retire for

23  deliberations.

24     I don't have the instructions memorized, so I'll

25  read them to you.  I'll attempt to do so slowly so that

1   you can follow along.  And then I will provide you with
2   a copy of them in the jury room so that you can refer
3   to them in the jury room.  I think that may be helpful.
4   Sometimes it's hard to catch everything when you're
5   listening to it, so I think it's appropriate that you
6   have a copy in the jury room so you can go over them
7   again in the jury room during the course of your
8   deliberation.
9       Members of the jury, now that you've heard all the
10  evidence, it's my duty to instruct you on the law that
11  applies to this case.  As I've indicated, a copy of the
12  instructions will be provided to you for your ability
13  to consult them in your deliberations.
14      It is your duty to weigh and evaluate all the
15  evidence received in the case and, in that process, to
16  decide the facts.  It's also your duty to apply the law
17  as I give it to you and apply it to the facts as you
18  find them, whether you agree with the law or not.  You
19  must decide the case solely on the evidence and the law
20  and must not be influenced by any personal likes or
21  dislikes, any opinions, prejudices, or sympathy.  You
22  will recall that you took an oath promising to do so at
23  the beginning of the case.
24      You must follow all of these instructions and not
25  single out some and ignore others.  They're all equally

1  important.  Please do not read into any instructions or

2  into anything I have said or done any suggestion as to

3  what verdict you should return.  That is a matter

4  entirely up to you.

5       The indictment is not evidence.  The defendant has

6  entered a plea of not guilty to the charges.  The

7  defendant is presumed to be innocent unless and until

8  the government proves the defendant guilty beyond a

9  reasonable doubt.  In addition, the defendant does not

10 have to present testimony to prove innocence.  The

11 government has the burden of proving every element of

12 the charge beyond a reasonable doubt.

13      The defendant has testified.  You should treat his

14 testimony just as you would treat the testimony of

15 other witnesses.

16      Now, you've heard me discuss reasonable doubt, the

17 standard of proof that the government has in this case.

18 Proof beyond a reasonable doubt is proof that leaves

19 you firmly convinced that the defendant is guilty.  It

20 is not required that the government prove guilt beyond

21 all possible doubt.

22      A reasonable doubt is a doubt based on reason and

23 common sense and is not based purely upon speculation.

24 It may arise from a careful and impartial consideration

25 of all of the evidence or from lack of evidence.

1    If after careful and impartial consideration of all

2 the evidence, you are not convinced beyond a reasonable

3 doubt that the defendant is guilty, it is your duty to

4 find the defendant not guilty.  On the other hand, if

5 after careful and impartial consideration of all the

6 evidence you are convinced beyond a reasonable doubt

7 that the defendant is guilty, it is your duty to find

8 the defendant guilty.

9    The evidence you are to consider in deciding what

10 the facts are consists of the sworn testimony of

11 witnesses, exhibits received into evidence, and any

12 facts to which the parties have stipulated or agreed.

13    In reaching your verdict you may consider only the

14 testimony and exhibits received in evidence.  The

15 following things are not evidence and you may not

16 consider them in deciding what the facts are:

17 Questions, statements, objections, and arguments by the

18 lawyers are not evidence.  The lawyers are not

19 witnesses.  Although you must consider a lawyer's

20 questions to understand the answers of the witness, the

21 lawyer's questions are not evidence.  Similarly, what

22 the lawyers have said in their opening statements, what

23 they'll say in a few moments in their closing arguments

24 is intended to help you interpret the evidence, but

25 those statements are not evidence.  If the facts as you

1  remember them differ from the way the lawyers state
2  them, your memory of the facts controls.
3       Any testimony that I excluded or struck or
4  instructed you to disregard is not evidence.  In
5  addition, some evidence was received only for a limited
6  purpose.  When I gave you such an instruction, you're
7  bound by it.
8       Finally, anything you may have seen or heard when
9  the court was not in session is not evidence.  You're
10 to decide the case solely on the evidence received here
11 at the trial.
12      Now, evidence may be both direct and
13 circumstantial.  Direct evidence is direct proof of a
14 fact, such as testimony by a witness about what that
15 witness personally saw or heard or did.  Circumstantial
16 evidence is indirect evidence, that is, proof of one or
17 more facts from which you can find that another fact
18 exists.
19      You are to consider both direct and circumstantial
20 evidence.  Either can be used to prove any fact.  The
21 law makes no distinction between the weight to be given
22 to either direct or circumstantial evidence.  It is for
23 you to decide how much weight to give to any evidence.
24      In deciding the facts in the case, you have to
25 decide what testimony to believe and what testimony not

1  to believe.  You may believe everything a witness says

2  or part of it or none of it.

3     In considering the testimony of a witness, you may

4  take into account the following -- and this is not an

5  exhaustive list -- the witness's opportunity and

6  ability to see or hear or know the things testified to;

7  the witness's memory; the witness's manner while

8  testifying; the witness's interest in the outcome of

9  the case, if any; the witness's bias or prejudice, if

10 any; whether other evidence contradicted the witness's

11 testimony; the reasonableness of the witness's

12 testimony in light of all the evidence; and any other

13 factors that bear on believability.

14    The weight of the evidence as to a fact does not

15 necessarily depend on the number of witnesses who

16 testified.  What is important is how believable the

17 witnesses were and how much weight you think their

18 testimony deserves.

19    You are here only to determine whether the

20 defendant is guilty or not guilty of the charge in the

21 indictment.  The defendant is not on trial for any

22 conduct or offenses not charged in the indictment.

23    Now, the indictment charges two counts.  Count One

24 is a threat against the President of the United States,

25 and it's alleged that on or about March 1, 2016, in the

1   District of Nevada, Steven Eugene Ford, the defendant
2   herein, did knowingly and willfully make a threat to
3   take the life of the President of the United States.
4   Specifically, he told a White House telephone operator
5   that, quote, "I'm going to kill that president.  I hate
6   him," end of quote, all in violation of Title 18,
7   United States Code, Section 871(a).
8       Count Two is the interstate communication of a
9   threat.  On or about March 1, 2016, it's alleged in the
10  District of Nevada defendant Steven Eugene Ford
11  knowingly and willfully did transmit in interstate
12  commerce from Reno, Nevada, to Washington, D.C., a
13  threat to injure a White House telephone operator.
14  Specifically, he stated that, quote, "I'm going to kill
15  you, bitch.  I'm going to kill your children by cutting
16  their heads off.  I'm going to burn you alive.  I'm
17  going to bury you alive," end of quote, all in
18  violation of Title 18, United States Code, Section
19  875(c).
20      Now I'm going to discuss each of those counts and
21  the elements that must be proven beyond a reasonable
22  doubt by the government before you can find the
23  defendant guilty.
24      The defendant is charged in Count One of the
25  indictment with threatening the life of the President

1  of the United States in violation of Section 871(a) of

2  Title 18 of the United States Code.  In order for the

3  defendant to be found guilty of this charge, the

4  government must prove each of the following elements or

5  things beyond a reasonable doubt:

6      First, the defendant made a verbal threat by

7  telephone to a White House telephone operator that he

8  was going to take the life of the President of the

9  United States.

10     Second, the defendant understood and intended the

11 words to be a threat or knew that the communication

12 would be viewed as a threat against the President of

13 the United States.

14     And, third, the defendant made the threat knowingly

15 and willfully.

16     Now, the defendant is charged in Count Two of the

17 indictment with making a verbal threat in interstate

18 commerce by telephone to a person in violation of

19 Section 875(c) of Title 18 of the United States Code.

20 In order for the defendant to be found guilty of this

21 charge, the government must prove each of the following

22 elements beyond a reasonable doubt:

23     First, the defendant knowingly sent a verbal threat

24 in interstate commerce over the telephone to injure a

25 White House telephone operator.

1        Second, the defendant understood and intended his

2   words to be a threat or knew that the communication

3   would be viewed as a threat against the White House

4   telephone operator.

5        Third, the defendant made the threat knowingly and

6   willfully.

7        Now, the government need not prove that the

8   defendant intended to carry out the threat.

9        You heard me use the words "knowingly and

10  willfully."  A threat is knowingly made if the

11  defendant knew and was aware of the threat he made.

12       A threat is willfully made if the defendant makes

13  the threat voluntarily and intentionally.

14       The government does not have to prove that the

15  defendant knew his conduct was illegal or that he

16  intended to violate the law.

17       Now, evidence has been admitted that the defendant

18  may have suffered from a diminished capacity at the

19  time the crimes charged in the indictment were

20  committed.

21       You may consider evidence of the defendant's

22  diminished capacity in deciding whether the government

23  has proved beyond a reasonable doubt that the defendant

24  had the ability to form the intent to threaten the

25  President of the United States and/or the White House

1   telephone operator and acted with the intent required
2   to commit the crimes charged in Counts One and Two of
3   the indictment.
4       The punishment provided by law for the offenses
5   charged in this case is for the court to decide.  You
6   may not consider punishment in deciding whether the
7   government has proved its case against the defendant
8   beyond a reasonable doubt.
9       Now, as I've reminded you, you're not to discuss
10   this case with anyone or permit anyone to discuss it
11   with you or in your presence.  I know you have cell
12   phones, iPhones, perhaps Blackberries, iPads, the
13   internet and other communication devices.  The
14   prohibition against discussing the case certainly
15   extends to emails, text messaging, discussions on any
16   blog or website as well as any network sites, including
17   Facebook, My Space, You Tube, Twitter.  During recesses
18   I indicated to you you could use your cell phones to
19   communicate concerning personal schedules and matters
20   unrelated to the trial, but only those calls can be
21   made and nothing involving the case or discussing the
22   case at any time.
23       And, finally, when you begin your deliberations,
24   you should elect one member of the jury to serve as
25   foreperson of the jury, and that person will preside

1  over your deliberations and speak for you here in

2  court.

3      You'll then discuss the case with your fellow

4  jurors to reach an agreement if you can do so.  Your

5  verdict, whether it is not guilty or guilty, must be

6  unanimous, that is, all of you must agree before you

7  can return a verdict of either not guilty or guilty in

8  this case.

9      Each of you must decide the case for yourself, but

10  you should do so only after you have considered all of

11  the evidence, discussed it fully with the other jurors,

12  and listened to the views of your fellow jurors.

13      Do not be afraid to change your opinion if the

14  discussion persuades you that you should, but do not

15  come to a decision simply because other jurors think it

16  is right.

17      It is important that you attempt to reach a

18  unanimous verdict, but, of course, only if each of you

19  can do so after having made your own conscientious

20  decision.  Do not change an honest belief about the

21  weight and effect of the evidence simply to reach a

22  verdict.

23      Your verdict must be based solely on the evidence

24  and the law as I have given it to you in these

25  instructions.  Nothing I have said or done is intended

1   to suggest what your verdict should be.  That is a
2   matter entirely up to you.
3       Now, I have prepared a verdict form, and it recites
4   Count One and Count Two.  After you have reached
5   unanimous agreement on a verdict, your foreperson will
6   fill in the form that's given to you, sign it and date
7   it and advise the marshal or bailiff outside your door
8   that you're ready to return to the courtroom.
9       If it becomes necessary during your deliberations
10  to communicate with me, you may send a note through the
11  bailiff signed by the foreperson or another member of
12  the jury.  No member of the jury should ever attempt to
13  communicate with me except in a signed writing, and I
14  will communicate with any member of the jury on
15  anything concerning the case only in writing or here in
16  open court.  If you send out a question, I'll consult
17  with the lawyers before answering it which may take
18  some time.  You may continue your deliberations while
19  waiting for an answer from the court to the question.
20      Remember that you're never to tell anyone,
21  including me, how the jury stands numerically or
22  otherwise on the question of the guilt of the defendant
23  until after you've reached a unanimous verdict or been
24  discharged.
25      What I mean by that is if after your deliberations

1   you're divided, you're not to advise the court.  You

2   can tell the court, "We're hopelessly deadlocked and

3   can't reach a verdict."  You could send a note to me on

4   that, but it would be inappropriate for you to tell me

5   in that note what the numerical division is of the jury

6   in getting to that point.

7        That completes my instructions.  You'll have a copy

8   of them in the jury room to consult with them if you

9   need to examine them more closely and more fully.  And

10  now we'll proceed with the closing arguments.  Again,

11  remember, they're the statements made by counsel, what

12  they believe the evidence shows.  Your memory of the

13  facts as they've been presented to you in this case

14  will control.

15       Because the government has the burden of proof,

16  Mr. Sullivan will make the closing arguments on behalf

17  of the government first.  Mr. Cameron then will make

18  the closing arguments on behalf of the defense.  And

19  because the burden does rest with the government,

20  they'll have the final closing argument in rebuttal.

21       Mr. Sullivan, you may go ahead.

22       MR. SULLIVAN:  Thank you.

23       The Court just went through all the instructions.

24  I don't intend to read them all again, but I would like

25  to narrow them down.  There are two counts, as you've

1   been told.  You know that there's a Count One that

2   alleges a threat against the President of the U.S.  And

3   the government would have to prove for you to be able

4   to return a guilty verdict that the defendant made a

5   verbal threat by telephone to a White House operator

6   that he was going to take the life of the President of

7   the United States.

8       What evidence do you have?  It's very

9   straightforward.  The government brought in that White

10  House operator.  She told you in detail when she

11  realized that she was being threatened and the

12  President was being threatened, she started writing it

13  down and turned it over to the Secret Service.

14      She told you, "I'm going" -- the threat, the

15  specific threat, basically, "I'm going to kill" -- let

16  me read it correctly here.  "I'm going to kill that

17  president.  I hate him."  I submit that that proof

18  shows that a threat was made.

19      The next element says, second, the defendant

20  understood and intended the words to be a threat or

21  knew that the communication would be viewed as a threat

22  against the President of the United States.

23      Well, first of all, how do we know it was the

24  defendant?  We know that it was Mr. Steven Eugene Ford,

25  the defendant in this case, because he gave his name.

He also used an unusual biblical name that he also used to identify himself, Elezar Melchizedek.  And the White House operator captured his telephone number from the caller ID, the precise number that was calling in.  And he called back a second time.  It was the same number when he identified himself as Elezar Melchizedek.

Third, the defendant made the threat knowingly and willfully.  Well, did he know what he was doing?  Did he do this?  Was it mistake or accident?

You have the testimony of two agents, Secret Service Agent George Cheretis, who is the case agent in this case, and a Reno police officer, a detective, Ryan Ashton, both of whom testified that as part of their investigation they went out that same day later in the day when they got to work and got the referral and went to talk to Mr. Ford.

And, yeah, he was obnoxious, he was calling them names, and they had to wait for a little bit for him to calm down, but eventually, even though he wasn't under arrest, they read him his rights.  He seemed to understand them according to the agent.

After reading the rights -- you will recall, I think, even the defendant himself said this statement -- they kind of had a deal, "Look, quit talking.  Let me talk for a while and then you can talk

1  for a while."  But two witnesses here have testified
2  under oath that the defendant stated to them, "Yes, I
3  made the call earlier today," and, "Yes, I made those
4  threats.  And if you were good Catholics, you would
5  help me to carry out those threats."
6      I submit to you, ladies and gentlemen, that that
7  evidence that has been presented here in court today
8  shows you beyond a reasonable doubt that the defendant
9  committed that crime to threaten the President of the
10 U.S.
11     The second count is the count that deals with the
12 several threats that were made against the White House
13 operator, Lilia Claude.  The government had to prove
14 first that the defendant knowingly sent a verbal threat
15 in interstate commerce over the telephone to injure a
16 White House telephone operator.
17     Well, once again -- I don't mean to belabor this --
18 there's the telephone call.  I'm not going to repeat
19 all the threats.  "I'm going to kill you, bitch," so on
20 and so forth, "I'm going to kill your children."  All
21 those threats she copied down.
22     The second element, once again, the defendant
23 understood and intended his words to be a threat or
24 knew that the communication would be viewed as a threat
25 against the White House telephone operator.  Well, once

1  again, as I mentioned, he, according to two witnesses

2  who swore under oath this is what he told them, "Yes, I

3  made it, I made that call, and I made those threats."

4      And, third, the defendant made the threat knowingly

5  and willfully.  It's pretty much the same as in the

6  other one, that he knew what he was doing, it wasn't a

7  mistake, it wasn't an accident.  And as that

8  instruction also says, the government need not prove

9  that the defendant intended to carry out the threat.

10     Ladies and gentlemen, I'm not going to take much

11  more of your time.  I submit to you that the government

12  has proved to you here today beyond a reasonable

13  doubt -- and keep in mind that, as the judge just read

14  that instruction -- I'm not going to read it again --

15  it's not beyond all possible doubt.  It's beyond a

16  reasonable doubt.  The evidence in this case is clear.

17  The defendant is guilty of Count One, he's guilty of

18  Count Two, and I ask you to return verdicts of guilty

19  on both.

20     Thank you.

21     THE COURT:  All right.  Thank you, Mr. Sullivan.

22     Are you ready to proceed?

23     MR. CAMERON:  I am, Your Honor.  Thank you.

24     THE COURT:  All right.  Mr. Cameron, you may go

25  ahead.

1    MR. CAMERON:  Ladies and gentlemen, here we are at
2    a quarter to 4:00.  I have to tell you, in 45 years of
3    being involved in trials, this is the shortest trial I
4    can ever remember.  I think that's because the issues
5    in this case are very straightforward.

6        There were four witnesses that testified from the
7    stand, and that's where you get the information that
8    you use to decide whether the government has met its
9    heavy burden of proof beyond a reasonable doubt in this
10   case.  And I will submit to you there are a number of
11   issues in that that I think we need to discuss fairly
12   thoroughly.  And I think it would be easier simply to
13   start with Count Two, the alleged threats against the
14   White House operator.

15       Now, the government has already advised you, as
16   well as the judge, what elements they have to prove to
17   do that and what they have to prove beyond a reasonable
18   doubt.  But as a threshold issue, I think you need to
19   decide whether there was a threat at all made against
20   the White House operator.

21       The language from a 13-minute telephone call that
22   she wrote down covers about 30 to 40 seconds of that
23   call.  I asked her that on the stand.  She said, "White
24   House," and the person on the other end of the line
25   started rambling and ranting.  He was speaking

1  irrationally.  He was excited.  He was angry.  But what
2  did he say?  He said, "I'm going to kill you, bitch."
3  And she wrote that down.
4      But as the agents testified, that's not a single
5  gender word anymore.  The agent had heard many times
6  that a male can refer to another male in a derogatory
7  fashion by using the word "bitch."
8      So from the very outgo has the government proved
9  that's a threat against the White House operator beyond
10  a reasonable doubt?  She testified, never heard of
11  Mr. Ford, had no information about him, he had no
12  reason to dislike her.  They didn't have any
13  conversation that he could get angry about.  She simply
14  answered the phone.
15      Mr. Ford testifies he doesn't even remember making
16  the call.  And we'll get into the significance that has
17  after we meet the threshold burden of whether there was
18  a threat made against the White House operator, because
19  he goes on to say, "I'm going to kill your children by
20  cutting their heads off."
21      What's the testimony about that?  First, this young
22  lady has no children.  The government in investigating
23  this case never even bothered to determine that.  In
24  the words of the agent, everybody just assumed the
25  threats were against her.

1      Well, that's not the burden of proof that the
2  government has, the assumption.  They're basically
3  asking you to fill in and do their work for them by
4  saying, "Oh, yeah, we're going to assume it as well."
5  That's not the burden of beyond a reasonable doubt.
6      She has no children.  He never knew her.  They
7  never had any beef.  There was no reason for him to
8  make threats against the White House operator,
9  especially against her children that she doesn't have.
10     "I'm going to burn you alive.  I'm going to bury
11  you alive.  I'm going to cut their heads off."
12     I would submit to you, ladies and gentlemen, if you
13  read the bare words -- and that was all that was
14  offered by anybody, any witness that testified against
15  Mr. Ford, the bare words -- the meaning of those words
16  could be directed towards the President and not towards
17  the operator at all.  And if that's the case, and if
18  that's what you believe, then you need to direct your
19  inquiry as to whether those are threats knowingly made
20  and threats that he wanted directed towards the
21  President, to him.
22     There is no case about the White House operator.
23  Just based on the government's presentation, there's no
24  proof beyond a reasonable doubt that they were directed
25  towards the White House operator, because there was no

1  need to do that.  There was no basis for it.  There is

2  no children.  Who has children?  The President and the

3  First Lady.  I think that's all you really need to know

4  as to who those threats were directed towards.

5      This is a fairly easy decision to make in what

6  could otherwise be sometimes a complex case.  If you

7  believe the testimony, that these threats were made,

8  and you believe that there was another 11, 12 minutes

9  of that conversation that nobody knows what the context

10  was, then the government hasn't really proved their

11  case beyond a reasonable doubt, because the context is

12  everything when the words are gender neutral.

13      Think to yourself.  If somebody calls to threaten

14  the President, why would they threaten the operator?

15  And if these words were, "Ms. Operator, I'm going to do

16  this to you because you picked up the phone," then they

17  would have a case.  But the verbiage they presented to

18  you and the context or lack of context that they have

19  presented is certainly not proof beyond a reasonable

20  doubt or even a prima facie case -- or even a prima

21  facie case that these threats were made against the

22  White House operator.

23      Both agents testified they had no idea what state

24  of mind Mr. Ford was in when he allegedly made these

25  calls.  The language itself can be interpreted one of

1  two ways.  Now, when you have two interpretations that
2  are equally easy to make, neither one has been proved
3  beyond a reasonable doubt.  But in this case, threats
4  against the operator that answered the telephone, that
5  had no beef with Mr. Ford, that had no children, I
6  would submit this language is gender neutral and, if
7  considered at all, should only be considered as
8  additional threats against the President.  There's no
9  case for the White House operator.
10      Now, when you get into what this case is really
11  about, alleged threats against the President of the
12  United States, you understand what the burden is that
13  the state has.  It's proof beyond a reasonable doubt.
14  And that means they have to convince you beyond a
15  reasonable doubt that every element of this offense was
16  knowingly and willfully committed by my client,
17  Mr. Ford.
18      Now, I cross-examined these agents from the stand.
19  And I don't have a lot of reason to doubt the
20  credibility of what they said, because I think they
21  were fairly unbiased in their testimony.  But what did
22  they say?  The agent in charge got a memo from
23  Washington, D.C., that said, "Hey, go out and interview
24  this guy."  The same day, the same day, within hours
25  after these alleged threats had been made, he did that.

1  He went out.

2     What did he do?  He confirmed what the White House

3  operator wrote down on her report, that Mr. Ford was

4  irrational, he was excited, and he was rambling.

5     Not just the resident agent in charge.  The Reno

6  Police Department officer testified to the same thing.

7  He says he tried to talk to him and tried to understand

8  him, but he wasn't making any sense at all.

9     Now, consider, if you will, the fact that the

10  allegations are a threat against the President.

11  According to the agent's testimony, when they go there,

12  after they can calm him down from being irrational,

13  rambling, nonsensical, they're able to elicit what they

14  call a confession from him, that he made the calls,

15  that there was a threat, and that all good Catholics,

16  all religious people, should follow him and help stamp

17  out evil.

18     Even during this alleged confession my client is

19  irrational.  You can tell that from the agent's

20  testimony if you didn't glean it from his own

21  testimony.  But what supports that?  First, every

22  witness the government called, starting with the White

23  House operator through the Secret Service agent and the

24  Reno detective, all testified.  And the thing that

25  really, I think, brings that home more than anything

else is after the alleged confession to a very serious
crime, they don't arrest him.  According to the agent,
it's because he wants to consults with the U.S.
Attorney's Office.  But you heard the facts.  You heard
what he testified to.  He was concerned about the
mental state of Mr. Ford.

     And what did he find out about that?  Well, first
of all, he found out that the next day he was picked up
by the Reno Police Department, but before that
happened, 17 calls to the Secret Service office, 17
calls that were recorded but not kept.  But I'll take
the agent at his word, all 17 were nonsensical, were
rambling, were religious pronouncements by Mr. Ford,
because, ladies and gentlemen, Mr. Ford was in the
midst of a psychotic event exacerbated by drinking.

     You can tell that by the other telephone calls he
made to the Russian Embassy, to the Israeli Embassy, to
the CIA.  This is a man who doesn't remember what he
did at all, because it was a psychotic breakdown.  And
that's what he was arrested for the next morning.  I
won't call it an arrest, because technically it's a
civil commitment.

     The police find somebody on the street who is
rambling incoherent, threatening to take his own life,
they take them in.  He's got to be held at least 72

1    hours until a psychiatrist can make a determination
2    that he's mentally stable enough to be released.  And
3    this is the next morning.  This is a continuing event
4    if you believe the testimony of the agents, that he was
5    rambling, incoherent from the time that they met him
6    through the 17 calls that he made to the Secret Service
7    office right afterwards, through the next morning when
8    he goes to the 7-Eleven and is picked up by the Reno
9    police and taken to the Veterans Hospital to be
10   examined for his mental deficits.
11       What do they come up with?  He's psychotic.  He's
12   having an antisocial diagnosis of schizophrenia.  He's
13   drinking.  They find gallon bottles of vodka in the
14   room.  And Mr. Ford testified, amongst other things,
15   that that's when he drinks, at the end of the month
16   when he sees how much money he has left over.
17       I asked every agent that testified, "Do you know
18   what Mr. Ford's mental state was at the time of this
19   alleged incident?" in other words, the calls.  None of
20   them knew that.  And they couldn't know it, because
21   they weren't there.  But your job is to determine,
22   first of all, do you think he was operating from
23   diminished capacity.  Well, that's clear on the face of
24   the testimony.
25       The doctors at the Veterans Hospital said he was

1   having a psychotic episode.  They put him on Risperdal.

2   They kept him not 72 hours, but they kept him seven

3   days until they could bring him down to a point where

4   he could be safely released.

5       The agents testified he wasn't making any sense at

6   all the day that it happened.  The White House operator

7   testified that he was irrational.  Now, we don't have

8   the context of the rest of the conversation.  It would

9   help you make the determination as to what his mental

10  state was at that time.  Why?  Because they didn't

11  record it and they didn't write any of it down and they

12  didn't bring the Secret Service agent that heard it.

13      That's not Mr. Ford's job to disprove.  He's

14  innocent.  He has the presumption of innocence.  It's

15  the government's job to prove it beyond a reasonable

16  doubt.  And they certainly didn't do it with the

17  testimony from the stand.  The testimony from the stand

18  is the exact opposite.  This was a man in the middle of

19  a psychotic episode when these events took place.

20      Now, Mr. Ford testified, because it's his right to

21  testify.  The judge gave you an instruction on that.

22  And you're to give his testimony the same examination

23  that you would any other witness.  And what was the

24  difference between his testimony and the testimony of

25  the agents?  Clearly, he's mental.  You can hear that

1  from his testimony and from the events surrounding this

2  event, this alleged crime.  He is clearly mental.

3     He was having a psychotic episode according to the

4  VA Hospital, according to the agent's investigation,

5  and according to their observations of him at the time

6  it took place.  That's the testimony.  That's what you

7  have to decide when you decide the question was there

8  diminished capacity.

9     And I would submit, ladies and gentlemen, if he

10 doesn't even remember the conversation, it's difficult

11 for the government to prove beyond a reasonable doubt

12 that he intended that as a threat.  They don't have to

13 prove that it was a reckless statement that he made.

14 They don't have to prove that a reasonable person would

15 have thought that that was a threat.

16    What they have to prove beyond a reasonable doubt

17 is that Mr. Ford made these calls and he made these

18 statements, he at the time had the mental capacity to

19 determine that it was a threat and it's what he wanted

20 to do.  That has clearly not been proved at all in this

21 case, much less beyond a reasonable doubt.  All the

22 testimony indicates that he was not in control of his

23 faculties at the time these alleged threats were made.

24    Now, there's a couple of instructions I wanted to

25 talk about specifically.  And we've talked about Count

1  Two, so I'm going to focus the rest of my argument on
2  Count One.
3      Now, you've seen the indictment.  You've seen that
4  the judge has given you the instruction that he has the
5  presumption of innocence.  He starts not guilty, and
6  the government through their witnesses have to take him
7  to the level of reasonable doubt.  And proof beyond a
8  reasonable doubt has to firmly convince you that every
9  element of this offense has been proven.  And the
10  elements that they have to prove are that he knowingly
11  came in and made this call believing it to be a threat
12  against the President, knowing what he was doing, and
13  made this threat willfully.  That's the essence of the
14  diminished capacity defense.
15      If he was unable to do that at the time the act
16  took place, then it is impossible for the government to
17  prove any of those elements beyond a reasonable doubt.
18  So that's the crux of the issue.  That's what you need
19  to decide.  Does the proof convince you that he had
20  diminished capacity at that time?
21      The government hasn't produced any evidence
22  whatsoever that his capacity was not diminished.  In
23  fact, their witnesses have all supported that
24  proposition.  And you can go back and review their
25  testimony when you think about it.

1    And Mr. Ford doesn't make the rules.  That's a rule

2   as ancient as English common law, that to commit a

3   crime you can't just do the act, you have to willfully

4   and knowingly have the intent to do that.  That's one

5   of the protections in the criminal justice system for

6   people like Mr. Ford who are not like us.  They do have

7   a different world view, and they don't know that

8   they're out of step.

9    In fact, I asked Mr. Ford that.  "Do you consider

10  yourself to be impaired?"  And he had to think about

11  it, and finally he said, "Well, yes, I guess I would

12  be."  But I think you can tell from the tenor of his

13  testimony, he believes the things he was telling you.

14  And the agents reported it that way.  The White House

15  operator reported it that way.

16   Go back and try to think of one shred of evidence

17  that came from that stand that said he does not have

18  diminished capacity.  I can't think of any, but, of

19  course, your recollection of the evidence will be

20  controlling.  But think closely about the questions I

21  asked the agents.  Was he rambling?  Was he incoherent?

22  Was he spouting bible verses?  Did you have some

23  concern about his mental state?  Both of them did.

24  Even the White House operator who answered the phone

25  who only listened to it and only had her notes, that's

1  the only thing she remembers about the conversation.

2  She said he was irrational.

3      When you put that together with all the other

4  testimony, I think it paints a pretty clear picture of

5  his mental state during that timeframe.  He was not

6  able to form the requisite intent.  He was drinking

7  heavily.  He was psychotic.  He was taking Trazodone.

8  And Trazodone and alcohol simply do not mix.  He has a

9  schizophrenic personality disorder.  He has

10 posttraumatic stress disorder.  He believes a lot of

11 things are going on that may or may not be true.

12     This is the evidence that the government has

13 presented and this is the evidence that they ask you to

14 convict on.  Read the judge's instructions.  When you

15 retire, think about it individually, and then see if

16 you can reach a conclusion that my client's diminished

17 capacity was able to keep him from the requisite intent

18 to commit this crime.

19     The government is going to have the ability to come

20 back and close, because they have the burden of proof

21 beyond a reasonable doubt.  And I can tell you what

22 they're going to tell you.  They're going to say, "He

23 did it.  He made the phone call.  Look at the phone.

24 There's five calls to Washington, D.C."

25     Of course, we only know about two, and we only know

1  30 seconds of the two calls that they allege were made.

2  We don't know what the other calls were about.  We

3  don't know if they had any explanation of what his

4  intent was.  We don't know if it would have any bearing

5  on this case whatsoever, because they seem to have just

6  disappeared.

7      But the question is for you to answer individually

8  and then see if you can agree as a group.  And the

9  judge will instruct you, if you have a honest

10  conviction that he was suffering from diminished

11  capacity, that negates the other elements of the

12  offense, the willfulness, the knowing, the fact that it

13  was a real threat.  Then it's your duty to act on that

14  and it's your duty to return with a not guilty verdict.

15  And that's what we'll ask you to do.

16      Thank you very much.

17      THE COURT:  Thank you, Mr. Cameron.

18      Mr. Sullivan, you may conclude the arguments.

19      MR. SULLIVAN:  When you get back in the jury room,

20  as the judge has told you, he's going to give you a

21  package of instructions, the ones that he read to you,

22  the ones that we've been referring to.  I'm not going

23  to refer to the elements again.  I already -- both of

24  us have already talked about the elements for both of

25  the crimes.  But what I would ask you to do is look at

1  both of the crimes, and you will see that there is no

2  requirement that the government have to prove the

3  motive of someone who commits a crime here.  In this

4  case, neither of those two crimes have in those

5  elements the government has the duty to prove why

6  Mr. Ford did what he did.

7      And defense counsel has made a big deal out of the

8  words that were said.  "Well, we don't know who was

9  being threatened.  We don't know this; we don't know

10  that.  We don't know if 'bitch' means a guy or it means

11  a woman."

12      I submit to you that's just nothing but a red

13  herring.  These threats are pretty straightforward.

14  The operator testified that she answered, "The White

15  House."  You immediately hear a female voice.  Whether

16  he -- how he intended to use that word "bitch," who

17  cares.  But the important thing is that he didn't say,

18  "I'm going to blow up Russia," or, "I'm going to do

19  this to so-and-so."  He said, "I am going to kill you.

20  I am going to kill your children."  Not somebody else's

21  children.  Not Obama's children.  "I am going to kill

22  you, bitch.  I am going to kill your children by

23  cutting off their heads."

24      I don't know how much more threatening you can get

25  than that.

1    "I am going to burn -- I'm going to burn you alive.

2  I'm going to bury you alive."

3    Well, we don't have to prove, once again, from the

4  elements that he intended to kill anybody with respect

5  to Count Two.  The threat -- or the only requirement

6  that the government has is that he intended to make a

7  threat to injure the person.  And that I submit is what

8  he did.  He used the word "you."  And when he was

9  talking about the President, "I'm going to kill that

10 president."

11   Defense counsel has made a big issue too about the

12 jury instruction that the judge read to you about

13 diminished capacity.  I'm not going to spend a whole

14 lot of time on it.  I would simply submit to you that

15 simply having some form of mental illness or problems

16 doesn't excuse you from violating the law.

17   What this instruction says is that if you find that

18 he really did not know what he was doing, that he

19 didn't do it knowingly -- and let me just emphasize

20 that instruction.  It's very short.

21   "A threat is knowingly made if the defendant knew

22 and was aware of the threat he made."

23   Keep in mind that two agents testified to you under

24 oath that he admitted, "Yeah, I made the call," and,

25 "Yeah, I made those threats.  And you'd help me out too

1   if you were a good Catholic."

2      "A threat is willfully made if the defendant makes

3   the threat voluntarily and intentionally."

4      Well, there's no testimony or evidence that

5   somebody put a gun to his head and made him do it.  So

6   I submit to you that diminished capacity, yes, could be

7   a defense in certain circumstances.  I would submit to

8   you that all of us at some point in time -- I mean, my

9   kids and my grandkids often accuse me of having a

10   senior moment.  Sometimes my colleagues accuse me of

11   having a senior moment where I just can't remember

12   stuff.

13      I'm not saying necessarily that that's a mental

14   illness.  I'm just saying that we all interact with

15   people in our daily lives.  Some of us do suffer from

16   certain forms of mental illness.  We get obsessed with

17   things.  Maybe we like to gamble too much and it's too

18   much an addiction.  Maybe we like to shop too much.

19   Does that mean that we don't know what's going on

20   around us?  No.  It means you have a problem, but you

21   still can perform daily tasks, you can still do things

22   knowingly.

23      And here I submit to you that the defendant, even

24   though you find when you discuss this case back in the

25   jury room that, yeah, he's kind of strange, he's got

1  some ideas that we don't really understand, but did he

2  know what he was doing?  Did he do this intentionally?

3  I submit to you, yes, he did.  The evidence says he did

4  do it intentionally.

5      And then, finally, I think some of the other

6  evidence -- you will recall that the judge told you

7  that, you know, you have to consider all the evidence

8  and decide what weight to give it.  But consider this

9  too.  Where do you find the number for the White House

10  and call directly to the White House?  You have to be

11  kind of smart.

12      I think in this day and age most of us would agree.

13  I mean, I live by this cell phone.  I think the judge

14  asked you this morning, "Does anybody not have a cell

15  phone here?"  Nobody raised their hands.  Everybody

16  lives by cell phones and computers and iPads.

17      It takes some skill to get on line and figure

18  out -- it's not that hard, but you still have to go in

19  and Google or whatever search engine you're using to

20  figure out, "Okay.  How do I get ahold of the White

21  House?  I want to call up the White House."

22      And you punch it in and you come up with the right

23  number.  Think about that.  The defendant had to do

24  some research there, had to figure that out.  That took

25  some thought and some consideration.  And he talks to

1  the operator and then calls back the same number.

2      One last point that I just want to make and then

3  I'm going to sit down and you guys can decide this

4  case.  One of the instructions -- I'm not going to read

5  the whole thing, but one of the instructions that the

6  judge read to you was how to decide the facts in this

7  case.  And you have to decide who to believe.  You

8  know, do you believe this witness or do you believe

9  this witness or do you believe everything this witness

10  says or part of what they said or none of what they

11  said?

12      One of the things that is in the list there is

13  you're to consider, amongst many things, the witness's

14  interest in the outcome of the case.  I would just ask

15  you to think about that when you consider that the

16  defendant denied and disputed that two sworn law

17  enforcement officers said, "He admitted these things

18  and challenged us to help him carry it out."

19      I mean, the fact that he challenged them to carry

20  it out shows -- is more evidence that it was done

21  knowingly and willfully.  Otherwise, when they showed

22  up at his door and said, "We're here to talk to you

23  about some threats" --

24      "What on earth are you talking about?  I don't know

25  what you -- what?  I didn't make no call; I didn't make

1   no threats."

2        Think about that.  That shows that even though he

3   may have been drinking, he may have some mental issues,

4   he still knew what he was doing.  And I once again ask

5   you to find him guilty as charged on both counts, Count

6   One and Two.

7        Thank you.

8        THE COURT:  Thank you, Mr. Sullivan.

9        That concludes the arguments.  You will have a copy

10  of the instructions in the jury room with you to

11  consult.  In addition, all of the evidence that's been

12  received, and there are not very many exhibits, but

13  those exhibits will be submitted to you in the jury

14  room.

15       At this time -- in a moment I'll have the marshal

16  come forward to take charge of the jury.  Two of you

17  are alternate jurors.  You may recall at the outset of

18  the trial I indicated two of you would be alternate

19  jurors.  Alternates are selected by virtue of the

20  random draw that we had, the order in which you were

21  called as a juror.

22       Alternate jurors are not permitted to go into the

23  jury room and deliberate unless you replace a permanent

24  member of the panel, for some reason that person cannot

25  continue as a juror.  Fortunately for all of you,

1  perhaps unfortunately for the alternates, you're still
2  part of our jury and we do not have a juror to replace.
3      So I'm going to ask the two alternates to pick up
4  anything that they have in the jury room and then come
5  back here, if you have anything, or just remain here,
6  and I'll give you further instruction that you must
7  remain under the direction of the court and you may get
8  called back in case a juror cannot continue.  It's rare
9  that that would happen, but that will be the
10  instruction of the court.
11      And because of the draw, Juror No. -- in fact, to
12  the left, Mr. Weis --
13      Do you know pronounce it Weess or Wiess?
14      ALTERNATE JUROR WEIS:  Weess.
15      THE COURT:  Mr. Weis and Mr. Diaz are our two
16  alternates.
17      So do either of you have anything in the jury room?
18  All right.  Why don't you remain here then, and then
19  I'll have the marshal come forward and I'll give you
20  further instruction.
21      I'll have the marshal come forward to take charge
22  of the jury.
23      And I'll have you start your deliberations.  It's
24  4:15.  I probably will contact you around 5:00 o'clock
25  and see if you want to continue this evening or come

1  back tomorrow morning, and you will make that decision
2  at that time.
3      (The oath was administered to the bailiff.)
4      THE BAILIFF:  I do.
5      THE COURT:  All right.  Thank you.
6      And at that time I'll make the decision on whether
7  or not you should continue your deliberations this
8  evening or come back tomorrow.  It's always my advice
9  that you not continue deliberations into the evening
10  hours, but I'll hear from you.
11      I know one of you has to let your employer know, I
12  think, by 6:00 o'clock this evening whether or not
13  you'll be available tomorrow or not.  So I don't want
14  the fact that I'm going to have you come back in about
15  45 minutes and decide whether to go home or continue
16  your deliberations to have any bearing whatsoever on
17  the length of your deliberations.
18      You should take whatever period of time is
19  necessary to decide this case.  It's very important to
20  the government, it's very important to the defense, and
21  it's very important to you.  So you should take
22  whatever due deliberation is necessary in connection
23  with this case, however long that takes, but at some
24  point later I need to call you back here and we'll find
25  out what we're going to do, whether to stay this

1  evening or come back tomorrow.  And I'll probably do
2  that around 5:00 o'clock or so unless you send me a
3  note before and indicate what you want to do.
4      You may take your notes with you.  You're allowed
5  to look at your notes during the course of your
6  deliberation.  Again, I'm going to ask you to leave
7  your cell phones outside the jury room with the
8  marshal.  And so please take your cell phones out and
9  give them to the marshal.  And they will be given to
10  you then when you're ready to either go home this
11  evening and come back tomorrow or if you reach a final
12  verdict at some point today then you'll get them back
13  after that.
14      Thank you very much for your attention in this
15  case, and I will see you again.  If you send a note out
16  to me, you can simply send a note indicating that you
17  have reached a decision, or you can send a note and say
18  we wish to retire for the evening and come back
19  tomorrow and continue our deliberations, or you could
20  tell me that you're hopelessly deadlocked, or something
21  else, but I will respond to whatever note you send to
22  me.  And if I don't receive anything from you, I will
23  call you back around 5:00 o'clock and we'll discuss
24  whether we stay this evening or come back tomorrow.
25  Thank you.

1    We'll be in recess subject to the call of the jury.

2         (Outside the presence of the jury.)

3    THE COURT:  And I'll talk with both of you in just

4    a moment.

5    All right.  First off, I want to -- you may be

6    seated.  I want to thank both of you for serving on

7    this panel.  It is possible that you'll still be called

8    to serve as a juror and deliberate with the other

9    jurors.  They would have to resume their deliberations

10   and have you be a part of it if a juror could not

11   continue.  So you'll be under the admonition of the

12   court not to discuss this case with anybody or to allow

13   anyone to approach you about the case.

14   I do ask that you make certain that my courtroom

15   deputy has your telephone number where you can be

16   reached, because we may have to call you and bring you

17   back here.  That would apply to tomorrow too if the

18   jury continues to deliberate tomorrow.

19   As soon as we get a verdict from the jury or some

20   resolution from the jury, we'll let you know

21   immediately, and you'll then be discharged from any

22   further obligation in connection with the case, and

23   we'll tell you what happened.  Because I will be

24   calling the jurors back around 5:00 o'clock, I would

25   ask you to stay here.  And you can stay in the rooms

1  right outside the door here and what have you.

2      You can't talk about the case or let anyone talk

3  about the case with you.  But I would perhaps ask you

4  to stay until 5:00 until I know whether the jury is

5  coming back tomorrow or if they're going to continue

6  tonight.  And then I'll give you further instruction.

7  But if they decide to come back tomorrow, then I'm

8  going to release you to go home but subject to being

9  called back tomorrow.  And we have your telephone

10 number to reach you.

11     If they decide they want to continue deliberating

12 tonight, then I'll either discuss with you staying here

13 or having you go ahead and go home tonight but subject

14 to being called tonight in case I have to bring you

15 back here.

16     So, again, it's important that you not discuss this

17 case with anyone.  So you'll be released at this point,

18 not from the orders of the court, but to go ahead and

19 go into the rooms.  My clerk can show you where the

20 rooms are out there where you can stay until 5:00

21 o'clock.  And then I'll call the jurors back at 5:00

22 and we'll make a decision on what to do.

23     Thank you, counsel.  I appreciate it.  Stay in

24 touch.  I will reconvene at 5:00 o'clock if we don't

25 get a note sooner.  I'll let you know so we can come

1  back earlier, and then we'll decide what to do at

2  5:00 o'clock.  Again, it will be my suggestion that

3  they come back tomorrow, but if they say they want to

4  stay this evening and they're all committed to doing

5  that, in all probability I'll make that arrangement and

6  have food brought in to them, but I'll make that

7  decision at 5:00 o'clock.  Thank you very much.  I'll

8  see you back here in about 35 minutes.

9                    (A recess was taken.)

10     THE COURT:  If they come back tomorrow, counsel,

11  would you willing to stipulate that I would have our

12  courtroom deputies simply take roll and make sure

13  they're here and they can proceed with deliberations

14  without having to come into court?

15     MR. SULLIVAN:  Absolutely.

16     MR. CAMERON:  That's fine with me, Judge.

17     THE COURT:  And then we'll let you know if we need

18  to call you in.  Okay.

19                (In the presence of the jury.)

20     THE COURT:  You may all be seated.

21     All right.  The jurors are all present.

22     I think you recall I indicated I would bring you in

23  around 5:00 o'clock and see what your pleasure is,

24  whether you wish to remain here this evening -- and, if

25  so, we can make arrangements to have some food brought

1  in.  I think we order through Jimmy Johns or someplace.

2  Is that where it is?  I don't know.

3      THE CLERK:  Yes.

4      THE COURT:  -- or alternatively come back tomorrow

5  morning.  I would have you come back either at 8:30 or

6  9:00 o'clock tomorrow morning.  My preference is for

7  you to come back tomorrow, because I rarely like to

8  have jurors here in the evening hours deliberating, but

9  certainly I will accommodate you if that is your

10  choice.  So that's really what I need to find out from

11  you, whether or not you wish to come back tomorrow

12  morning or if you wish to stay tonight.

13      Whatever you do, again, I urge you to make certain

14  that you take all the time that's necessary to decide

15  this case and to resolve the case, if you can.  And so

16  the fact that I'm bringing you back in now should have

17  no bearing whatsoever on the speed in which you

18  deliberate or attempt to make a decision.

19      Do you all understand that?  Because I'm willing to

20  accommodate you in any way that will work for you.  So

21  is it your choice to come back tomorrow then or to stay

22  here and continue this evening or is that something you

23  want to go back and talk some more about?

24      JUROR RUDOLPH:  We hadn't decided.

25      THE COURT:  You haven't decided?

1    JUROR RUDOLPH:  We hadn't gotten to that.  We were

2    just getting to it when he knocked.

3        THE COURT:  To talk about that.  Okay.

4        JUROR RUDOLPH:  There were some on yes, some on no.

5    So we hadn't really --

6        THE COURT:  Well, unless you're -- I'll put it this

7    way.  Unless you're unanimous on staying tonight, I'll

8    have you come back tomorrow morning.  I'll just make

9    the decision.  So that's what we'll do.  I don't want

10   to force you to be unanimous about that decision, but I

11   just think it's unfair to be taking a divided vote on

12   whether you stay tonight or not, because it is a

13   hardship on people that don't want to stay in the

14   evening hours, because when you sign up for jury duty,

15   normally you don't anticipate that you could be here

16   for a long time in the evening hours.  So that would be

17   my practice.  And I employ that in all the cases that I

18   have.

19       If all of you wish to stay this evening, then I'll

20   have you stay this evening and we'll make arrangements.

21   And then I would at some reasonable hour release you

22   this evening anyway.  I'm not a judge that keeps people

23   here until 10:00 or 11:00 o'clock at night.  But if you

24   are unanimous in staying, we'll make those

25   arrangements.  If you're not, then I'll have you come

1  back tomorrow morning, and we can start either at 8:30

2  or 9:00 o'clock, whatever is convenient.  Normally we

3  start our court -- except for today when we selected

4  the jury, because of the procedures we had to go

5  through, I normally would start at 8:30 in the morning.

6  If that's too early for a number of you, then we can

7  start at 9:00 o'clock, but I'll make that decision in a

8  few minutes.

9       So go ahead back to the jury room, and then you can

10 let me know in a moment.  I'm not sure I have to call

11 you back in again.  If you decide that you can't all

12 agree that you're going to stay this evening, you can

13 just send a note saying we've decided to go home this

14 evening.  And then if that's the case, I would instruct

15 you all to be back here at 8:30 tomorrow morning.  And

16 make certain that our courtroom deputy, Ms. Rich, has a

17 telephone number to reach you.

18      If one of you does not come back tomorrow morning

19 at 8:30, then I might have to declare a mistrial.  So

20 you all have to be here tomorrow morning at the

21 appointed time so we can start with the deliberations

22 at that point.  Until finally I discharge you, you're

23 still under the control of the court and the admonition

24 that you're not to discuss this case with anyone.  That

25 includes your family members, anyone else.  Just say

1  you're in court, you're on the jury, you've been

2  instructed by the court that you cannot talk about this

3  case.

4      I know I'm a broken record, but you heard me say in

5  all the years I've been on the bench I've never

6  declared a mistrial because of juror misconduct.  One

7  thing that is juror misconduct is to not follow my

8  admonition and talk with somebody about this case or

9  let somebody talk with you about it.  That would be

10  improper.  And if I found out about it, then I would

11  have to declare a mistrial.  So that's a very important

12  instruction from the court.

13      So why don't you go back.  And then if you want to

14  send a note out, you can do that, and then I'll release

15  you until tomorrow morning.  If the note says you want

16  to stay here this evening, then we'll make immediate

17  arrangements to try to get some food, bring it in

18  probably around 6:00 o'clock or 6:15 for you this

19  evening, and you can continue your deliberations

20  tonight.

21      It's been a long day.  You got here really early.

22  And it's not often that we can put a trial on in a day.

23  So there certainly is nothing wrong with coming back

24  tomorrow to continue your deliberations.  And I don't

25  want to compel any of you to be here if you don't want

1  to be here this evening to deliberate.

2      So why don't you go ahead and just either say you

3  want to come back in here again or just send a note out

4  telling me what you want to do.

5      Thank you very much.

6                      (A recess was taken.)

7              (Outside the presence of the jury.)

8      THE COURT:  Counsel, I got a note from one of the

9  jurors, and that may be one of the problems.  She said

10  she doesn't want to be part of the jury.  Okay.  So

11  here's the note.  You can take a look at it.

12      She is the one who had car problems, said that, you

13  know, her husband -- she had to leave at 3:00 o'clock

14  in the afternoon.  She's the one that came in late this

15  afternoon, and that's why we started late.  And now she

16  says she doesn't want to be a part of the jury.

17      I still have two alternates, as you know, here.

18  And I'm inclined to release her and have another

19  alternate in unless any of you have any other ideas

20  about what you want to do.

21      MR. SULLIVAN:  I'll agree to that, Your Honor.

22      THE COURT:  She definitely has had problems about

23  being in this trial from the initial stages.

24      Oh, you got another note?  Let's take a look at the

25  other note.  At least I'm getting a lot of notes.

1     All right.  They've indicated they want to come

2   back at 8:30 tomorrow morning.  My concern is this,

3   that she may not even come back tomorrow morning at

4   8:00 o'clock or 8:30.  And I do have two alternates

5   there that are perfectly willing and prepared, I'm

6   sure, to sit, and I don't want to lose them.

7     So you tell me what you want to do on this.  And I

8   can bring her in here and canvass her, if you want me

9   to do that, but I'll defer to your consideration in

10  terms of what you wish to do at this point.

11    MR. SULLIVAN:  Well, based on what you've

12  described, Your Honor, I don't want to antagonize the

13  poor woman.  I have no problem with substituting one of

14  the alternates.

15    THE COURT:  Mr. Cameron.

16    MR. CAMERON:  Well, I think in the final analysis

17  that may save us some time, Your Honor.  I'm not

18  inclined to have people on a jury that don't want to be

19  there, because verdicts can come back for reasons other

20  than the reasons they're chosen.

21    THE COURT:  So would you both stipulate that she

22  could be excused --

23    MR. SULLIVAN:  Yes.

24    THE COURT:  -- without an additional canvass on why

25  she doesn't want to be here?

1      MR. CAMERON:  I don't really care why she doesn't

2  want to be here, so I would stipulate to that.

3      MR. SULLIVAN:  I'll stipulate to it.

4      THE COURT:  All right.  Let's bring her in.  I'm

5  going to excuse her first.  Then I'll bring the other

6  jurors in.  I'll need to replace her with -- our first

7  alternate juror is Mr. Weis; is that correct?  So I

8  will advise Mr. Weis that he will be replacing her.

9  And her name is --

10      THE CLERK:  Villafana.

11      THE COURT:  -- Ms. Villafana.  I'll bring her in.

12      Could I have the note that she sent in here?  Thank

13  you.

14      If you'll have her take a seat here.

15      Will you take a seat here, please.

16      I got this rather short note from you saying you

17  don't want to be a part of this trial.  I know that you

18  had difficulties on car arrangements and what have you

19  and indicated that you had to leave at 3:00 o'clock

20  this afternoon and then were able to make other

21  arrangements, and then you were late coming this

22  afternoon, so I got the impression you probably didn't

23  want to be a part of the trial.  Counsel has been

24  willing to stipulate to release you as a juror.  And so

25  I'll go ahead and release you.

1      That's what you want; is that correct?

2      JUROR VILLAFANA:  Yes, sir.

3      THE COURT:  I don't think I'm going to release you

4  from our jury pool, though, because I don't know -- you

5  know, maybe you're upset with the jury concept or you

6  don't have time for it.  And that's a shame, but that's

7  a decision you have to make.  There is an important

8  constitutional provision for jury trials.  And it's a

9  shame you've made that decision, but we're going to go

10 ahead and release you and have an alternate replace

11 you.

12     So I'm going to direct the jury commissioner not to

13 take your name off our roll for the two-year period

14 that I'm going to take off for other jurors, but you're

15 released from this case.  You're free to go.  You can't

16 talk with any of the other jurors.

17     So do you have anything in the jury room?

18     JUROR VILLAFANA:  Just my phone.

19     THE COURT:  Pardon me?

20     JUROR VILLAFANA:  Just my phone.

21     THE COURT:  Okay.  Let's go get her phone, and then

22 I want her to go out this way.

23     You might have to go identify what your phone is

24 unless they know.

25     Did you find the phone?

1        Oh, she can get her phone from there.

2        All right.  You're released -- thank you -- from

3   this trial.  I'm sorry you for whatever reason don't

4   care for jury trials, but you're free to go.

5        JUROR VILLAFANA:  May I speak?

6        THE COURT:  Pardon me?

7        JUROR VILLAFANA:  May I say something?

8        THE COURT:  You may if you want to.

9        JUROR VILLAFANA:  It's not that I don't care for

10   jury trials, but in speaking to the other jurors, it

11   just became difficult for me like --

12        THE COURT:  You mean the language is difficult?

13        JUROR VILLAFANA:  No.  Just everyone's opinions.

14        THE COURT:  Okay.  Well, and some people tell me at

15   the outset of a trial that they, you know, have

16   difficulty talking with other people and trying to

17   reach agreement on things.  So if that's a problem you

18   have, you know, I'm sorry that that's a difficulty that

19   you have, but I respect that, so you're released.

20   Thank you.

21        JUROR VILLAFANA:  Thank you.

22        THE COURT:  Now, if you'll go ahead and call in

23   Mr. Weis.  And just have him take a seat in the jury

24   box where Ms. Villafana was.

25        And you're free to go out this way.  Thank you very

1  much.

2      All right.  If you'll take a seat, the third seat

3  in from the front here, Mr. Weis.  And you'll be

4  replacing what we have designated here as Juror No. 12.

5  She has been released.  You're under the same

6  admonition that I've given the other jurors.  And I'll

7  ask the jurors then to start their deliberations anew

8  with you as part of the jury, but we're going to

9  adjourn tonight and it will all start anew tomorrow

10  morning.  All right.  Thank you.

11      Bring all the other jurors back, please.

12      And you can be here tomorrow morning; is that

13  correct?

14      JUROR WEIS:  Yes.

15      THE COURT:  All right.  Thank you very much.

16      I think because of these developments I'm going to

17  ask you to be here at 8:30 tomorrow morning, because,

18  again, I'm going to tell the jurors to start their

19  deliberations anew at 8:30.  And I'll tell them that

20  again tonight, but I think as a matter of precaution we

21  should do that unless you're willing to stipulate that

22  I give them that instruction now.  Then they can start

23  their deliberations first thing tomorrow morning anew

24  with the new juror.

25      MR. SULLIVAN:  I think the last part you just said,

1  give it now.

2      THE COURT:  Would you be willing to accept that?

3      MR. SULLIVAN:  Yes.

4      THE COURT:  On behalf of the defense?

5      MR. CAMERON:  Yes, Your Honor.

6      THE COURT:  Okay.  Fine.  We'll handle that right

7  now then.

8              (In the presence of the jury.)

9      THE COURT:  All right.  You may all be seated.

10      Well, I received two notes, one indicating that you

11  wish to come back tomorrow morning and start your

12  deliberations at 8:30 tomorrow morning.  I'm certainly

13  going to accommodate you on that.

14      When you come back tomorrow morning, you'll simply

15  come back through security and then up here to the jury

16  room.  You're not to discuss this case among yourselves

17  before everybody is here and Ms. Rich has come in and

18  taken the roll to make sure all of you are here.  And

19  then the doors close and then you can start your

20  deliberations.

21      Now, one other thing happened.  One of your jurors

22  ask to be excused as a juror, and I granted the request

23  to be excused.  And that's the reason we have alternate

24  jurors.  I don't have to use our alternates very often,

25  but Mr. Weis is alternate No. 1, and so he now is

1  replacing Juror No. 12, Ms. Villafana, and he will be

2  one of your jurors.

3       And I'm going to direct you at 8:30 tomorrow -- I'm

4  going to direct you now that at 8:30 tomorrow morning

5  you start your deliberations anew.  I know you were

6  only in there for about 20 minutes, but with a new

7  juror you're directed by the court to start your

8  deliberations anew.

9       If you discussed anything up to that point, discuss

10 it with Mr. Weis.  And then you will continue your

11 deliberations as if you were starting anew with the 12

12 of you that are now seated.

13      Do you all understand that and are you all in

14 agreement to do that?

15      All right.  Thank you very much.  It's been a long

16 day.  I appreciate your patience.  You've been very

17 attentive.  Have a nice evening.  Be careful tonight

18 when you drive home.

19      If for some reason somebody has a problem being

20 here at 8:30 tomorrow morning, please get on the

21 telephone and call the number you have, because that

22 will create some additional problems.  I have another

23 alternate, but I don't want to have to use alternates

24 if we don't have to.  So if there's any reason --

25      Now, I understand there's a storm coming in

1  tonight, you know, and we're supposed to get some snow.

2  Who knows how much.  We never know what the

3  forecasters -- how accurate they can be.

4      So if you are going to be late, let us know.  We

5  can still, you know, start the deliberations around

6  9:00 o'clock.  Maybe I ought to just say 9:00 o'clock

7  and give you a little more time in the morning.

8      Is that all right with all of you if we start at

9  9:00 o'clock tomorrow morning?  That way if there is

10 snow on the ground, it gives you a little extra time to

11 get here.  And I don't want to force you to be up at

12 5:00 o'clock in the morning so you can get here.  So

13 let's say we'll meet here at 9:00 o'clock.

14     You'll start your deliberations anew as soon as

15 you're all here and roll is taken.  And then send a

16 note out to me any time during the course of the day

17 tomorrow that you either need further instruction,

18 which I'll try to accommodate you on, or that you've

19 reached verdicts or that you can't agree and you're

20 deadlocked.  So I'll wait and respond on that.  But,

21 again, thank you very much for your patience, and you

22 can start your deliberations anew at 9:00 o'clock

23 tomorrow morning.

24     So we'll see you sometime tomorrow.  Thank you very

25 much.  Have a nice evening.

1      And I would like to have the jurors escorted down,

2  if we could.

3      THE BAILIFF:  Yes, sir.

4      THE COURT:  Okay.  Thank you very much.

5          (Outside the presence of the jury.)

6      THE COURT:  All right.  We'll just be in touch

7  tomorrow morning so that I can get in touch with you

8  and have you come in within, say, a 15-minute

9  notification, if that's all right.  Okay.  I'll see you

10 tomorrow morning sometime or sometime tomorrow.

11     THE CLERK:  Judge, do you want me to let the

12 alternate juror know he can --

13     THE COURT:  Yes.  Let's have the other alternate --

14 you can advise the other alternate juror that he's to

15 stay in touch by making certain that we have his

16 telephone number and he can be reached and we'll let

17 him know what happens.

18     Okay.  Thank you.

19     Thank you very much.  We'll see you tomorrow

20 sometime.

21         (The proceedings were adjourned at 5:20 p.m.)

22                     --o0o--

23

24

25

```
 1   STATE OF NEVADA    )
                        ) ss.
 2   COUNTY OF WASHOE   )

 3        I, LORI URMSTON, Certified Court Reporter, in and

 4   for the State of Nevada, do hereby certify:

 5        That the foregoing proceedings were taken by me

 6   at the time and place therein set forth; that the

 7   proceedings were recorded stenographically by me and

 8   thereafter transcribed via computer under my

 9   supervision; that the foregoing is a full, true and

10   correct transcription of the proceedings to the best

11   of my knowledge, skill and ability.

12        I further certify that I am not a relative nor an

13   employee of any attorney or any of the parties, nor am

14   I financially or otherwise interested in this action.

15        I declare under penalty of perjury under the laws

16   of the State of Nevada that the foregoing statements

17   are true and correct.

18        DATED: At Reno, Nevada, this 6th day of

19   April, 2017.

20

21
                         LORI URMSTON, CCR #51
22
                    _____
23
                         LORI URMSTON, CCR #51
24

25
```